# EXHIBIT "C"

1  **THORNTON DAVIDSON** #166487
   **ROBERT J. ROSATI** #112006
2  2055 San Joaquin Street
   Fresno, California 93721-2717
3  Telephone:    (559) 256-9800
   Facsimile:    (559) 256-9799
4
   Attorneys for Plaintiff,
5  MICHAEL CREMIN

6

7

8

9              UNITED STATES DISTRICT COURT FOR

10             THE NORTHERN DISTRICT OF CALIFORNIA

11                    (OAKLAND DIVISION)

12  MICHAEL CREMIN,                        )    Case No.: C-04-04394 CW
                                           )
13              Plaintiff,                 )    **PLAINTIFF'S OPENING TRIAL BRIEF**
                                           )
14  v.                                     )
                                           )    Date:    December 2, 2005
15  McKESSON CORPORATION EMPLOYEES' )        Time:    10:00 a.m.
    LONG TERM DISABILITY BENEFIT PLAN, )     Crtrm:   2 (4th Floor)
16  LIBERTY LIFE ASSURANCE COMPANY       )   Judge: Honorable Claudia Wilkin
    OF BOSTON                              )
17                                         )
                Defendant.                 )
18  _____)

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. NATURE OF TRIAL

III. THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Plan Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    B.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    C.    Gershengorn's Office Notes/Reports . . . . . . . . . . . . . . . . . . . . . . . . 2
    D.    Karalis' Office Notes/Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    E.    Liberty's Evaluations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    F.    Private Investigator Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV. THE EVIDENCE DEMONSTRATES THAT CREMIN IS TOTALLY DISABLED . . . . . . 12

    A.    The Social Security Administration Award . . . . . . . . . . . . . . . . . . . . . . . . 12
    B.    Failure to Obtain Independent Psychiatric Examination/Reliance on a
         "File Review" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    C.    Inadequate File Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    D.    Liberty's Failure to Solicit Comments on Mirkin's Report From Cremin's Doctors 14
    E.    The Surveillance Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    F.    Care of a Physician . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    G.    The GAF of 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    H.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

V. LIBERTY IS JUDICIALLY ESTOPPED TO DENY THAT CREMIN IS TOTALLY
    DISABLED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    A.    The Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    B.    Principles of Judicial Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    C.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VI. JUDGMENT SHOULD BE ENTERED IN FAVOR OF CREMIN
    AWARDING (1) RETROACTIVE REINSTATEMENT OF BENEFITS;
    (2) PREJUDGMENT INTEREST; (3) ATTORNEY'S FEES
    AND COSTS; AND (4) FUTURE BENEFITS . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    A.    The Proper Remedy is Retroactive Reinstatement of Benefits . . . . . . . . . . 22
    B.    Prejudgment Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    C.    Attorney's Fees and Court Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    D.    Future Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    E.    Calculation of Past Due Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VII. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

i

1

2

3 **<u>TABLE OF AUTHORITIES</u>**

4 *Abram v. Cargill, Inc.*,
         395 F. 3d 882 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14

5

6 *Caldwell v. Life Insurance Company of North America*,
         287 F. 3d 1276 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     25

7 *Coker v. Metropolitan Life Insurance Company*,
         281 F. 3d 793 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     19

8

9 *Cook v. Liberty Life Assurance Co. of Boston*,
         320 F. 3d 11 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     24

10 *Darland v. Fortis Benefits Insurance Co.*,
         317 F. 3d 516 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     22

11

12 *Dishman v. Unum Life Ins. Co. of America*,
         269 F. 3d 974 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     24

13 *Elliot v. Fortis Benefits Insurance Company*,
         337 F. 3d 1138 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     25

14

15 *Elliot v. Sarah Lee Corp.*,
         190 F. 3d 601 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     19

16 *Grosz-Salomon v. Paul Revere Life Insurance Company*,
         237 F. 3d 1154 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     23

17

18 *H2O Houseboat Vacations, Inc. v. Hernandez*,
         103 F. 3d 914 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     18

19 *Hackett v. Xerox Corporation Long-Term Disability Income Plan*,
         315 F. 3d 771 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     23

20

21 *Hamilton v. State Farm Fire and Casualty Co.*,
         270 F. 3d 778 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     21, 22

22 *Harris v. H&W Contracting Co.*,
         102 F. 3d 516 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     18

23 *Helfand v. Gerson*,
         105 F. 3d 530 (9th Cir. 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     21

24

25 *Hummell v. S.B. Rycoff & Co.*,
         634 F. 2d 446 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     25

26 *Jordan v. Northrup Grumman Welfare Benefit Plan*,
         370 F. 3d 869 (9th cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15, 18

27

28 *Kearney v. Standard Insurance Company*,
         175 F. 3d 1084 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

*Kerr v. Charles F. Vattertott & Co.,*
    184 F. 3d 938 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Lang v. Long-Term Disability Plan of Sponsor Applied Remote Technology, Inc.*
    125 F. 3d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Lopes v. Metropolitan Life Insurance Company,*
    332 F. 3d 1, note 9 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Madden v. ITT Long Term Disability Plan, Etc.,*
    914 F. 2d 1279 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mansker v. TMG Life Insurance Co.,*
    54 F. 3d 1322 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*McElwaine v. U.P.S. West, Inc.,*
    176 F. 3d 1167 (9th Cir. 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*New Hampshire v. Maine,*
    532 U.S. 742, 749, 149 L. Ed. 2d 968, 121 S. Ct. 1808 (2000). . . . . . . . . . . . . . . . . . 21

*Newcomb v. Standard Insurance Company,*
    187 F. 3d 1004 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13, 14

*Quinn v. Blue Cross & Blue Shield Association,*
    161 F. 3d 472 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Ratliff v. Celebrezze,*
    338 F. 2d 978 (6th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rissetto v. Plumbers & Steam Fitters Local 343,*
    94 F. 3d 597 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Russell v. Rolfs,*
    893 F. 2d 1033 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wade v. Life Insurance of North America,*
    245 F. Supp. 182 (D. Me. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Walker v. American Home Shield Long Term Disability Plan,*
    180 F. 3d 1065 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Rules

F.R.E. 201(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

iii

# I. INTRODUCTION

_____Plaintiff is Michael Cremin ("Cremin"). Defendant is the Liberty Life Assurance Company of Boston ("the Plan"). Cremin was an employee of McKesson Corporation; he participated in the Plan, which is wholly insured and administered by Liberty Life Assurance Company of Boston. This action is to establish Cremin's right to back benefits and reinstatement of long term disability benefits ("LTD") from the Plan.

# II. NATURE OF TRIAL

The procedure this Court is required to follow is set forth in *Kearney v. Standard Insurance Company*, 175 F. 3d 1084, 1094-1095 (9th Cir. 1999). In this trial on the record "The judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Id.* at p. 1095. In conducting its de novo review this Court does not rely upon or accept the conclusions or findings of the insurance company. Instead, its task is to weigh the evidence and render a decision as to whether or not Cremin is disabled under the Plan's standards. *Newcomb v. Standard Insurance Company*, 187 F. 3d 1004, 1007 (9th Cir. 1999); *Kearney v. Standard Insurance Company*, *supra*, 175 F. 3d at p. 1095.

# III. THE FACTS

A.   Plan Provisions

1.   The Plan defines disability as:

> "'Disability' shall mean any physical or mental condition arising from an illness, pregnancy or injury which renders a Participant incapable of performing work. During the first twenty-four (24) months of Disability, a Participant must be unable to perform the work of his or her regular occupation or any reasonably related occupation, and must not, except as provided in Section 3.4, be performing work or services of any kind for remuneration. After twenty-four (24) months Disability, Participant must be unable to perform the work of any occupation for which he or she is or becomes qualified by training, education, or experience, and, in addition, be receiving Social Security benefits on account of his or her disability." Plan 0065.

2.   The Plan provides that a claimant must be under the regular and continuous care and treatment of a physician, unless such regular and continuous care are not medically indicated given the nature of the disability. Plan-0079.

3.   The Plan could have required that Cremin submit to an examination by a physician

TRIAL BRIEF
CASE NO.: C-04-04394 CW

1   designated by the Plan Administrator. Plan–0083.

2       B.    Procedural History

3   4.    Cremin was hired by McKesson Corporation on October 29, 1977 as a Director of

4   Profitability Analyst. CF-0074.

5   5.    Cremin became disabled from working on January 23, 1998. CF-0490.

6   6.    Cremin was disabled due to coronary artery disease and anxiety disorder. CF-0391.

7   7.    Cremin applied for LTD benefits on September 21, 1998. CF-0391.

8   8.    Cremin was granted LTD benefits effective April 20, 1999. CF-0394.

9   9.    Cremin applied for and, on August 16, 1999, was retroactively granted Social Security

10  Disability benefits effective January 1999. CF-0352-0353.

11  10.    By letter dated October 10, 2002, Cremin appealed the termination of his benefits,

12  explaining, in part: "I have heart disease, suffer regular chest pains, shortness of breath, and lack

13  stamina. Additionally, I suffer from acute anxiety and depression, lack energy and have a great

14  degree of difficulty performing many routine tasks." CF-0137.

15  11.    By letter dated December 6, 2002, Liberty denied Cremin's appeal.

16  12.    By letter dated December 31, 2002, Liberty notified Cremin that the decision to uphold the

17  termination of his benefits was upheld. CF-0083.

18      C.    Gershengorn's Office Notes/Reports

19       Cremin was treated by Dr. Gershengorn, whose notes and reports state:

20  13.    January 23, 1998: "His current stats indicates to me that he needs

21  approximately 2 weeks off from work because of his health. He should then return to work part-time

22  for 2-3 weeks, at which time he will be reassessed regarding further recommendations." CF-0490.

23  14.    May 8, 2001: "Refills–4 Xanax #30. CF-0212.

24  15.    October 15, 2001: "Meds See Med Sheet". CF-0212.

25  16.    December 4, 2001: On Liberty's Physical Capacity's Form, Dr. Gershengorn

26  reported Cremin could physically Sit 8 hours; Stand 2 hours; Walk 1 hour; Squat 0 hours; Bend at

27  waist 0 hours; Kneel 1hour; Climb stairs ½ an hour; Climb ladders 0 hours; On the job driving 4

28  hours; Push/pull/reach AS ½ hour; Reach at Shoulder level 1 hour; Reaching below shoulder level 2;

TRIAL BRIEF
CASE NO.: C-04-04394 CW

1    lift 20-30 pounds six times per day. All of this is in reference to a eight hour day. CF-0269.

2    17.    March 4, 2002: "Meds See med sheet". CF-0214.

3    18.    April 10, 2002: "Plan cont. meds . . . . Meds See meds sheet". CF-0213-0214.

4    19.    June 10, 2002: "Meds See Meds sheet". CF-0213.

5    20.    August 12, 2002: On a Functional Capacities Form from Liberty, Dr.

6    Gershengorn marked the following restrictions: Sitting: 8 hours; Standing: 1/3 to 2/3 of an 8 hour

7    day; Walking: up to 1/3 of an 8 hour day; Driving: 1/3 of an 8 hour day; Squatting, Bending,

8    Kneeling, Climbing, Pushing, Pulling, Reaching, Grasping: Unable to perform at all. Cremin's

9    diagnosis was Acute MI, Coronary Heart Disease, and Angina. Dr. Gershengorn made these

10    restrictions permanent. CF-0169.

11    21.    By letter dated December 21, 2002, Cremin forwarded a December 4, 2002 opinion letter

12    from Dr. Gershengorn. It stated in part:

13        "Michael Cremin worked part-time at McKesson Corporation from
14        January 1997 through August 1998. Subsequently, he was deemed
         disabled by SSDI because of his cardiac condition and anxiety
15        disorder. Mr. Cremin has the exertional limitations indicated on your
         form. However, he also has exertional limits due to his medical
16        conditions. Examples of non-exertional activities that could be
         harmful to him are structured schedules, deadlines, adversarial
17        relationships, and commuting to work." CF-0085.

18        "His condition is stable. He remains on cardiac medications. . . . and
         Xanax, and he remains in therapy for his anxiety disorder. I am
19        unaware of any dramatic improvement in Mr. Cremin's medical
         condition that warrants reversal of the previous decision, which found
20        him to be disabled. 'Major depression/anxiety has been shown to be
         the strongest predictor of adverse outcome (MI, CABG, angioplasty)
21        on patients with coronary artery disease. (Vincent Pons, M.D. TAM
         Program brochure presentation on depression and anxiety.)" CF-0085.

22       D.     Karalis' Office Notes/Reports

23       Cremin was treated by Dr. Karalis, whose notes and reports state:

24    22.    September 10, 1998: "Anxiety disorder." Severe. Earliest return to work date:

25    10/10/98. Class 5. [This is defined as:] Severe limitation of function capacity, incapable of

26    minimum (sedentary) activity (75-100%). Totally disabled. CF-0473.

27    23.    September 21, 1998: "Anxiety, depression, insomnia." Anxiety disorder. Severe.

28    Earliest return to work date: "10/21/98" Class 5. Severe limitation of function capacity, incapable of

---

TRIAL BRIEF
CASE NO.: C-04-04394 CW

1    minimum (sedentary) activity (75-100%). Totally disabled. CF-0512.

2    24.    March 17, 1999: "Anxiety, depression, insomnia." Anxiety disorder. Severe.

3    Earliest return to work date: "4/18/99 earliest." Totally disabled. CF-0392.

4    25.    April 14, 1999: "The 3-12-99 form (attached) reflects the current situation. To

5    update: 1) he came for appointment today 4-14-99; 2) disability is extended to 5-19-99." CF-0388.

6    26.    May 19, 1999: "Anxiety, depression, insomnia." Anxiety disorder. Severe.

7    Earliest return to work date: "6/19/99 at very earliest." Class 5. Severe limitation of function

8    capacity, incapable of minimum (sedentary) activity (75-100%). Totally disabled. CF-0386.

9    27.    June 16, 1999: "Anxiety, depression, insomnia." Anxiety disorder. Severe.

10    Earliest return to work date: 7/19/99. (Very earliest)" Class 5. Severe limitation of function

11    capacity, incapable of minimum (sedentary) activity. (75-100%.) Totally disabled. CF-0369.

12    28.    June 21, 1999:  "Mental Disorder Questionnaire. No assistance needed for keeping

13    appointments, well oriented x 3 alter; thin, good hygiene. Heart attack 10 years ago. Psychiatric

14    symptoms include fear, anxiety, depression. Receiving supportive therapy here. Well educated,

15    happily married, no drug abuse, criminal problems, fearful constricted affect, good intelligent

16    function, mod. severe anxiety, isolation. Can do activities of daily living but very cautious not to

17    physically overstress. More quiet and withdrawn. Can focus attention. Household routines done

18    very cautiously to avoid cardiac probs. Not good adaptation–fearful, anxious, depressed. Currently

19    on heart meds. Anxiety disorder. Poor prognosis. Competent. Totally disabled at least another 3

20    years. CF-0314-0318.

21    29.    June 21, 1999: "Heart attack 10 years ago. Psychiatric symptoms include fear,

22    anxiety, depression. Receiving supportive therapy here." CF-0314. "Fearful constricted affect."

23    CF-0315. "Mod. Severe anxiety. Isolation. Can do [present daily activities], but very cautious to

24    physically overstress." CF-0316. "More quiet and withdrawn. Can focus attention. Household

25    routines done very cautiously to avoid cardiac problems. Not good adaptation. Fearful, anxious,

26    depressed." CF-0317. Cardiac Meds. 300 anxiety disorder. Poor prognosis. . . . Is totally disabled

27    at least another 3 yrs." CF-0318.

28    30.    July 14, 1999:  "Anxiety, depression, insomnia. Anxiety disorder. Severe.

Earliest return to work date: 8/19/99. (Very earliest)"  Class 5.  Severe limitation of function

capacity, incapable of minimum (sedentary) activity.  (75-100%.) Totally disabled." CF-0364.

31.    August 18, 1999: "Anxiety, depression, insomnia.  Anxiety disorder.  Severe.

Earliest return to work date: "9/20/99. (Very earliest)"  Class 5.  Severe limitation of function

capacity, incapable of minimum (sedentary) activity.  (75-100%.) Totally disabled." CF-0357.

32.    September 22, 1999: "Status quo.  Remains anxious and depressed--"blood work"

not encouraging--has been c/o anxiety fatigue.  Feels unproductive and devalued.  Supportive therapy

given." CF-0308.

33.    November 11, 1999: "Anxiety, depression, insomnia.  Earliest return to work date:

2/1/00.  Class 5.  Severe limitation of function capacity, incapable of minimum (sedentary) activity.

(75-100%.)  Totally disabled." CF-0323.

34.    November 24, 1999: "Status quo.  Anxiety, insomnia, depression.  Zing discussed.

Sxt discussed. [illegible].  Increased fear of M.I. attack.  Supportive therapy given." CF-0309.

"Class 5 physical impairment.  Severe limitation of functional capacity: incapable of minimum

(sedentary) activity (75-100%)." CF-0323.

35.    March 6, 2000: "Psychotherapy/prognosis--poor/on cardiac meds only."  Class 5

impairment: Patient has significant loss of psychological, physiological, personal, and social

adjustment (severe limitations).  CF-0309.

36.    May 10, 2000: "Pt. Status quo" from April 10.  "Apprehensive of cardiac problems

or sudden death.  Continues anergic and feeling unproductive.  Supportive therapy given.  Pt. feels as

if every minute might be his last." CF-0253.

37.    March 20, 2001: "Pt. states that his is status quo. . . . Very concerned about sudden

death (cardiac)."  CF-0253. . . . "Axis I: 300./00 Anxiety Disorder; Axis II: None; Axis III: Cardiac

problems (infarctions); Axis IV: personal; Axis V: Current GAF=45." CF-0251.

38.    July 19, 2001: ". . . .Continues having same symptoms as noted in most recent

visits.  Anxious.  Supp. tx. given." CF-0253.

39.    February 5, 2002: "C/O chest pain every day esp. when involved in mild activity;

pain when gardening, carrying light objects, walking briskly, or climbing stairs.  Ongoing fear of

1    dying from a heart attack. Supportive therapy given."

2    40.    February 5,2002: "Attached find clinical notes and his 3-20-01 Zung test-

3    questionnaire. Incorporated by reference find my 3-20-01 Attending Physicians Statement. . . . The

4    info. thereon is current & the document is herein incorporated by reference. The "estimated Return-

5    to-work date" remains "never." As before, the Restrictions Form continues to be "No work at all."

6    The "Axis V" GAF remains 45. Except for these updates, the 3/20/01 Forms remain reflective of his

7    current status." CF-0247.

8    41.    April 11, 2002: "Pt. says he is anergic and depressed and anxious. Says his ongoing cardiac

9    symptoms (chest pains on exertion, etc.). Pt. worried about potential death. Denies suicidality.

10   Supportive therapy given." CF-170.

11   42.    May 22, 2002: "Pt taking "TAM" holistic approach to mental stress control to help C-V

12   disease. Pt. optimistic that he can avoid another MI. Emotion support from ex-wife. Supportive

13   therapy given." CF-0170.

14   43.    August 6, 2002: "Pt. denies suicidality but has been depressed and anergic about being afraid

15   of dying (cardiac). Pt. says he "did the cardiac (TDM) program." When asked if he can do any pt/ft

16   work, he says "I'm either depressed and the medication (cardiac) is a problem. . . . There's no way I

17   can do any work." Supportive therapy given." CF-0172.

18   44.    On October 21, 2002, Cremin submitted a letter from Dr. Karalis in support of his appeal.

19   CF-136. Dr. Karalis' October 18, 2002 opinion letter, stated, in pertinent part, stated:

20            "The Zung depression and an anxiety psychological test was
             administered again on 10-15-02. Pathological test responses included,
21           but not limited to, the following: feeling more nervous and anxious
             than usual; feeling afraid for no reason; feeling like falling apart and
22           going to pieces; rarely feeling things are alright and nothing bad will
             happen; headache, neck, or back pains; feeling down-hearted and blue
23           most or all of the time; trouble sleeping at night; getting tired for no
             reason; some loss of mental clarity; not finding it easy to do things he
24           used to; restless and unable to keep still; not feeling hopeful about the
             future; more irritable than usual; not finding it easy to make decisions;
25           not feeling useful or needed; not feeling life is full; only sometime
             enjoying things he used to." CF-0141.
26
             "I reviewed an 8-12-02 Liberty Mutual form filled out by Kent
27           Gershengorn, M.D., who saw you recently (8-12-02). . . . The *only*
             activity he found "no restrictions" in was "sitting". All the other
28           categories had restrictions, including standing, walking, and driving.

1    There were full restrictions on squatting, bending, kneeling, climbing,
pushing, pulling, reaching, and grasping. In my view, the panoply of
2    restrictions renders you totally disabled for *any* part-or full-time work.
In my experience, patients who attempt job reentry in jobs allowing
3    only "sitting" do not do well, since sitting becomes uncomfortable and
there is often (as with you) an ongoing psychological impairment
4    (concentrating, remembering, analyzing, etc.–commonly called
*cognitive* functions). Thus, I cannot recommend any future job
5    position for you, even if proffered by Liberty Mutual as being limited
to "sitting". CF-0141-0142.

6
    "But, in its 08/30/02 denial letter, Liberty Mutual ignored the
7    psychiatric problems. It took Dr. Gershengorn's 8-12-02 entry of "no
restrictions" on "sitting" and concluded (pg. 2) that, "The functional
8    capacities outlined above from Dr. Gershengorn indicate that you have
sedentary work capacity on a full time basis." CF-0142.

9                                        * * * *

10
    "I reviewed a 08-07-02 The TAM Program letter authored by Sue
11    Laliberte, RNP, TAM Nurse Coordinator. Her letter dovetails with my
findings, stating, 'Psychological screening pre-TAM suggested
12    moderate depression and severe anxiety. . . . I have encouraged Mike
to continue with mental health follow-up as stress and anxiety remain
13    major issues for him. *In fact, obstacles to his cardiac recovery.'*
(italics added)." CF-0142.

14
    "In its 08-30-02 letter denying further compensation, Liberty Mutual
15    states, 'The results of this TSA indicate there are positions for which
Mr. Cremin possesses skills and aptitude that fall within the sedentary
16    physical capacity and do not require directorship or management
responsibilities.' Financial Analyst, Budget Analyst, Economist, and
17    Credit Analyst are mentioned." CF-0142.

18    "However, you do not possess the stabilization of moods and control
of psychiatric symptomology required to have predictably stable
19    cognitive functioning to perform these jobs, which assume full
cognitive functioning. As the Zung testing shows, you lack mental
20    clarity, calmness, decision-making facility, and other cognition needed
to perform in a stable manner." CF-0142.

21
    "A major hazard would occur if you started a new job, failed at it, and
22    then became more depressed." CF-0143.

23    "Addressing the 08-30-02 Liberty Mutual denial letter, specifically
pages 2 and 3 therein, I find it making false assertions which are
24    material to your appeal. I m noted as having said, 'He stated that you
had never been in therapy.' This statement is a falsehood. The same
25    letter goes on to quote progress notes from my charts which *repeatedly*
state "Supportive therapy given." CF-0143.

26    E.    Liberty's Evaluations

27    45.    On March 9, 2002, Liberty's case manager, Heather Carignan, noted in the Claim Notes:

28        "Dr. Karalis provides notes of 7/01 and 2/02 and says EE can 'never'

TRIAL BRIEF
CASE NO.: C-04-04394 CW

7

1    return to work due to anxiety. 'No work at all. GAF is 45.' The case
2    mgr appears that tx is not fequent renough and questions Dr.'s
     assessment of disability prognosis." CF-0072.

3    46.    Susan Leonardos, Liberty's in-house nurse, noted in the MDS Service Note of Liberty's

4    diary, dated March 14, 2002:

5    "Called psychiatrist MD answered the phone right away/ he has not
     prescribed any antidepressants or antianxiety meds for clmnt due to his
6    cardiac condition. D statd that clmnt is improved overall. Z7 that he
     only sees him every few mos. Clmnt has never been in therapy.
7    Explained to MD that to qualify for compensation clmnt has to be in
     active tx & need objective medical info to support lack of function/
8    MD voiced understanding. . . . Discuss with DCM–Refer for IPE if
     DCM agrees. . . . Clmnt not seeing psychiatrist for med management
9    as there are no meds. No objective info to support lack of functional
     activity. If info is needed for psych dx would have OT recommend
10   IPE–cardiologist has given R&L's." CF-180.

11   47.    Liberty's Leonardos noted in an MDS Service Note in Liberty's diary dated March 25, 2002:

12   "Clmnt answered phone-voice very soft-slow monotone. . . . Clmnt
     states that he has no energy- does have chest pain with walking up
13   stairs- has to sit down or lie down- when clmnt was asked about tx
     with psychiatrist- he stated that he sees him sporadically- had cancelled
14   appt with him due to the cardiac testing. Clmnt stated that psych MD
     has given him instruction in how to handle stress. Clmnt stated that he
15   would rather have RN receive info from cardiologist than have him-
     clmnt-try to explain it in amateur terms. . . . Clmnt very vague re: his
16   physical & medical status-does not seem motivated to resume function
     with ER but could be functioning in some other capacity. Need to
17   update medical info to support any further lack of function. . . .
     Discussed case with DCM- told her of clmnts early am phone call form
18   Calif.-the physical file is out of the office being reviewed with all other
     McKesson files- will not be returned to this office for 2 weeks. . . .
19   DCM requested that I close out of this case until file is returned to
     office, nonmedical assessment report is received, medical info from
20   cardiologist is received. Time frame may be 4-6 weeks-DCM will
     then re refer case to RN- for possibility of setting up IPE if needed
21   later." CF-0183-0184.

22   48.    On March 28, 2002, Liberty's B.Silva, noted:

23   "DX: Anxiety disorder. Mininal medical info on file. Recent meds
     form psychiatrist state EE will never be able to work yet EE
24   sporadically treating. EE on no meds other than cardiac. Based on
     medical file how are we able to determine degree in which EE is
25   disabled? Can we close based on lack of treatment (both therapy and
     med management?) CM considering IPE pending 3/02 cardiac stress
26   test. CM assigned surveillance. If no activity recommend
     unannounced field investigator to talk to neighbors and contact EE.
27   EE states day typically spent eating, napping, and tending to dog. EE
     states anxiety surrounding heart condition and fear of another H/A
28   keep him from working. EE able to drive in City (SF?) For an hour.

---

Agree with IPE if unable to close. If findings on IPE recommend in house Dr. Mirkin or Taylor to discuss with Dr. Karalis his rationale for minimal treatment and how he is able to project the future (6/99: EE is TD for at least another 3 years. What was going to happen in 3 years? Most recently Dr. K states EE can never work). Perform internet check on EE. Ask SIU to run license search (Wife is a state licensing staff person). Ask SIU to check Dr. K's credential (licensing, etc.). CF-0068.

49.    On November 6, 2002, Liberty's Joyce DeSimon filled out a Medical Referral Form sent to

Dr. Mirkin M.D., M.B.A., LLC . This form states, in part:

"Claimant has been surveilled and another round of observation has been ordered beginning on this date. Surveillance on tape and in file do show activity that is not already reported by claimant. As claimant is stating his disability is psyche related at this point, I feel comfortable submitting this for your medical review without the new surveillance results. . . .Claimant's psychiatrist, Dr. Karalis, in SF, has been treating the claimant since 1998. However, the claimant is not taking any medications for his conditions of anxiety and depression due to his heart meds (per the patient and the doctor). Doctor states he has been providing 'therapy session" to help the claimant deal with his conditions." CF-0119.

50.    On November 30, 2002, Dr. Peter Mirkin, wrote to Liberty regarding his review of Cremin's

records. He concluded, in part:

"1. The psychiatric information that supports Mr. Cremin's claim that he is unable to perform full-time work in a sedentary occupation consists of subjective symptoms and fears that he has reported to Dr. Koralis, who has taken very little clinical action to manage these claimed symptoms. There is no valid reason not to have used medication, which might even be life-saving if he were significantly depressed. If he had unwarranted fears about his future, then more active psychotherapy treatment should have been instituted because of the increased cardiac risk of unmanaged stress. However, only clinical intervention that Dr. Koralis has taken, according to his records, was to provide what he refers to as supportive therapy. . . . Supportive therapy is not warranted for people who claim overwhelming anxiety that limits their capacity to function." CF-0109.

* * * *

"2. Based on information from his cardiac evaluations and notes of Dr. Gershengorn, there is no indication of imminent threat from his cardiac disease. . . . Since Mr. Cremin is aware of his cardiac status and apparently does not display abnormally cautious behavior, in his daily activities, there does not appear to be any good reason to restrict him from a psychiatric perspective." CF-0109.

* * * *

"3. It is not clear from the records from either Dr. Gershengorn or Dr.

---

TRIAL BRIEF
CASE NO.: C-04-04394 CW

9

Koralis that he had any particular medical event or change in his symptoms that would have led to as sudden increase in his concerns about another myocardial infarct. The major change that resulted in him leaving work appears to have arisen at his job where he was presented with the need to either return to full-time work, change his job or to leave the firm. He appears to have chosen to do the latter." CF-0110.

\* \* \* \*

" In his last paragraph [Dr. Karalis' October 18, 2002 letter], Dr. Koralis accuses Liberty of making false assertions. On 3/14/02 Dr. Koralis apparently spoke with a nurse at Liberty and told her that Mr. Cremin had not been seen since 2/02 and had never been in therapy. He subsequently retracted that statement and indicated that his notes state, "Supportive therapy is given." This notation needs to be placed in the context of Dr. Koralis' stated opinion that Mr. Cremin has significant psychiatric symptoms, i.e., "[does] not possess the stabilization of moods and control of psychiatric symptomology required to have predictability stable cognitive functioning to perform jobs, which assumes full cognitive functioning." If Mr. Cremin is as impaired as described, then his psychiatric treatment does to indicate that this is so because Dr. Koralis has not provided medication to him nor provided intensive psychotherapy. Either or, preferably both of these treatment modalities could have improved his claimed incapacity. Dr. Koralis stated on 3/14/02 that he has not prescribed antidepressant medication because of his cardiac state. This is not a valid reason for not prescribing necessary medication. While SSRI antidepressants have the capacity to elevate digoxin level due to competition for protein binding sites, this risk can be easily accommodated by the available choice of medications as well as by reduction of digoxin dosage. Contrarily there is evidence that post-myocardial infarction patients with untreated or ineffectively treated depression are three times more likely than effectively treated patients to suffer a second myocardial infarct. . . . Therefore, it is not only incumbent on Dr. Koralis to provide effective care for his depression, but it may even be life saving for Mr. Cremin. This presupposes that Mr. Cremin was, in fact, as depressed as he claims, and there is very limited recent evidence of this in Dr. Koralis' notes." CF-0115-0116.

51.    On December 6, 2002, an appeal recommendation from Liberty's Appeal Consultant, Joyce DeSimon, stated:

"Recommendation: Uphold. . . . Claimant is a now 54 y/o male director of profitability services for a large company who has been out of work since 1/27/98 due to anxiety and depression due to Cad. He suffered an MI in 1988, returned to work and worked for several years. At some time in 1997 he went part-time in his occ do to his inability to handle the stress, then (after 7 months) was told he either had to return to work full-time or move to another department. Claimant took a vacation and then filed for disability. He has been paid LTD benefits, reduced by SSD and the California State Plan, sine 7/26/98 until his denial for not TD Any Occ on 9/1/02. Claimant has appealed this decision indicating he cannot work due to anxiety and depression over

1    worrying about 'sudden death' from another MI."

2    "Neither psyche nor cardiac medical information support disability
     from his or any other sedentary occupation."

3

4    "Our claimant was employed in a highly paid occupation which he
     states required him to work long hours.  Based on his Transferable
     Skills Analysis and Labor Market survey, Voc resources were able to
5    identify alternative, gainful occupations to meet his cardiologist's
     restrictions and limitations.  This is coupled with the fact there was no
6    proof that he could not do his own occupation."

7    "File was reviewed by Consulting Psychiatrist who opined there is not
     documented proof of disability from a psyche standpoint."

8

9    "Recommendation: Uphold the claim denial.  Please see uphold letter
     for complete details.  Thank you.  Joyce A. DeSimon."  CF-0101.

10    F.    Private Investigator Reports

11    52.    Liberty had Cremin surveilled by a private investigator for three days in March 2002.

12    The investigator conducted approximately 23 hours of surveillance for which there were

13    approximately nine minutes of videotape of Cremin.  The reported activity was:

14    A.    March 28, 2002: 6:17 a.m.-3:28 p.m.  Entered, exited, drove car and walked.  CF-

15          0237-0239.  (Approximately 9 hours surveillance, 6 minutes videotaped.)

16    B.    March 29, 2002: 4:26 a.m. - 1:30 p.m.  Picked up something from his car, got in and

17          out of his car.  Walked and talked on the phone into his house.  CF-0240-0241.

18          (Approximately 11.5 hours surveillance, 45 seconds videotaped.)

19    C.    March 30, 2002: 5:51a.m. - 2:00 p.m.  Getting in the car, driving, getting out of the

20          car, walking and standing.  CF0241-0243.  (Approximately 11.5 hours surveillance, 2

21          minutes videotaped.)

22    53.    In November, 2002, Liberty had Cremin surveilled by a private investigator for five more

23    days.  Approximately 42.25 hours of surveillance was conducted.  Cremin was videotaped for

24    approximately three minutes.  The reported activity was:

25    A.    November 6, 2002: 6-8 a.m.: Exited house and drove his vehicle.  CF-0088.

26          (Approximately 6.75 hours surveillance, 1 minute videotaped.)

27    B.    November 7, 2002: 6 a.m-12:30 p.m.  Cremin was not observed.  CF-0088.

28          (Approximately 11.5 hours surveillance, no videotape obtained.)

TRIAL BRIEF
CASE NO.: C-04-04394 CW

11

C.    November 8, 2002: 6 a.m.-2 p.m. Cremin came outside, picked up a newspaper and returned to the house. CF-0089. (Approximately 8 hours surveillance, no videotape obtained.)

D.    November 9, 2002: 6 a.m. -2 p.m. Drove to a store then back home. Video of sitting in car, opening door and leaning partially outside his vehicle. Drove and backed up vehicle. CF-0089. (Approximately 8 hours of surveillance, 2 minutes videotape obtained.)

E.    November 10, 2002: 7:30 a.m. - 11:31 a.m. Pickup parked in driveway. Nobody answered the phone or door. CF-0089. (Approximately 8 hours of surveillance, no videotape obtained.)

## IV.  THE EVIDENCE DEMONSTRATES THAT CREMIN IS TOTALLY DISABLED

Can Cremin perform any occupation for which he is become qualified by training, education or experience? No. Cremin's lack of mental capacity to work is beyond reasonable dispute. Cremin's Global Assessment of Functioning Scale of 45 indicates that he is unable to keep a job. This rating is uncontroverted. Cremin's behavior as documented in eight days of private investor surveillance, Liberty's documented conversations with Cremin, medical reports from Cremin's doctors, and the Social Security award, corroborate the conclusion that Cremin simply is not psychologically functional such that he can hold a job. Liberty's conclusion that Cremin is capable of working ignores overwhelming evidence to the contrary and instead relies upon a selective misinterpretation of the evidence, which is analyzed below.

A.    The Social Security Administration Award

Liberty's evaluators never considered the effect or implications of Cremin's Social Security Disability award. At a minimum, it is "one factor the court should consider" in evaluating whether Cremin is disabled. *Calvert v. Firstar Finance, Inc.*, 409 F. 3d 286, 294-295 (6th Cir. 2005). A plan administrator may not arbitrarily disregard the medical evidence proffered by the claimant. *Calvert, supra*, 409 F. 3d at p. 294. Here, neither Dr. Mirkin nor any other Liberty evaluator ever mentions the SSA determination at all, even to discount or disagree with it, which indicates that they may not even have been aware of it. See *Calvert, supra*, 409 F. 3d at p. 296.

1      B.    <u>Failure to Obtain Independent Psychiatric Examination/Reliance on a "File Review"</u>

2      _____The Plan authorizes Liberty to have Cremin examined by a physician of its choice,

3  Plan–0083, did not do so. While Liberty certainly had the right not conduct an independent medical

4  examination of Cremin, its "decision to conduct file review rather than a physical exam [is] just one

5  more factor to consider in our overall assessment of whether Liberty acted in an arbitrary and

6  capricious fashion. Thus, while . . . . Liberty's reliance on a file review does not, standing alone,

7  require the conclusion that Liberty acted improperly, . . . . the failure to conduct a physical

8  examination–especially where the right to do so is specifically reserved in the Plan–may, in some

9  cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert,*

10  *supra,* 409 F. 3d at p. 295.

11      C.    <u>Inadequate File Review</u>

12      _____If the physician's file review is clearly inadequate, that does not support a decision. *Calvert,*

13  *supra,* 409 F. 3d at p. 296. In *Calvert* the physician who conducted the file review made no mention

14  of surgical reports, x-rays, or CT scans in the record; the court of appeal noted that it appeared that

15  he was not even aware that the plaintiff's initial surgery was prompted by an injury and that his

16  report suggested that a functional capacity evaluation might be of some value even though, despite

17  claims to have made a thorough review of the record, he obviously did not in fact review the

18  functional capacity evaluation which had already been done. *Id.* at p. 296. The court also noted that

19  in addition to the foregoing gaps in his report, the reviewing physician did not mention the Social

20  Security Administration disability determination at all, "even to discount or disagree with it, which

21  indicates that he may not even have been aware of it." *Id.* Furthermore, the reviewing doctor, while

22  mentioning the plaintiff's physicians by name, "does not explain why their conclusions that [the

23  plaintiff] suffer from some degree of functional limitation. . . . were rejected out of hand." *Id.*

24      Here, Mirkin did note: (1) Cremin was taking Xanax, CF-0111; and (2) Dr. Gershengorn, CF-

25  0111 (4/20/98 note) and Dr. Karalis (various notes CF-0112-0114) noted that Cremin had anxiety

26  and depression. Nonetheless Mirkin emphasizes that Karalis did not prescribe anti-depressant

27  medication. CF-0115. Given that Cremin was taking Xanax, Mirkin's opinion is unjustified and

28  Liberty should not have relied upon it. As explained in *Abram v. Cargill, Inc.*, 395 F. 3d 882, 887

1   (8th Cir. 2005): "the plan is not free to accept [a medical report] without considering whether its

2   conclusions follow logically from the underlying medical evidence." Here, the conclusion drawn by

3   Mirkin, and relied upon by Liberty was that Cremin was not disabled because he was not taking

4   psychotropic medication. This is directly contradicted by the medical evidence which the Plan and

5   Mirkin had. Since the report and opinions expressed therein are contrary to known evidence, the

6   Plan was unjustified in relying upon it.

7           D.    Liberty's Failure to Solicit Comments on Mirkin's Report From Cremin's Doctors

8           Liberty did not ask Cremin's physicians to review or comment on Mirkin's report. In *Jordan*

9   *v. Northrup Grumman Welfare Benefit Plan,* 370 F. 3d 869, 877-878 (9th cir. 2004) the insurance

10  company got an independent medical evaluation and then sent that evaluation to the plaintiff's

11  physicians so that the plaintiff's physicians could explain why they disagreed; they failed to respond.

12  The Ninth Circuit reasoned that the failure of an employee's physician to respond to inquiries by the

13  plan administrator undermined evidence in the employee's favor and that therefore the court was

14  bound to treat the treating physician's opinions that the plaintiff was disabled as undermined, which

15  is to say less reliable or unreliable. Here, whether or not Liberty was legally obligated to send

16  Mirkin's report to Karalis and Gershengorn for their comments and responses, its failure to do so

17  certainly undermines the credibility and reliability of Mirkin's report and therefore detracts from

18  both Mirkin's opinion and the Plan's decision to terminate benefits based on that opinion.

19          E.    The Surveillance Evidence

20          The March surveillance material was relied upon–inappropriately–to terminate benefits.

21  Liberty concluded–contrary to the evidence –that the March surveillance showed activity that was

22  not already reported by Cremin. Dr. Mirkin was told: "Claimant has been surveilled and another

23  round of observation has been ordered beginning this date. Surveillance tapes in file do show

24  activity that is not already reported by claimant." CF-0119. None of this was true: the surveillance

25  evidence is completely consistent with Cremin's reports.

26          That the March and November surveillance evidence were not relied upon to support the

27  denial of the claim or the denial of the appeal is irrelevant. The surveillance evidence corroborates

28  Cremin's claim. The surveillance evidence shows Cremin doing nothing more stressful than driving

TRIAL BRIEF
CASE NO.: C-04-04394 CW

14

1  his car and/or walking out to his driveway to pick up his newspaper, activities which he reported he

2  could do and which are in no way inconsistent with his disability.

3        On November 6, 2002 at 6:40 a.m. the investigator reported that Cremin ". . . . backed out of

4  the garage. The INSURED did a three point turn around and backed up the Honda partially into the

5  driveway, got out of his vehicle and walked to the garage." CF-0127. What the investigator did not

6  report, and what the videotape shows, is that Cremin parked his car with the front end of the care

7  parked partially in a lane of the traffic when he walked into the garage. On November 9, 2002 at

8  10:09 a.m., the investigator reported that, "The INSURED entered his vehicle and **backed it 150**

9  **feet**, enabling him to turn . . . ." CF-0131. Does a person with normal mental function leave his car

10  parked with the front end partially in a lane of traffic? Or back up a vehicle 150 feet?

11        Cremin was surveilled for three days in March , CP 0237-0243, and five days in November.

12  CF-0088-0089:

13      *     He rarely left his house.

14      *     He never was seen working.

15      *     While driving is not one of his job duties, it is an "activity of daily living." Here,

16  Cremin's driving not only does not support the conclusion that he can work–because driving was not

17  a job duty–but also provides tangible evidence of his lack of mental capacity.

18      F.    Care of a Physician

19      Liberty relied upon claimed lack of care and treatment to terminate benefits:

20      *     March 9, 2002: "Therapy is not frequent enough. CF-0072.

21      *     March 14, 2002: "Psychiatrist has not prescribed medication; claimant has never been

22           in therapy." CF-180.

23      *     March 28, 2002: "On no meds other than cardiac." CF-0068.

24      *     August 30, 2002: "Sees psychiatrist sporadically and is on no psychiatric medication."

25           CF-0158.

26      *     November 6, 2002: " Claimant is not taking any medications for his conditions of

27           anxiety and depression. . . ." CF-0119.

28      *     November 30, 2002 (Mirkin): "No valid reason not have used medication. . . . more

1    active psychotherapy should have been instituted." CF-0109.

2    *    December 6, 2002: "Low intensity of care provided." CF-0104. "Karalis did not use

3    psychotrophic medication." CF-0104.

4    The Plan specifies that a claimant must be under the regular and continuous care and

5    treatment of a physician. CF-0047. Exclusions and limitations include:

6    "(d) an illness or injury for which he or she is not under the regular and
     continuous care and treatment of a physician, unless such regular and
7    continuous care and treatment are not medically indicated given the
     nature of disability;" Plan-0032, 0034.

8    The Plan's conclusion that Cremin was not under such care is unsupported by the evidence

9    and ignores the Plan criteria. Instead, Cremin demonstrates that he was under the regular and

10   continuous care and treatment of physicians. Cremin was under the care of a psychiatrist and the

11   cardiologist. The cardiologist prescribed all the medication, including Xanax. Liberty's evaluators

12   repeatedly criticized the psychiatrist for not prescribing medication–a critique which makes

13   absolutely no sense in light of the fact that the cardiologist was prescribing Xanax. Nothing in the

14   Plan authorizes Liberty to dictate the treatment Cremin received or which of his two doctors

15   prescribed anti-depressant medication.

16   G.    The GAF of 45

17   In his Attending Physician's Statements of 2001 and 2002, Dr. Karalis stated that Cremin's

18   GAF (Global Assessment of Functioning) was 45. There is no reference in Liberty's termination or

19   denial letter, or in the report from Mirkin that addresses the Axis V, GAF of 45. Dr. Karalis scored

20   Cremin's GAF at 45 on March 20, 2001 and then again on February 5, 2002. CF-0251, CF-0247.

21   Cremin must be able to psychologically fulfill the duties of a given occupation. With a GAF of 45,

22   Cremin cannot perform any occupation. Liberty has not addressed or refuted that Cremin has a GAF

23   of 45.

24   A GAF of 45 means "serious symptoms . . . . or any serious impairment in social,

25   occupational, or school functioning (e.g., no friends, unable to keep a job)." See Request for Judicial

26   Notice.

27   Courts routinely take judicial notice of self-evident medical truths. F.R.E. 201(b)(1); H2O

28   Houseboat Vacations, Inc. v. Hernandez 103 F. 3d 914 (9th Cir. 1999): judicial notice taken that to be

1  injurious, carbon monoxide emissions must be contained within an enclosed space; *Ratliff v.*

2  *Celebrezze*, 338 F. 2d 978, 981(6th Cir. 1964): judicial notice taken since it is generally known that

3  spinal fusion operations are dangerous and painful. Scientific principals and authoritative treatises

4  are commonly the subject matter of judicial notice. See, e.g., *Harris v. H&W Contracting Co.*, 102

5  F. 3d 516 (11th Cir. 1996): judicial notice taken that Graves disease is a condition that is capable of

6  substantially limiting major life activities if left untreated by medication. Courts often rely upon

7  undisputed medical principals without officially judicially noticing them. See, e.g., *Lang v. Long-*

8  *Term Disability Plan of Sponsor Applied Remote Technology, Inc.*, *supra*, 125 F. 3d at p. 796: court

9  relied upon an arthritis foundation pamphlet to explain nature and symptoms and possible causes of

10  fibromyalgia: *Walker v. American Home Shield Long Term Disability Plan*, 180 F. 3d 1065, 1067

11  (9th Cir. 1999): court relied upon the same pamphlet regarding nature and symptoms of fibromyalgia;

12  *Supp v. Unum Life Insurance Co. of America*, 390 F. 3d 301, 302-303 (4th Cir. 2004): court relied

13  upon the Merk Manual, a website from the U.S. Department of Health and Human Services and the

14  Institutes of Health, and a website about fibromyalgia to explain lupus and fibromyalgia. Evidence

15  outside the administrative record is admissible to prove conflict of interest.

16       The surveillance records and reports corroborate the GAF of 45: Cremin did nothing.

17  Cremin's March 25, 2002 conversation with Leonardos also corroborates the GAF 45: Cremin spoke

18  in a soft, slow monotone; he was very vague. CF-0183-0184.

19       The Social Security disability determination corroborates the GAF of 45–yet it is never

20  analyzed.

21       Failure to consider or address Cremin's GAF of 45 demonstrates the inherent unreliability of

22  Liberty's analysis and conclusions.

23       H.    Conclusion

24       The evidence demonstrates that Cremin is totally disabled. Liberty's decision was arbitrary

25  and capricious and not support by substantial evidence because:

26       1.    Liberty relied upon selective and incorrect review of the evidence.

27       2.    Liberty did not consider all aspects of Cremin's condition, most notably the GAF

28            score.

3.   Liberty's assessment is based on speculative conclusions from the evidence, most notably the unjustified analysis regarding Cremin's alleged lack of medication to treat his psychiatric condition.

4.   Liberty failed to give any weight to the Social Security award.

5.   Finally, the conclusion that Cremin can perform a "sedentary job" is not logically related to the issues which disable him.  Cremin is not physically incapacitated; he is mentally incapacitated.  The conclusion that he is capable of working because he is not physically incapacitated is a logical fallacy.  The question is whether he is mentally capable of working, not physically capable of working.

## V.  LIBERTY IS JUDICIALLY ESTOPPED TO DENY THAT CREMIN IS TOTALLY DISABLED

Since the Plan receives the benefits of the Social Security award and required Cremin to apply for it, the Plan is judicially estopped to deny Cremin is totally disabled. (This is a different argument than that which was presented in the Motion for Summary Judgment re: Standard of Review.)

Numerous courts, without analysis, have concluded that the determinations are independent and unrelated.  See, e.g., *Madden v. ITT Long Term Disability Plan, Etc.*, 914 F. 2d 1279, 1283-1286 (9th Cir. 1990); *Elliot v. Sarah Lee Corp.*, 190 F. 3d 601, 607 (4th Cir. 1999); *Coker v. Metropolitan Life Insurance Company*, 281 F. 3d 793, 797 (8th Cir. 2002).  Other, courts have held that a Social Security disability benefits decision is relevant evidence but not controlling except in the rare case in which the statutory criteria are identical to the criteria in the Plan.  See, e.g., *Lopes v. Metropolitan Life Insurance Company*, 332 F. 3d 1, note 9 (1st Cir. 2003); *Pari-Fasano v. ITT Hartford Life and Accident Insurance Co.*, 230 F. 3d 415, 420 (1st Cir. 2000).  None of these cases consider or address judicial estoppel; none are dispositive here.

A.   The Facts

_____By letter dated April 20, 1999 the Plan awarded Cremin disability benefits in the amount of $4,655 per month.  CF-0394.

_____By letter dated May 3, 1999 the Plan requested that Cremin apply for Social Security Disability benefits and offered to assist him in the process.  CR-0377-0378.

TRIAL BRIEF
CASE NO.: C-04-04394 CW

18

1      The Plan required Cremin to sign a Social Security reimbursement agreement, which Cremin

2 did on May 22, 1999. CF-0372.

3      By notice dated August 16, 1999 Cremin was awarded Social Security Disability benefits in

4 the amount of $1,455 per month retroactive to January 1999. CF-0352-0353.

5      By letter dated September 21, 1999, the Plan thanked Cremin for sending it a copy of his

6 Social Security award certificate and demanded repayment of overpayment due to that award of

7 $11,640. CF-0347.

8      Cremin repaid the full $11,640. CF-0343-0344.

9      By letter dated December 1, 1999, the Plan acknowledged receipt of the repayment amount.

10 CF-0341.

11      By letter dated December 1, 1999, the Plan notified Cremin that he had completed his "own

12 occupation" coverage under the Plan, but that medical information in his file indicated that his

13 condition prevented him from working in any occupation and in addition he was receiving Social

14 Security Disability benefits and therefore met the requirements of the Plan for continued benefits.

15 CF-0342.

16      Cremin's net benefit after reduction due to Social Security benefits was $3,200 per month.

17 CF-0329.

18      Cremin is eligible to receive this benefit until he attains the age of 65, that is, until December

19 31, 2012. CF-0332.

20      B.    Principles of Judicial Estoppel

21      "Judicial Estoppel, sometimes also known as the doctrine of preclusion of inconsistent

22 positions, precludes a party from gaining an advantage by taking one position, and then seeking a

23 second advantage by taking an incompatible position." *Rissetto v. Plumbers & Steam Fitters Local*

24 *343*, 94 F. 3d 597, 600 (9th Cir. 1996). Judicial estoppel is in equitable doctrine that is intended to

25 protect the integrity of the judicial process by preventing a litigant from "playing fast and lose with

26 the courts." *Russell v. Rolfs*, 893 F. 2d 1033, 1037 (9th Cir. 1990). Judicial estoppel applies to a

27 party's stated position whether it is an expression of intention, a statement of fact, or a legal

28 assertion. *Helfand v. Gerson*, 105 F. 3d 530, 535 (9th Cir. 1997).

1    Absent any good explanation, a party should not be allowed to gain an advantage by litigation

2  on one theory, and then seek an inconsistent advantage by pursuing and incompatible theory. *New*

3  *Hampshire v. Maine*, 532 U.S. 742, 749, 149 L. Ed. 2d 968, 121 S. Ct. 1808 (2000). The doctrine

4  is intended to protect the integrity of the judicial process and to prevent parties from playing fast and

5  loose with the courts. *Id.* at pp. 749-751. Generally, courts consider the following factors in

6  determining whether to apply judicial estoppel; however, they are not inflexible prerequisites. *Id.* at

7  p. 751. First, the pleader's present claim must be clearly inconsistent with its position in an earlier

8  lawsuit. Second, the court in the earlier lawsuit must have accepted the pleader's position so that

9  judicial acceptance of an inconsistent position in the present proceeding would create the perception

10  that either the first or the second court was mislead. Third, the inconsistent position in the present

11  proceeding would give the pleader an unfair advantage or impose an unfair detriment on the

12  opposing party if not estopped. *Id.* at p. 751.

13    Thus, in *Hamilton v. State Farm Fire and Casualty Co.*, 270 F. 3d 778, 785 (9th Cir. 2001)

14  the pleader was judicially estopped from suing an insurer for property losses because he failed to list

15  his claim against the insurer as an asset in an earlier benefits proceeding. It made no difference that

16  the bankruptcy proceeding was dismissed and no bankruptcy discharge obtained. The court reasoned

17  that it was enough that the pleader obtained an automatic stay in the bankruptcy proceeding (an

18  automatic stay) and the bankruptcy court and his creditors may have relied upon and been mislead by

19  his failure to disclose this asset.

20    That the Plan was not a party to Cremin's Social Security proceedings does not preclude

21  application of the doctrine of judicial estoppel. The Plan is the primary beneficiary of that claim: it

22  gets all the money except the COLA. Thus, before the Social Security Administration the Plan in

23  effect argued and certainly benefitted from the argument that Cremin was incapable of performing

24  his own job or any other job for which he is reasonably fitted by education, training, experience and

25  age. Once the Plan got the benefit of that determination it now claims in this proceeding that Cremin

26  is capable of performing not only his own job but also other jobs for which he is reasonably fitted by

27  education, training, experience and age.

28    In *Darland v. Fortis Benefits Insurance Co.*, 317 F. 3d 516, 529-530 (6th Cir. 2003) the

TRIAL BRIEF
CASE NO.: C-04-04394 CW

1    court addressed this issue. There, the Plan requested that the beneficiary apply for Social Security

2    Disability benefits so as to reduce the amount of monthly disability payments that it paid the

3    beneficiary under the Plan. The court explained:

4        "Although Fortis claims that the statutory criteria and factors
         considered by the SSA may be markedly different from the criteria and
5        factors considered by an insurer in determining whether a claimant is
         disabled, it is plainly evident that the Social Security standard for a
6        disability determination is much more stringent than that required by
         Fortis' insurance policy. Moreover, after the SSA determined. . . that
7        Darland was totally disabled. . . ., Fortis then requested the Darland
         reimburse it for over payment of insurance benefits, even though Fortis
8        terminated payment of disability benefits to him under its policy. . ."
         *Id.* at page 530.
9
     The *Darland* court concluded:
10
11       " It is totally inconsistent for Fortis to request that Darland apply for
         Social Security Disability benefits, yet avail itself of that Social
12       Security determination regarding disability and contend, at the same
         time, that he is not disabled. (Citation) While not directly applicable in
         this case, the principles of judicial estoppel certainly weigh against
13       Fortis taking such inconsistent positions."

14       In *Poweragent v. Electronic Data Systems*, 338 F. 3d 1187 (9th Cir. 2004) the court held that

15   judicial estoppel applied to a successful argument presented in an arbitration proceeding. In

16   *Poweragent* the court explained that the doctrine of judicial estoppel is "the principal that a litigant

17   may not benefit by making directly contradictory arguments regarding the same dispute in different

18   tribunals." *Id*. at p. 1192. In *Poweragent* the plaintiff formidably urged to the arbitrators to decide

19   arbitribility and asserted their authority to do so. The court explained that they "cannot await the

20   outcome and, after an unfavorable decision, challenge the authority of the arbitrators to act on that

21   very issue." *Id*. at 1192.

22       C.    Analysis

23       Here, the Plan is judicially estopped from denying that Cremin is totally disabled because it

24   required him to pursue a collateral claim, he prevailed on that collateral claim, the Plan benefitted

25   from his receipt of benefits. In this context, the Plan's position is similar to any insurance company

26   which pays benefits to its own insured due to the tort of another: it can pursue subrogation rights

27   against a third party or submit a lien against its own insured's recovery against the third party; either

28   way, it is bound by the results of the litigation with the third party: it cannot say in litigation with the

TRIAL BRIEF
CASE NO.: C-04-04394 CW

1    third party that the third party was liable and in collateral litigation with its own insured that its

2    insured was liable. Cremin and the Plan "won" the Social Security Disability claim by establishing

3    that Cremin was totally disabled. The Plan cannot now claim that Cremin is not totally disabled.

4    **VI.  JUDGMENT SHOULD BE ENTERED IN FAVOR OF CREMIN**
**AWARDING (1) RETROACTIVE REINSTATEMENT OF BENEFITS;**
5    **(2) PREJUDGMENT INTEREST; (3) ATTORNEY'S FEES**
**AND COSTS; AND (4) FUTURE BENEFITS**

6

7        A.    The Proper Remedy is Retroactive Reinstatement of Benefits

8            In *Grosz-Salomon v. Paul Revere Life Insurance Company*, 237 F. 3d 1154, 1163 (9th Cir.

9    2001) the Ninth Circuit held: "a Plan administrator will not get a second bite at the apple when its

10   first decision was simply contrary to the facts." Instead, "retroactive reinstatement of benefits is

11   appropriate in ERISA cases where, as here, but for the insurer's arbitrary and capricious conduct,

12   [the insured] would have continued to receive the benefits or where there [was] no evidence in the

13   record to support a termination or denial of benefits." *Id.* at p. 1163, quoting *Quinn v. Blue Cross &*

14   *Blue Shield Association*, 161 F. 3d 472, 477 (7th Cir. 1998). See also: *Zervos v. Verizon New York*

15   *Inc.*, 277 F. 3d 635, 648: "a remand of an ERISA action seeking benefits is inappropriate where the

16   difficulty is not that the administrative record was incomplete but that a denial of benefits based on

17   the record was unreasonable; *Hackett v. Xerox Corporation Long-Term Disability Income Plan*, 315

18   F. 3d 771, 775-777 (7th Cir. 2003): in determining the remedy a court should distinguish between an

19   initial decision to deny benefits and a decision to terminated benefits previously granted; the remedy

20   should return the Plaintiff to the status quo at the time the defendant made its decision; therefore,

21   when a court concludes that a decision to terminate benefits was defective a return to the status quo

22   would be a continuation of benefits from the time of termination; *Cook v. Liberty Life Assurance Co.*

23   *of Boston*, 320 F. 3d 11, 23-25 (1st Cir. 2003): Liberty argued that there was no evidence of the

24   Plaintiff's disability status after it terminated the Plaintiff's benefits and therefore no basis for

25   awarding benefits past that date. The court rejected that argument reasoning, "the absence of

26   information about [the Plaintiff's] disability status resulted from Liberty's arbitrary and capricious

27   termination of her benefits. As a recipient of disability benefits, Cook was under a continuing

28   obligation to adduce proof of her disability pursuant to the long term disability Plan. Once Liberty

1    terminated her benefits, she was no longer obligated to update Liberty on her health status. It would

2    patently unfair to hold that an ERISA Plaintiff has a continuing responsibility to update her former

3    insurance company and the court on her disability during the pendency of her internal appeals and

4    litigation, on the off chance that she might prevail on her lawsuit. Moreover, as the district court

5    notes in its decision, reconstruction of the evidence of disability during the years of litigation could

6    be difficult for a recipient of long term disability benefits wrongfully terminated from a Plan."

7        In *Cook*, as in other cases, the court concluded that once the plaintiff is reinstated to benefits,

8    the plaintiff would be obligated to prove continuing eligibility for benefits and if the plaintiff could

9    not do so or if the plan acquired sufficient evidence to contradict the plaintiff's doctor's opinions, the

10    Plan could pursue termination of eligibility for benefits at that time.

11        That is the case here. The proper remedy is reinstatement of benefits from date of

12    termination (August 2002).

13        B.     Prejudgment Interest

14    _____ Cremin is entitled to prejudgment interest at an equitable rate. *Dishman v. Unum Life Ins.*

15    *Co. of America*, 269 F. 3d 974, 988 (9ᵗʰ Cir. 2001). Many courts have used an interest rate based on

16    the post-judgment rate of interest. *Kerr v. Charles F. Vattertott & Co.*, 184 F. 3d 938, 945-946 (8ᵗʰ

17    Cir. 1999); *Mansker v. TMG Life Insurance Co.*, 54 F. 3d 1322, 1331 (8ᵗʰ Cir. 1995). Others have

18    used an "equitable rate." *Dishman, supra*, 269 F. 3d at p. 588; *Caldwell v. Life Insurance Company*

19    *of North America*, 287 F. 3d 1276, 1286-1288 (10ᵗʰ Cir. 2002). Cremin submits that 5% is an

20    equitable rate.

21        C.     Attorney's Fees and Court Costs

22    _____ Cremin is entitled to an award of attorney's fees incurred prosecuting this action. *Dishman v.*

23    *Unum Life Ins. Co., supra*, 269 F. 3d at pp. 987-988. In order to determine the appropriateness of an

24    award of fees, this Court should generally consider five factors:

25        1.     The degree of the opposing party's culpability or bad faith;

26        2.     The ability of the opposing party to satisfy an award of fees;

27        3.     Whether an award of fees would deter others from acting under similar

28             circumstances;

4.      Whether the party requesting fees sought to benefit all participants and beneficiaries

of an ERISA plan or to resolve a significant legal question regarding ERISA;

5.      The relative merits of the parties' positions. *Hummell v. S.B. Rycoff & Co.*, 634 F. 2d

446, 453 (9th Cir. 1980).

These factors should be "liberally construed in favor of protecting participants in employee

benefit plans." *McElwaine v. U.P.S. West, Inc.*, 176 F. 3d 1167, 1172 (9th Cir. 1999). "Successful

plaintiffs in ERISA suits should ordinarily recover fees unless special circumstances would render

such an award unjust." *Elliot v. Fortis Benefits Insurance Company*, 337 F. 3d 1138, 1148 (9th Cir.

2003).

Here, Cremin should be awarded reasonable attorney's fees pursuant to motion and statutory

court costs pursuant a timely filed cost bill.

D.      Future Benefits

The judgment should order Defendant to pay future benefits–beginning January 2006, until

and unless Defendant properly determines that Cremin is no longer entitled to such benefits under

the terms of the Plan. It is established that Cremin is not entitled to judgment awarding the present

value of future benefits. *Wade v. Life Insurance of North America*, 245 F. Supp. 182, 188-189 (D.

Me. 2003).

E.      Calculation of Past Due Benefits

As stated above, Cremin is entitled to equitable prejudgment interest. Cremin  submits that

5% per year is an equitable rate and has calculated past-due benefits based on that.

The chart below sets forth the calculations for benefits and interest through December 2005,

using Cremin's net monthly benefit (gross benefit minus initial Social Security Disability award:

Back Benefit
Calculation

|          | 2002 | 2003 | 2004 | 2005 |
|----------|------|------|------|------|
| January  |      | 3200 | 3200 | 3200 |
| Interest |      | 466.59 | 306.63 | 146.64 |
| February |      | 3200 | 3200 | 3200 |
| Interest |      | 453.26 | 293.30 | 133.31 |
| March    |      | 3200 | 3200 | 3200 |

|  |  |  |  |  |
|---|---|---|---|---|
| Interest |  | 439.93 | 297.97 | 119.98 |
| April |  | 3200 | 3200 | 3200 |
| Interest |  | 426.60 | 266.64 | 106.65 |
| May |  | 3200 | 3200 | 3200 |
| Interest |  | 413.27 | 253.31 | 93.32 |
| June |  | 3200 | 3200 | 3200 |
| Interest |  | 399.94 | 239.98 | 79.99 |
| July |  | 3200 | 3200 | 3200 |
| Interest |  | 386.61 | 226.65 | 66.66 |
| August | 3200 | 3200 | 3200 | 3200 |
| Interest | 557.99 | 373.28 | 312.32 | 53.33 |
| September | 3200 | 3200 | 3200 | 3200 |
| Interest | 544.66 | 359.95 | 199.99 | 40 |
| October | 3200 | 3200 | 3200 | 3200 |
| Interest | 531.33 | 346.62 | 186.66 | 26.67 |
| November | 3200 | 3200 | 3200 | 3200 |
| Interest | 493.25 | 333.29 | 173.30 | 13.33 |
| December | 3200 | 3200 | 3200 | 3200 |
| Interest | 479.92 | 319.96 | 159.97 | 0 |

Sub-Total: benefits        16000 38400   38400 38400
Sub-Total: interest        2607.15 4719.30 2799.72 879.88
Sub-Total Benefit      $131,200
Sub-Total Interest     $11,006.05

Total:            $142,206.05

## VII. CONCLUSION

Judgment should be entered in favor of Plaintiff in the amount of $142,206.05 for past

benefits through December 2005 ordering that benefits should be reinstated effective January 2006,

and granting Plaintiff court costs and attorneys fees according to motion.

Dated: October 21, 2005

_____        ROBERT J. ROSATI
                                        Attorney for Plaintiff,
                                        MICHAEL CREMIN

TRIAL BRIEF
CASE NO.: C-04-04394 CW