EXHIBIT "D"

1  PAMELA E. COGAN (SBN 105089)
   KATHRYN C. CURRY (SBN 157099)
2  ERIN A. CORNELL (SBN 227135)
   ROPERS, MAJESKI, KOHN & BENTLEY
3  1001 Marshall Street
   Redwood City, CA  94063
4  Telephone:    (650) 364-8200
   Facsimile:    (650) 780-1701
5
   Attorneys for Defendant
6  LIBERTY LIFE ASSURANCE COMPANY OF
   BOSTON
7

8               UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10                  OAKLAND DIVISION

11

12 MICHAEL CREMIN,                    CASE NO.  C 04-04394 CW

13              Plaintiff,             **LIBERTY LIFE ASSURANCE COMPANY
                                       OF BOSTON'S OPPOSITION AND CROSS
14 v.                                  MOTION FOR JUDGMENT**

15 McKESSON CORPORATION               **[Fed.R.Civ.P. 52]**
   EMPLOYEES' LONG TERM
16 DISABILITY BENEFIT PLAN,           Date:        December 2, 2005
   LIBERTY LIFE ASSURANCE            Time:        10:00 a.m.
17 COMPANY OF BOSTON,                 Judge:       Hon. Claudia Wilkin

18              Defendants.

19

20

21

22

23

24

25

26

27

28

LIBERTY'S OPPOSITION AND CROSS-MOTION
FOR JUDGMENT PURSUANT TO F.R.C..P. 52
CASE NO.  C 04-04394 CW

*(left margin, vertical)* Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | STATEMENT OF FACTS | 1 |
| | A. BACKGROUND | 1 |
| | B. CREMIN SUBMITS A CLAIM FOR DISABILITY BENEFITS | 2 |
| | C. RECORDS FROM DR. KARALIS AND DR. GERSHENGORN | 2 |
| | D. CREMIN'S CLAIM FOR LONG TERM DISABILITY BENEFITS IS APPROVED | 3 |
| | E. LIBERTY BECOMES THE CLAIMS ADMINISTRATOR FOR THE PLAN | 4 |
| | F. CREMIN REPORTS HE CAN PERFORM THE ACTIVITIES OF DAILY LIVING | 5 |
| | G. DR. GERSHENGORN STATES CREMIN CAN RETURN TO WORK | 6 |
| | H. LIBERTY OBTAINS ADDITIONAL INFORMATION FROM CREMIN | 6 |
| | I. LIBERTY RECEIVES UPDATED RECORDS FROM DR. KARALIS | 7 |
| | J. MEDICAL REVIEW BY LIBERTY'S MANAGED DISABILITY SERVICES UNIT | 7 |
| | K. LIBERTY CONTINUES TO MONITOR THE CLAIM | 8 |
| | L. LIBERTY LEARNS ABOUT DR. KARALIS' QUESTIONABLE CREDENTIALS | 8 |
| | M. LIBERTY REQUESTS UPDATED INFORMATION FROM DR. GERSHENGORN | 8 |
| | N. LIBERTY TALKS TO DR. KARALIS AGAIN | 9 |
| | O. LIBERTY RECEIVES A COMPLETED FUNCTIONAL CAPACITY FORM FROM DR. GERSHENGORN AND RECORDS FROM DR. KARALIS | 9 |
| | P. CREMIN'S CLAIM IS DENIED AND PLAINTIFF APPEALS | 10 |
| | Q. LIBERTY REQUESTS A PSYCHIATRIC PHYSICIAN REVIEW | 11 |
| | R. LIBERTY UPHOLDS THE DENIAL OF CREMIN'S CLAIM FOR BENEFITS | 12 |
| III. | THE MCKESSON PLAN | 13 |
| IV. | LEGAL ARGUMENT | 13 |
| | A. PLAINTIFF HAS NOT MET HIS BURDEN OF PROOF TO SHOW THAT HE IS "DISABLED" WITHIN THE MEANING OF THE MCKESSON PLAN | 13 |
| | B. THERE WAS NO EVIDENCE OF DISABILITY AFTER SEPTEMBER 1, 2002 | 14 |
| | 1. Dr. Gershengorn's Records and Opinions Do Not Support Disability | 14 |

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

- i -

LIBERTY'S OPPOSITION AND CROSS-MOTION
FOR JUDGMENT PURSUANT TO F.R.C.P. 52
CASE NO. C 04-04394 CW

**TABLE OF CONTENTS**
(continued)

Page

2.   Dr. Karalis' Opinions and Records Are Insufficient to Support A Finding That Plaintiff Could Not Work After September 1, 2002 ............17

3.   Dr. Mirkin's Report Is Competent Evidence That Plaintiff Was Not Disabled ..............................................................................................19

4.   Dr. Mirkin's Opinions Should Be Given More Weight.............................20

5.   The Surveillance Reports Are Not Evidence of Total Disability .............21

C.   PLAINTIFF WAS NOT DISABLED UNDER THE MCKESSON PLAN..........21

D.   THE SOCIAL SECURITY AWARD IS NOT EVIDENCE OF DISABILITY ....................................................................................................22

E.   JUDICIAL ESTOPPEL HAS NO APPLICATION HERE...................................23

F.   LIBERTY WAS NOT REQUIRED TO OBTAIN AN IPE ..................................24

G.   THE APPROPRIATE REMEDY, IF ANY, IS REMAND...................................26

V.   CONCLUSION..............................................................................................................26

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1

## TABLE OF AUTHORITIES

2

### FEDERAL CASES

3    Alessi v. Raybestos-Manhattan, Inc.,
        451 U.S. 504, 101 S. Ct. 1895, 68 L. Ed. 2d 402 (1981)............................................24
4

5    Black & Decker Disability Plan v. Nord,
        538 U.S. 822, 123 S. Ct. 1965 .................................................................................22

6    Boomis v. Metropolitan Life Insurance Co.,
        970 F. Supp. 584 (E.D. Mich. 1997)........................................................................22
7

8    Boyd v. Trustees of United Mine Workers Health and Retirement Fund,
        873 F.2d 57 (5th Cir. 1989) ....................................................................................23

9    Butler v. Marvin Shoemaker,
        73 F. Supp. 2d 1069 (D.Ore. 2001) .........................................................................15
10

11   Cini v. The Paul Revere Life Insurance Co.,
        50 F. Supp. 2d 419 (E.D. Pa. 1999).........................................................................22

12   Darland v. Fortis Benefits Insurance Co.,
        317 F.3d 516 (6th Cir. 2003) ...................................................................................24
13

14   Dym v. Provident Life and Accident Insurance Co.,
        19 F. Supp. 2d 1147 (S.D. Cal. 1998)......................................................................22

15   Elmore v. Cone Mills Corp.,
        23 F.3d 855 (4th Cir. 1995) ....................................................................................16
16

17   Firestone Tire & Rubber Co. v. Bruch,
        489 U.S. 101 (1989)................................................................................................16

18   Gallo v. Amoco Corp.,
        102 F.3d 918 (7th Cir. 1996), cert. denied,
19      521 U.S. 1129, 138 L. Ed. 2d 1031, 117 S. Ct. 2532 (1997)......................................26

20   Hamilton v. State Farm Fire & Casualty Company,
        270 F.3d 778 (9th Cir. 2001) ...................................................................................23
21

22   Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan,
        349 F.3d 1098 (9th Cir. 2003) ...................................................................................1

23   Jones v. Aetna U.S. Healthcare,
        136 F. Supp. 2d 1122 (C.D. Cal. 2001) ....................................................................15
24

25   Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869 (9th Cir.
        2004  ....................................................................................................................24

26   Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,
        63 F. Supp. 2d 1145 (C.D. Cal. 1999) ..............................................................24, 25
27

28   Madden v. ITT Long Term Disability Plan,
        914 F.2d 1279 (9th Cir. 1990) .................................................................................22

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Miller v. United Welfare Fund,
        72 F.3d 1066 (2nd Cir. 1995) ...................................................................26

Miller v. Metropolitan Life Ins. Co.,
        925 F.2d 979, 985 (6th Cir. 1991).) .......................................................24

Mizzell v. Paul Revere Life Insurance Co.,
        118 F. Supp. 2d 1016 (C.D.Cal. 2000) ...................................................15

Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan,
        46 F.3d 938 (9th Cir. 1995) ..............................................................15, 15

Moskowite v. Everen Capital Long Term Disability Income Plan,
        2005 U.S. Dist. LEXIS 20842 (N.D. Cal. 2005) ....................................24

Rissetto v. Plumbers & Steamers Local 343,
        94 F.3d 597 (9th Cir. 1996) .....................................................................23

Russell v. Paul Revere Life Insurance Co.,
        288 F.3d 78 (3rd Cir. 2002) ...............................................................21, 22

Russell v. Rolfs,
        893 F.2d 1033 (9th Cir. 1990) .................................................................23

Sabatino v. Liberty Life Assur. Co.,
        286 F. Supp. 2d 1222 (N.D. Cal. 2004) ..................................................14

Smith v. Prudential Insurance Co. of America,
        2005 U.S. Dist. LEXIS 2000 (D.N.J. 2005) ...........................................25

Taft v. Equitable Life Assurance Society,
        9 F.3d 1469 (9th Cir. 1994) .....................................................................15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

# I. **INTRODUCTION**

This ERISA action arises out of the discontinuation of long term disability benefits to plaintiff Michael Cremin ("Cremin") under the McKesson HBOC, Inc. Employees' Long Term Disability Plan ("McKesson Plan") after September 1, 2002. By Order dated October 3, 2005, the Court ruled the applicable standard of review to be applied is *de novo*. The purpose of *de novo* review is to determine whether the claimant was entitled to disability benefits under the terms of the plan based on the evidence before the plan administrator. (Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan, 349 F.3d 1098, 1110 (9th Cir. 2003).) Here, plaintiff is not entitled to judgment in his favor, because he has not and cannot prove that he was "disabled" within the meaning of the McKesson Plan after September 1, 2002.

The <u>only</u> evidence Cremin asserts supports his claim of disability are: (1) the Social Security Award rendered four years earlier, (2) Dr. Karalis' GAF scores on March 20, 2001 and February 2002, long before benefits were discontinued; and (3) the video surveillance showing Cremin performing the activities of daily living. None of these factors are sufficient proof of disability <u>after September 1, 2002</u>. Accordingly, plaintiff has not met his burden of proof that he was "disabled" within the meaning of the McKesson Plan.

# II. **STATEMENT OF FACTS**

## A.    **BACKGROUND**

Plaintiff began working at McKesson Corporation ("McKesson") in 1980 and by 1986 he was promoted to Director of Profitability Analyst. (Ex. C to McGee Decl. previously filed by Liberty in support of its Cross Motion for Partial Summary Judgment, pp. CF-300, CF-0486.)[1] In 1988, he had a heart attack. (CF-0546.) Thereafter, Cremin returned to work <u>full-time</u> as a Director of Profitability Analyst <u>for ten years</u> until he left due to alleged anxiety on or about January 26, 1998. (CF-0456.) Cremin returned <u>two weeks later</u> on February 10, 1998, working part-time (four to six hours a day). (CF-0561.) Although Cremin's cardiologist released him to return to work full time in May 1998, Cremin continued to work part time. Seven months later, in September 1998, Cremin was told by McKesson that he had to return to work full-time or move

---

[1]    Hereinafter all references to Exhibit C shall be referred to as "CF."

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    to another department. (CF-0118.) Thereafter, on or about September 8, 1998, Cremin took a

2    personal leave of absence, went on vacation, and then filed a claim for disability. (CF 445, CF-

3    0118, CF-0456, CF-0539.)

4    **B.    CREMIN SUBMITS A CLAIM FOR DISABILITY BENEFITS**

5         On September 21, 1998, Cremin submitted a claim for long-term disability benefits under

6    the McKesson Plan. Although he stated his claim was based on coronary artery disease and

7    anxiety, and his attending physician was identified as cardiologist, Kent Gershengorn, M.D. (CF-

8    0539), the accompanying Physician's Statement was completed by Dr. Karalis, a psychiatrist, on

9    September 10, 1998. (CF-0541.) Dr. Karalis diagnosed Cremin only with severe anxiety

10   disorder. (CF-0541.) On October 6, 1998, Preferred Works (the McKesson Plan's claims

11   administrator) received another Physician's Statement completed by Dr. Karalis on September 21,

12   1998, indicating Cremin's estimated return to work date was October 21, 1998. (CF-0512.)

13        In October 1998, Preferred Works also received copies of Doctor's Certificates completed

14   by Dr. Gershengorn on <u>February 4, 1998</u> and <u>April 23, 1998</u> -- more than six months <u>before</u>

15   Cremin stopped working at McKesson. (CF-0504.) On February 4, 1998, Dr. Gershengorn

16   indicated Cremin could return to work on February 16, 1998, which he did part time.[2] (CF-0504.)

17   **C.    RECORDS FROM DR. KARALIS AND DR. GERSHENGORN**

18        In October 1998, Preferred Works received the following office notes from Dr. Karalis:

19   •    Dr. Karalis first saw Cremin on September 9, 1998, <u>the day after Cremin stopped</u>
          <u>working at McKesson.</u> The office note indicated Cremin had a heart attack ten
20        years earlier and had allegedly been anxious ever since. <u>Cremin felt</u> he was totally
          unable to work. (CF-0499.)
21
22   •    On September 21, 1998, Dr. Karalis reported Cremin was doing self-relaxation
          and was feeling better. Cremin had mild resistance, however, because <u>he felt</u> it
          was so hard to work at an anxious level. (CF-0499.)
23
24        On or around October 1998, Preferred Works also received the following office notes and

25   test results from Dr. Gershengorn dating back to January 1997. (CF-0480 to CF-0498)

26   •    On January 24, 1997, Cremin reported he was feeling well but had recently
          developed back and hip pain. (CF-0485.) [Cremin was still working full-time.]
27
28   •    <u>In June 1997 Cremin began taking Xanax for sleep.</u> (CF-0484.) Also in June

---

[2] Cremin returned to work part-time on February 16, 1998.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1997, Cremin stated he was feeling well and had begun a formal exercise program. He had no chest pain currently. (CF-0485.) [Cremin was working full-time.]

- In an undated office note, Dr. Gershengorn reported Cremin complained of chest pain and tightness on 12 occasions that would last for about 10 minutes. Cremin had increased stress due to a recent burglary and fire at his home. His coronary artery disease was stable but Cremin still had high periods of stress. (CF-0483.)

- On January 23, 1998, Cremin's treadmill exercise tolerance test was negative for myocardial ischemia at 91% predicted heart rate. Cremin had good functional capacity. (CF-0496.) [Three days later Cremin left work due to anxiety.]

- On February 9, 1998, Dr. Gershengorn reported Cremin's recent problems appeared to be stabilized and he could now return to work for 6 hours a day, 3 days a week. (CF-0488.) [A week later, on February 16, 1998, Cremin returned to work part-time working 4 to 6 hours a day.]

- On or around March 1998, Dr. Gershengorn noted Cremin had returned to work part-time. Although Cremin's cholesterol levels were elevated, his anxiety was better and he would be able to return to full-time work by May 1998. (CF-0482.)

- On August 4, 1998. Dr. Gershengorn noted Cremin spoke with McKesson about changing his work situation. He was feeling well in his current 20-hour work week schedule, but he was still under stress. He had no chest pain. (CF-0480.)

After receipt and review of the medical records, Preferred Works continued to investigate Cremin's claim and received periodic Physician's Statements from Dr. Karalis. (CF-0414, CF-0433, CF-0452, CF-0460.) His diagnosis remained the same throughout -- severe anxiety disorder. (CF-0465.) The "objective finding" was identified as "anxious." (CF-0465.) The "subjective findings" were identified as "anxiety, depression, insomnia, etc." (CF-0465.) Dr. Karalis continued to list the same diagnosis and findings in the Physician Statements, but kept extending Cremin's return to work date. (CF-0414, CF-0433, CF-0452, CF-0460.)

## D.    CREMIN'S CLAIM FOR LONG TERM DISABILITY BENEFITS IS APPROVED

On April 20, 1999, Preferred Works approved Cremin's claim for long term disability. (CF-0394 to CF-0395.) Cremin was advised that if he remained totally disabled for 24 months, his benefits would continue only if objective medical evidence showed he was prevented from performing any occupation for which he was reasonably qualified by training, education and experience. Cremin was requested to apply for Social Security disability, which he did on May 21, 1999. (CF-0394, CF-0374.) On August 16, 1999, the Social Security Administration sent Cremin an award letter approving his claim in the amount of $1,455 per month. (CF-0352.) Only

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   the Award letter was provided to Preferred Works.  No other information was provided regarding

2   the basis for the award or the medical documentation that was submitted in support thereof.

3          On December 13, 1999 Preferred Works received another Physician's Statement,

4   completed by Dr. Karalis on November 24, 1999.  (CF-0323.)  The estimated return to work date

5   was now February 1, 2000.  (CF-0323.)

6   **E.     LIBERTY BECOMES THE CLAIMS ADMINISTRATOR FOR THE PLAN**

7          On January 1, 2000, Liberty Life Assurance Company of Boston ("Liberty") became the

8   Claim Administrator for the McKesson Plan and took over the handling of Cremin's claim.  (CF-

9   0325.)  Liberty reviewed all medical records and continued to monitor plaintiff's claim, including

10  periodically requesting updated medical information from his treating physicians.

11         On March 10, 2000, Liberty received a Restrictions Form and an Attending Physician's

12  Statement ("APS") completed by Dr. Karalis on March 6, 2000.  (CF-0301 to CF-0303.)  Dr.

13  Karalis reported he only saw Cremin "as needed" for his diagnosis of anxiety disorder (CF-0301)

14  and he last saw Cremin on March 6, 2000.  Although Dr. Karalis was asked to identify specific

15  restrictions and limitations, Dr. Karalis simply wrote, "totally disabled."  (CF-0301.)  Under

16  "objective medical findings" Dr. Karalis wrote, "anxiety, depression, agitation."  (CF-0301.)  Dr.

17  Karalis reported **no** physical impairment or cardiac impairment.  (CF-0303.)  Dr. Karalis reported

18  Cremin had a Class 5 mental impairment, indicating significant loss of psychological,

19  physiological, personal, and social adjustment.  (CF-0303.)  Dr. Karalis, however, specifically

20  noted Cremin's only medication was his cardiac medication.  (CF-0303.)

21         Dr. Karalis also provided office notes for the period October 15, 1998 to March 6, 2000.

22  The notes were very brief, indicating only that Cremin remained anxious and fearful of sudden

23  death for which Dr. Karalis provided "supportive therapy."  (CF-0304 to CF-0309.)

24         On March 10, 2000, Liberty received a Mental Disorder Questionnaire that had been

25  completed by Dr. Karalis eight months earlier on June 21, 1999.  (CF-0314 to CF-0318.)  Dr.

26  Karalis indicated in this report that Cremin had a fearful, constricted affect, moderate severe

27  anxiety and isolation, but good intellect function.  (CF-0315.)  Cremin could perform daily

28  activities but was careful not to overstress himself physically.  (CF-0316.)  Although Dr. Karalis

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   never treated plaintiff while he was working, he reported Cremin did not have good adaptation to

2   work or work-like situations because he was fearful, anxious and depressed. (CF-0317.) Dr.

3   Karalis' diagnosis on June 21, 1999 was anxiety disorder with a poor prognosis. (CF-0318.)

4   Although Dr. Karalis indicated he was providing supportive therapy only as needed and Cremin

5   could perform daily activities, he concluded without explanation that Cremin was "totally

6   disabled <u>for at least another 3 years</u>." (CF-0318, emphasis added.)

7   **F.    CREMIN REPORTS HE CAN PERFORM THE ACTIVITIES OF DAILY LIVING**

8        On May 9, 2000, Liberty received an Activities Questionnaire completed by Cremin.

9   (CF-0296 to CF-0298.)  Cremin reported he was able to perform the activities of daily living as

10  well as performing most of the household activities, except cooking, washing floors or cleaning

11  bathrooms.  He was able to drive and travel by bus or plane.  The number of times he left the

12  house in a day or week varied.  He sometimes went to the mall or to a friend's house or a

13  restaurant.  He was not able to pursue his hobbies.  He slept one to four hours each night and

14  <u>occasionally</u> took a nap during the day.[3]  He reported he could walk three miles for one hour <u>but</u>

15  <u>he was not able to participate in an exercise program</u>.[4]  His daily routine was to get up, feed and

16  walk the dog, get dressed, eat, listen to the radio, walk the dog again, eat and then going to bed.

17       Liberty continued to monitor and investigate the claim, including requesting updated

18  medical records and forms from Dr. Karalis and Dr. Gershengorn. (CF-0220; CF-0224; CF-0260

19  to CF-0262; CF-0276; CF-0292 to CF-0294.)  On March 27, 2001, Liberty received an updated

20  APS and a Mental Status Functional Capacities form. (CF-0279, CF-0282.)  Dr. Karalis reported

21  he last saw Cremin on March 20, 2001, the day the form was completed (CF-0279.)  His primary

22  diagnosis of anxiety disorder and his prognosis remained the same. (CF-0279.)  The treatment

23  plan continued to be only "psychotherapy as needed." (CF-0282.)  In response to the question

24  asking Dr. Kiralis to identify restrictions and limitations, Dr. Karalis simply wrote, "no work at

25  all." (CF-0281.)  In response to the question asking him to identify the bases for the various

26  restrictions and limitations, Dr. Karalis wrote, "totally disabled." (CF-0280.)  <u>Dr. Karalis again</u>

27

28  [3] Cremin later claimed he slept 18 hours a day, including a two hour nap. (CF-0257 to CF-0259.)
    [4] Liberty later learned Cremin was able to exercise and had injured his ankle while doing so.  (CF-0015.)

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    noted there was no cardiac impairment. (CF-0282.)  Although Dr. Karalis specifically

2    acknowledged Cremin's condition had "not worsened while in treatment here" (CF-0281),

3    without any explanation he changed the estimated return to work date as "never" (CF-0279.)

4         Between February 2001 and May 2001, plaintiff saw Dr. Karalis only twice. (CF-284.)

5    **G.    DR. GERSHENGORN STATES CREMIN CAN RETURN TO WORK**

6         On December 17, 2001, after numerous requests for information, Liberty finally received

7    updated medical information from Dr. Gershengorn including a completed Physical Capacities

8    form and office notes. (CF-0016, CF-0269 to CF-0275.)  In the Physical Capacities form

9    completed on December 4, 2001, Dr. Gershengorn specifically indicated Cremin **could work**

10   **eight hours in a workday**. (CF-0269.)  Cremin could sit for eight hours per day with routine

11   breaks, stand for 2 hours, walk or kneel for one hour, climb stairs for half an hour and perform on

12   the job driving for 4 hours in an 8-hour workday. He could not squat, bend at the waist or climb

13   ladders. Further, he could push, pull and reach above the shoulder for half an hour. He could

14   reach at shoulder level for 1 hour and below shoulder level for 2 hours in an 8-hour workday and

15   could lifting and carry 20 to 30 pound range, 6 times a day. (CF-0269.)  Dr. Gershengorn also

16   provided office notes for visits on July 21, 2000; February 26, 2001; May 8, 2001; September 17,

17   2001; October 15, 2001; and October 30, 2001. (CF-0270 to CF-0271; CF-0274.)

18   **H.    LIBERTY OBTAINS ADDITIONAL INFORMATION FROM CREMIN**

19        On February 4, 2002, Cremin returned an updated Activities Questionnaire to Liberty.

20   (CF-0257 to CF-0259.)  In contrast to Dr. Gershengorn's statements, Cremin reported he was able

21   to walk or sit for only one hour. He now claimed he took two hour naps during the day and he

22   spent 16 hours each day in bed. He was able to drive for one hour. He left the house only two to

23   three times each week and one to two times on the weekends and went to the mall once a year.

24   He went outdoors three to four times a week. He also reported he was unable to exercise or

25   pursue his hobbies.[5]  Also in direct contravention of Dr. Gershengorn's opinions that he could

26   work full time, Cremin claimed he could not to perform his own or any occupation because of

27   job-related stress that caused anxiety, which created heart-related problems. (CF-0258.)

28   _____
     [5]  Cremin subsequently reported to Liberty several days later that he had injured his ankle while exercising.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    On February 7, 2002, Liberty called Cremin and spoke with him about his claim. (CF-

2    0015.) Liberty told Cremin that based on the information it had recently received from Dr.

3    Gershengorn, he was not disabled from a cardiac perspective and at this point the only issues

4    potentially restricting him from working was his anxiety and depression. Liberty then asked

5    Cremin about his plans to return to work. He responded that <u>he had been thinking about returning</u>

6    <u>but had torn some ligaments in his ankle while exercising</u> and he was just getting over that injury.

7    Cremin also told Liberty during the conversation that he was undergoing cardiac testing at the end

8    of the month and would provide Liberty with the results. (CF-0015.)

9    **I.    LIBERTY RECEIVES UPDATED RECORDS FROM DR. KARALIS**

10    On February 7, 2002, Liberty requested updated information from Cremin's psychiatrist,

11    Dr. Karalis. Dr. Karalis responded on February 13, 2002 by providing an APS and office notes.

12    (CF-0247 to CF-0254.) In the APS, Dr. Karalis simply referred back to his March 20, 2001 APS

13    stating it was an accurate reflection of Cremin's current status. (CF-0247.) Cremin's estimated

14    return to work date remained "never." (CF-0248.) Dr. Karalis reported he continued to provide

15    Cremin with only therapy "as needed." (CF-0248.) <u>Over the last year Cremin had seen Dr.</u>

16    <u>Karalis only three times</u> – on March 20, 2001, July 19, 2001 and February 5, 2002. (CF-0247.)

17    **J.    MEDICAL REVIEW BY LIBERTY'S MANAGED DISABILITY SERVICES UNIT**

18    On March 9, 2002, Liberty sent the claim file to its Managed Disability Services Unit

19    ("MDS") for a medical review. (CF-0014; CF-0246; CF-0229.) Susan Leonardos, R.N. reviewed

20    the medical records (CF-0246) and concluded there was no objective evidence from Dr. Karalis to

21    support his restrictions and limitations on Cremin's functional mental capacity. (CF-0229.)

22    On March 14, 2002, Nurse Leonardos telephoned Dr. Karalis to discuss Cremin's

23    condition. During the conversation, Dr. Karalis confirmed he had <u>not prescribed any</u>

24    <u>antidepressants or anti-anxiety medications</u> due to Cremin's cardiac condition. During the

25    conversation, Dr. Karalis also reported <u>Cremin's overall condition was improved</u>, that he only

26    saw Cremin every few months and that he had never been in therapy. (CF-0228.)

27    On March 25, 2002, Nurse Leonardos called Cremin to discuss his claim. Cremin

28    reported he had undergone an angiogram ten days earlier, but he was unable to relay any

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

- 7 -

1  information regarding its findings, except that he had "blockages." Cremin told Nurse Leonardos

2  to contact Dr. Gershengorn for more precise information. He had an appointment that week with

3  Dr. Gershengorn to discuss the results and a treatment plan. Cremin stated he had no energy and

4  suffered chest pains when walking up stairs. <u>Cremin confirmed he only saw his psychiatrist</u>

5  <u>sporadically.</u> Based on their conversation, Nurse Leonardos' assessment was that Cremin was not

6  motivated to return to work at McKesson but could function in some other capacity. (CF-0227.)

7  **K.    LIBERTY CONTINUES TO MONITOR THE CLAIM**

8        On April 11, 2002, Liberty received an investigative report for surveillance conducted on

9  March 28, March 29 and March 30, 2002. (CF-0233 to CF-0243.) On March 28, 2002, Cremin

10  was seen leaving his residence and driving to a grocery store and fabric store in Daly City. He

11  was seen entering and exiting his vehicle, walking and driving in a normal and natural manner.

12  On March 29, 2002, Cremin was seen retrieving an object from his car, entering and exiting his

13  car and walking into and out of his residence while talking on the phone in a normal and natural

14  manner. On March 30, 2002, Cremin was seen driving to a private residence in San Francisco,

15  again entering and exiting his car, walking, standing and driving in a normal and natural manner.

16  **L.    LIBERTY LEARNS ABOUT DR. KARALIS' QUESTIONABLE CREDENTIALS**

17        On May 7, 2002, Liberty learned the State Medical Board had put Dr. Karalis on

18  probation and that he had completed his probation on June 9, 1998 – only three months before he

19  began treating plaintiff. Dr. Karalis had also been a member of the State Bar of California, but

20  was put on probation on November 20, 1990 due to <u>Medicaid fraud</u>. He completed this probation

21  in 1995 and voluntarily resigned on November 10, 1997. (CF-0215.)

22  **M.    LIBERTY REQUESTS UPDATED INFORMATION FROM DR. GERSHENGORN**

23        On May 7, 2002, Liberty requested updated medical information from Dr. Gershengorn.

24  In this letter, Liberty stated that Dr. Gershengorn had previously indicated Cremin was capable of

25  working an eight hour day and he had the ability to sit for 8 hours, stand for 2 hours, walk for 1

26  hour, climb stairs for one-half hour with routine breaks and lift up to 30 pounds six times a day.

27  (CF-0224.) Almost three months after its initial request for the information and after several

28  follow-up requests, Liberty finally received a response from Dr. Gershengorn on July 30, 2002.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   (CF-0186 to CF-0214.)  Dr. Gershengorn did not return the Functional Capacities form as

2   requested, and only sent medical records and office notes from May 8, 2001 to June 10, 2002.

3   Laboratory tests from February 22, 2002 showed Cremin's blood pressure decreased from 140/87

4   to 123/74 and his oxygen saturation was 100%. There were no significant EKG changes from

5   baseline or suggestive of Dipyridamole induced ischemia. (CF-0189.) On March 11, 2002

6   Cremin underwent an examination that showed his lungs were clear bilaterally.  His heart size

7   and mediastinal contours were normal and no infiltrates were noted. (CF-0191.)  Blood tests on

8   June 17, 2002 demonstrated he had only an <u>average risk</u> for cardiac problems. (CF-0198.)

9   **N.    LIBERTY TALKS TO DR. KARALIS AGAIN**

10          On August 6, 2002, Nurse Leonardos again spoke with Dr. Karalis.  Dr. Karalis told her

11  he had not seen Cremin for a few months and <u>there had not been an appointment since February</u>

12  <u>2002</u>. When asked about a possible return to work, Dr. Karalis again noted he had not seen

13  Cremin.  Dr. Karalis told Nurse Leonardos that <u>he was not saying that Cremin could not return to</u>

14  <u>work and agreed that Cremin may very well have sedentary capacity.</u> (CF-0175.)

15  **O.    LIBERTY RECEIVES A COMPLETED FUNCTIONAL CAPACITY FORM
        FROM DR. GERSHENGORN AND RECORDS FROM DR. KARALIS**

16          After two requests on May 7, 2002 and July 5, 2002, Liberty finally received a Functional

17  Capacities form completed by Dr. Gershengorn on August 12, 2002. (CF-0169, CF-0220, CF-

18  0224.) No restrictions were given for sitting.  Cremin could stand for 1/3 to 2/3 of the day.  He

19  could also walk up to 1/3 of the day.  There were restrictions for more physical types of activities

20  and these restrictions were based on Cremin's positive stress test. (CF-0169.)  Dr. Gershengorn

21  wrote "unknown" in response to the question "Estimated return to work date." (CF-0169.)[6]  He

22  was last treated by Dr. Gershengorn on August 12, 2002 – the date of form was completed – and

23  his next appointment was in three months. (CF-0169.)

24          On August 13, 2002, Liberty received updated office notes from Dr. Karalis. (CF-0170 to

25  CF-0172.)  Despite Dr. Karalis' representations to Susan Leonardos on August 7, 2002 that he

26

27  ─────────────
    [6]  The fact that Dr. Gershengorn stated he did not know when Cremin would return to work **is not
28  equivalent to a statement that Cremin cannot return to work**, especially in light of the restrictions and
    limitations identified by Dr. Gershengorn.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   had not seen Cremin since February 2002, the office notes appeared to document contacts,

2   perhaps by phone or perhaps office visits, on April 11, 2002, May 22, 2002, and August 6,

3   2002—the day before Nurse Leonardos spoke to Dr. Karalis. (CF-170 to 172.) The office note

4   for February 5, 2002, indicated Cremin was complaining of chest pain everyday, especially when

5   he was involved in any mild activity. He had an ongoing fear of dying from a heart attack and

6   supportive therapy was given. On April 11, 2002, Cremin reported was still fearful of sudden

7   death and supportive therapy was again given. On May 22, 2002, Cremin reported he was taking

8   a TAM holistic approach to mental stress control to help his cardiovascular disease and was

9   optimistic that he could avoid another heart attack. On August 6, 2002, the day before Susan

10  spoke with Dr. Karalis, Cremin stated, "I'm either depressed or the medication (cardiac) is a

11  problem. There is no way I can do any work." (CF-0172.) After reviewing the updated

12  information, Nurse Leonardos concluded Cremin should be able to perform sedentary work. (CF-

13  0005.) The medical information from Dr. Gershengorn appeared to support sedentary activity

14  and the records from Dr. Karalis did not support a finding of disability. (CF-0005 )

15       Liberty then requested that a Transferable Skills Analysis and Labor Market Survey be

16  performed, which it received on August 23, 2002. (CF-0165 to CF-0166.) Several vocational

17  alternatives were identified that were consistent with Cremin's reasonable medical restrictions

18  and limitations, his education, work experience and skills. These occupations fell within the

19  sedentary work category. (CF-0166.)

20  **P.    CREMIN'S CLAIM IS DENIED AND PLAINTIFF APPEALS**

21       On August 30, 2002, Liberty sent Cremin a letter denying his claim for long term

22  disability benefits after September 1, 2002 because it had determined he was capable of

23  performing the material and substantial duties of several other occupations for which he was

24  reasonably suited by education, training and experience. Therefore, he did not meet the definition

25  of disability beyond August 31, 2002. (CF-0156 to CF-0161.) A copy of the Transferable Skills

26  Analysis and Labor Market Report was enclosed with Liberty's denial letter. (CF-0159.)

27       Cremin then requested a copy of his claim file, which was sent to him on September 13,

28  2002. (CF-0144, CF-0155.) On October 15, 2002, forty five days after the denial, Liberty

LIBERTY'S OPPOSITION AND CROSS-MOTION
FOR JUDGMENT PURSUANT TO F.R.C.P. 52
CASE NO. C 04-04394 CW

1    received Cremin's request for an appeal of Liberty's decision. The letter contained no additional

2    medical information but stated it would be sent as soon as possible. (CF-0154.) Liberty then

3    transferred the entire claim file to its Appeal Review Unit on October 18, 2002 for an independent

4    review. (CF-0145.) On October 21, 2002. the appeal review consultant requested Cremin submit

5    objective medical evidence to substantiate that he was disabled from any occupation and any

6    other information he believed would support his claim. (CF-0149.) On October 21, 2002,

7    Liberty also sent plaintiff a copy of the McKesson plan pursuant to his request (CF-0144) and

8    requested copies of the surveillance videos to send to Cremin. (CF-0151.)

9        On October 24, 2002, Liberty received a letter from Cremin along with a letter from Dr.

10    Karalis dated October 18, 2002. (CF-0140 to CF-0143.) Dr. Karalis disagreed with Liberty's

11    determination that Cremin was not totally disabled. (CF-0141 to CF-0143.) No information from

12    Dr. Gershengorn was included with the letter. After receiving Dr. Karalis' letter, which

13    contradicted his last conversation with Liberty wherein he stated he did not know whether

14    plaintiff could work, Liberty referred the claim to a psychiatrist to review the information in the

15    file and comment on Dr. Karalis' opinions and treatment. (CF-0118.) On November 6, 2002,

16    Liberty sent Cremin a letter advising that his claim was being referred for a further medical

17    review and assessment, and, the response was expected within 20 business days. (CF-0138.)

18        On November 21, 2002, Cremin informed Liberty for the first time that his cardiologist

19    was not in agreement with Liberty's decision to terminate his disability benefits. (CF-0134.)

20    Cremin stated he was sending additional medical information. (CF-0134.) Liberty informed him

21    he needed to provide the additional information as soon as possible. (CF-0134.) On November

22    22, 2002, Liberty received a second surveillance report. (CF-0124 to CF-0133.) Surveillance

23    was conducted on November 6, November 7, November 8, November 9 and November 10, 2002.

24    (CF-0125 to CF-0126.) On November 26, 2002, Liberty sent Cremin a letter enclosing a copy of

25    the surveillance videos he had previously requested. (CF-0122.)

26    Q.    **LIBERTY REQUESTS A PSYCHIATRIC PHYSICIAN REVIEW**

27        On November 30, 2002, Liberty received the report prepared by psychiatrist Peter Mirkin,

28    M.D., M.B.A., LLC., addressing the comments, opinions and conclusions made by Dr. Karalis in

LIBERTY'S OPPOSITION AND CROSS-MOTION
FOR JUDGMENT PURSUANT TO F.R.C.P. 52
CASE NO. C 04-04394 CW

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    his letter dated October 19, 2002. (CF-0109 to CF-0116.) Dr. Mirkin observed that Cremin's

2    inability to perform full-time work in a sedentary occupation was based on subjective symptoms

3    and fears that he had reported to Dr. Karalis, who had taken very little clinical action to manage

4    these claimed symptoms. Dr. Mirkin opined that if the symptoms were as severe as Dr. Karalis

5    now reported, then he should have prescribed more intensive psychotherapy, psychotropic

6    medication and collaborated with Cremin's cardiologist on his care.  Depression and coronary

7    artery disease were not mutually exclusive and both conditions would require active treatment if

8    they were as severe as Dr. Karalis now claimed.  Based on the cardiac evaluations and the notes

9    of Dr. Gershengorn, there was no indication of imminent threat due to his cardiac disease.

10   Further, there was no indication in the medical records that Dr. Karalis considered the use of

11   psychotropic medication or had even consulted Dr. Gershengorn about the need to do so.  Dr.

12   Mirkin noted "supportive therapy" was appropriate for treating mild anxiety only, not for

13   someone who was experiencing overwhelming anxiety that limited his capacity to function.  Dr.

14   Mirkin also found discrepancies with Dr. Karalis that raised concerns about the accuracy of the

15   information he recorded in his notes.  Dr. Karalis' opinion that Cremin did "not possess the

16   stabilization of moods and control of psychiatric symptomatology required to have predictably

17   stable cognitive functioning to perform these jobs, which assumes full cognitive functioning" was

18   not supported by the office notes or treatment given.  Further, there was no medical event or

19   change in symptoms that would have led to a sudden increase in his concerns about another heart

20   attack in 1998.

21   **R.      LIBERTY UPHOLDS THE DENIAL OF CREMIN'S CLAIM FOR BENEFITS**

22        On December 6, 2002, Liberty sent Cremin a letter upholding the decision to discontinue

23   long term disability benefits after September 1, 2002. (CF-0102 to CF-0106.)  Liberty concluded,

24   after its review on appeal, that the substantive medical information showed he had sedentary work

25   capacity and, therefore, he was "disabled" as defined in the McKesson Plan. (CF-0105.)

26        On December 21, 2002, two weeks after its decision on appeal, Cremin sent a letter to

27   Liberty from Dr. Gershengorn. (CF-0084 to CF-0085.)  On December 31, 2002 Liberty sent

28   Cremin a letter stating that, pursuant to ERISA regulations, he was afforded the opportunity to

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1  appeal the denial of his claim and to submit additional documentation to support his claim. (CF-

2  0083.) Cremin had exhausted his administrative remedies under ERISA and his claim remained

3  closed so no additional information would be considered. (CF-0083.)

### III. THE MCKESSON PLAN

5  On December 1, 1976, McKesson established the McKesson Plan. (Ex. A to McGee

6  Decl., pp. PLAN-001.) As a benefit of his employment, Cremin became a participant in the

7  McKesson Plan. Prior to January 1, 2000, the McKesson Plan was self-insured by McKesson

8  HBOC, Inc. and the third party claims' administrator was Preferred Works. (Decl. of McGee ¶

9  2.) Effective January 1, 2000, Liberty entered into a Reserve Buy Out Agreement ("RBO

10 Agreement") with McKesson HBOC, Inc., the McKesson Plan and McKesson HBOC, Inc.

11 Employees' Long Term Disability Plan Trust. (Decl. of McGee ¶ 4.) Pursuant to the RBO

12 Agreement Liberty agreed to assume the claims administration and payment obligations for

13 designated Claimants in accordance with the terms of the McKesson Plan. (Decl. of McGee ¶ 4.)

14 Liberty took over the claim's administration and payment obligations for Cremin's claim on

15 January 1, 2000. (Decl. of McGee ¶ 6.)

### IV.  LEGAL ARGUMENT

17 **A.    PLAINTIFF HAS NOT MET HIS BURDEN OF PROOF TO SHOW THAT HE IS
   "DISABLED" WITHIN THE MEANING OF THE MCKESSON PLAN**

19 In order to continue receiving benefits under the McKesson Plan, plaintiff was required to

20 provide proof of continuing disability. (PLAN-0084 § 5.1) Pursuant to the terms of the

   McKesson Plan in effect at the time of plaintiff's disability, "disability" was defined as:

22 "[A]ny physical or mental condition arising from an illness,
   pregnancy or injury which renders a Participant incapable of
   performing work. . . .After twenty-four (24) months of Disability, a
23 Participant must be unable to perform the work of any occupation
   for which he is she becomes reasonably qualified by training,
24 education or experience, and, in addition, be receiving Social
   Security benefits on account of his or her disability." (PLAN-0065,
25 emphasis added.)

26 In addition, the Plan required proof of disability by objective medical evidence.

27 "Pursuant to the procedures established by the Plan Administrator,
   a determination shall be made whether a Disability exists with
28 respect to a Participant on the basis of objective medical evidence."

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

LIBERTY'S OPPOSITION AND CROSS-MOTION
FOR JUDGMENT PURSUANT TO F.R.C.P. 52
CASE NO.  C 04-04394 CW

1    (PLAN-0072 § 3.2)

2        In an ERISA action, the plaintiff must carry the burden to prove that he was disabled

3    under the meaning of the plan. (Sabatino v. Liberty Life Assur. Co., 286 F. Supp. 2d 1222,

4    1232.) Here, plaintiff did not and cannot meet his burden of showing that he was disabled within

5    the meaning of the McKesson Plan after September 1, 2002. Indeed, the objective medical

6    evidence indicated plaintiff was able to work and was therefore not "disabled" under the Plan.

7    **B.**    **THERE WAS NO EVIDENCE OF DISABILITY AFTER SEPTEMBER 1, 2002**

8        **1.**    **Dr. Gershengorn's Records and Opinions Do Not Support Disability**

9        In his opening brief, plaintiff contends he is disabled only from a mental impairment.

10   (Plaintiff's Opening Brief, p. 12, line 13.) He does not allege or aver that he is unable to work

11   due to a cardiac condition and he does not dispute Dr. Gershengorn's and Liberty's finding that

12   from a cardiac standpoint plaintiff has sedentary work capacity. Nor can he, because Dr.

13   Gershengorn's records and opinions do not support a finding of disability. On December 4, 2001,

14   a year before Liberty's denial, Dr. Gershengorn (the cardiologist) indicated Cremin <u>could work</u>

15   <u>eight hours a day</u>. (CF-0269.) On February 7, 2002, Liberty told Cremin that based on the

16   information it received from Dr. Gershengorn, he was not disabled from a cardiac perspective.

17   During that same conversation, Cremin told Liberty <u>he was considering retraining so he could</u>

18   <u>return to some kind of work</u>. (CF-0015.) The records obtained by Liberty from Dr. Gershengorn

19   thereafter, including completion of a Functional Capacities form, do not indicate that plaintiff was

20   unable to work. The office notes and test reports provided by Dr. Gershengorn show, at the most,

21   only mild cardiac stress that does not affect Cremin's ability to perform a sedentary job, and only

22   an <u>average risk</u> for cardiac problems. (CF-0189, 191, 198.)

23       Further, in response to Liberty's specific request to identify physical restrictions and

24   limitations Cremin could perform in an average eight hour work day, Dr. Gersgengorn indicated

25   on August 12, 2002 that Cremin had <u>no restrictions</u> on sitting, he could frequently (1/3 to 2/3 of

26   the time) stand, and occasionally (up to 1/3 of the time) walk and drive, which is consistent with

27   the physical requirements for sedentary work. (CF-0169.) Dr. Gershengorn did **not** indicate on

28   the form that Cremin could not work, only that he did not know when he would. (CF-0169.)

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    The Transferable Skills Analysis and Labor Market Survey obtained by Liberty dated

2    August 23, 2002, identified several vocational alternatives Cremin could perform within the

3    restrictions and limitations identified by Dr. Gershengorn on August 12, 2002 and for which

4    plaintiff was capable of performing based upon his education, work experience and skills.  All of

5    the occupations were sedentary in nature, less demanding than his prior job, and allowed Cremin

6    to change positions throughout the day as needed.  (CF-0165 to CF-0166.)

7              **a.    Dr. Gershengorn's Untimely Letter Cannot Be Considered**

8         Dr. Gershengorn's letter dated December 4, 2002, is not evidence of "disability."

9    Although the letter is contained in the Liberty claim file, it is not part of the administrative record

10   because it was received **after** Liberty had made its final decision on appeal.  A court's decision as

11   to whether a plan administrator abused its discretion must be based on facts known to the

12   administrator at the time the benefits claim decision was made.  (Jones v. Aetna U.S. Healthcare,

13   136 F.Supp.2d 1122 (C.D. Cal. 2001); Taft v. Equitable Life Assurance Soc'y, 9 F.3d 1469, 1471

14   (9th Cir. 1994);  Mizzell v. Paul Revere Life Ins. Co., 118 F.Supp.2d 1016, 1020 (C.D.Cal.

15   2000).)  Although an exception to the general rule limiting review to the administrative record

16   was recognized in Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan, 46 F.3d 938

17   (9th Cir. 1995) when the standard of review is *de novo*, it applies only in limited circumstances.

18   (Butler v. Marvin Shoemaker, 73 F. Supp. 2d 1069 (D.Ore. 2001).)  The admission of new

19   evidence is limited to instances where the "circumstances clearly establish that additional

20   evidence is necessary to conduct an adequate *de novo* review of the benefit decision"

21   (Mongeluzo, supra, 46 F.3d at 944.)  The court in Mongeluzo cautioned that "a district court

22   should not take additional evidence merely because someone at a later time comes up with new

23   evidence" and "in most cases" only the evidence before the plan administrator should be

24   considered.  (Id.)  Here, Dr. Gershegorn's letter dated December 4, 2002 (received by Liberty on

25   December 21, 2002) should not be considered because it was not before the claims administrator,

26   and is not necessary to conduct a *de novo* review.

27         Furthermore, under the terms of the McKesson Plan, the letter was untimely and the

28   termination of benefits without consideration of this letter was proper.  Under ERISA, a claims

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    administrator is obligated to apply the written terms of the plan. The misapplication of a clear

2    plan provision is a breach of its fiduciary duty. (See, Firestone Tire & Rubber Co. v. Bruch, 489

3    U.S. 101, 108 (1989), Elmore v. Cone Mills Corp., 23 F.3d 855, 860-861 (4th Cir. 1995).) Here,

4    the McKesson Plan provides disability will terminate on the earliest of:

> "F) a refusal by the Participant to provide information requested in
> writing by the Plan Administrator for the purpose of determining
> whether the Participant is entitle to benefits under the Plan; failure
> to provide such information within thirty (30) days following such
> request shall be considered to constitute a refusal. " (PLAN-0079.)

8    Here, Liberty specifically requested in writing on August 30, 2002 that plaintiff provide

9    medical documentation to support his appeal. (CF-0160.) On October 21, 2002, Liberty again

10    requested plaintiff to submit medical documentation to support his claim and advised him that he

11    had thirty days within which to provide the information. (CF-0149.) The only information

12    Liberty received within the 30 day time period was a letter from Dr. Karalis. Because Dr.

13    Gershengorn's letter was not received within 30 days, and only after Liberty's final decision, it is

14    not part of the administrative record and under the terms of the Plan cannot be considered.[7]

### b.    Dr. Gershengorn's Untimely Letter Does Not Support Disability

16    Even if Dr. Gershengorn's untimely letter were to be considered by this court, which it

17    should not, the letter is not competent evidence of "disability." The letter is not part of the

18    administrative record on which Liberty based its claim decision, and is inadmissible hearsay. The

19    statements made therein are vague, ambiguous, conclusory, unsupported, and uncertain. More

20    significantly, in his letter, Dr. Gershengorn never states that plaintiff cannot work. Rather, he

21    states only that due to his "medical conditions," Cremin also has non-exertional limitations that

22    "could be harmful." Although he includes examples of certain non-exertional limitations, Dr.

23    Gershengorn does not state that Cremin has any of these, nor does he explain why they "could

24    be" harmful to him or if they even preclude him from working. (CF-0085.)

25    On the other hand, Dr. Gershengorn affirmatively stated that Cremin's condition was

26    stable and that he was unaware of any dramatic improvement since Social Security had found him

27    [7] There was no justification for the late submission of the letter, because plaintiff had sufficient time to
28    obtain information from Dr. Gershengorn to support his appeal. Liberty's initial denial was made August
     30, 2002 and Liberty rendered a final decision more than three months later on December 6, 2002.

LIBERTY'S OPPOSITION AND CROSS-MOTION
FOR JUDGMENT PURSUANT TO F.R.C.P. 52
CASE NO. C 04-04394 CW

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    to be disabled. Again, this is not a statement that plaintiff cannot work at this time. Nor does Dr.

2    Gershengorn refute or contest Liberty's interpretation of the Functional Capacities Forms,

3    wherein he had previously indicted that Cremin could work an eight-hour day in 2001.

4    Therefore, if plaintiff's medical condition was stable and nothing had changed, then from a

5    cardiac standpoint plaintiff was able to work, as Dr. Gershengorn had previously stated himself.

6        Further, the basis for Dr. Gershengorn's conclusion that plaintiff was entitled to continue

7    receiving Social Security benefits was not due to plaintiff's coronary artery disease (for which

8    Cremin was able to work full-time for ten years after his heart attack), but due to his incorrect

9    assumption that Cremin was experiencing major depression or severe anxiety, because he wrote,

10    "Major depression/anxiety has been shown to be the strongest predictor of adverse outcome in

11    patients with coronary artery disease." (CF-0085.) As set forth below, however, plaintiff was **not**

12    experiencing major depression or severe anxiety. Dr. Gershengorn was not a psychiatrist and had

13    not made the diagnosis himself. Accordingly, Dr. Gershengorn's records, forms, and letter are

14    insufficient proof that plaintiff was "disabled" under the McKesson Plan.

15        **2.    Dr. Karalis' Opinions and Records Are Insufficient to Support A Finding
        That Plaintiff Could Not Work After September 1, 2002**

16

17        Similarly, there is no competent evidence that plaintiff was unable to work due to a

18    psychiatric or mental condition. Dr. Karalis' records, statements to Liberty, letters and forms are

19    insufficient proof of continuing disability after September 1, 2002. Although Dr. Karalis reported

20    to Liberty in February 2002 that plaintiff could never return to work, Cremin told Liberty at that

21    time that his treatment with Dr. Kiralis was sporadic and that he was considering retraining to go

22    back to work. Moreover, on August 6, 2002, several weeks before Liberty denied the claim, Dr.

23    Karalis candidly admitted **he did not know** whether plaintiff could work because he had not seen

24    him since February 2002 and that Cremin may well have sedentary work capacity. (CF-0175.)

25    Thus, as of August 2002, Dr. Karalis was no longer certifying that Cremin could not work.

26        Dr. Karalis' letter dated October 18, 2002 is insufficient evidence under the McKesson

27    Plan of continuing "disability," because it was based on non-psychiatric opinions, erroneous

28    findings, and non-objective testing. (CF-0141.) Dr. Karalis' opinion that plaintiff was unable to

1    work any part- or full-time work was **based on his interpretation of Dr. Gershengorn's**

2    **restrictions and limitations form,** which he claimed without any basis was misinterpreted by

3    Liberty. Indeed, Dr. Gershengorn did not dispute Liberty's interpretation. The opinion is also

4    obviously erroneous because it ignores that fact that Dr. Gershengorn told Liberty Cremin could

5    work an eight hour day. Finally, Dr. Karalis is not a cardiologist and his notes showed no

6    interaction with Dr. Gershengorn. Therefore, he had no basis for proffering the opinion.

7         Similarly, Dr. Karalis' opinion that plaintiff could not work was also based on the

8    erroneous contention that plaintiff would be required to sit all the time. (CF-0141.) Dr.

9    Gershengorn, however, did not limit plaintiff to just sitting and the vocations identified in the

10   Transferable Skills Analysis Report identified jobs (that were less demanding than plaintiff's

11   prior job) where plaintiff could change positions as needed. Dr. Karalis' opinion that plaintiff

12   could not work because there were no jobs that could be performed within the restrictions and

13   limitations identified by Dr. Gershengorn contradicted the Transferable Skills Report. Dr. Karalis

14   is not a vocational expert and therefore his opinion is unsupported and must be disregarded.

15        Dr. Karalis' conclusion that "Cremin does not possess the stabilization of moods and

16   control of psychiatric symptomology" to be able to perform the jobs identified by Liberty was

17   also unsupported and contradicted by his prior statements to Liberty, his medical records and the

18   level of treatment given. Moreover, the conclusion was based entirely on Zung testing performed

19   that day, which as Dr. Mirkin explained was a self-rating method (e.g. based on Cremin's

20   subjective reports) as opposed to the more reliable clinician rating scales, which Dr. Karalis did

21   not use. Dr. Mirkin further noted the Zung Depression and Anxiety Psychological Tests should

22   not be used to resolve a dispute regarding the valid presence of symptoms because there was no

23   objective validity scale built into the questions. (CF-0114.) The McKesson Plan requires proof

24   of disability by objective medical evidence. (PLAN-0072 § 3.2.) Finally, Dr. Karalis admitted in

25   his letter that only supportive therapy was given to Cremin and supportive therapy is indicative of

26   mild anxiety at best, which would not preclude Cremin from working. (CF-0116.)

27              **a.    The GAF Scores Do Not Establish Disability After September 1, 2002**

28        Dr. Karalis' Global Assessment Function (GAF.) ratings are not evidence of disability

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1  after September 1, 2002, because those scores were made in September 2001 (a year before) and

2  February 2002 (nine months prior to the discontinuation of benefits).[8]  The GAF ratings are also

3  irrelevant because in March 2002, Dr. Karalis told Liberty Cremin's condition had improved.

4  (CF-0228.)  In February 2002, Cremin indicated on the Activities Questionnaire that he could

5  perform all the activities of daily living. (CF-0257.)  Cremin also told Liberty in February 2002,

6  that he was considering retraining to return to work, but could not do so at that time because he

7  had torn ligaments in his ankle while exercising. (CF-0015.)  In August 2002, Dr. Karalis told

8  Liberty he did not know whether Cremin could work. (CF-0175.)  Thus, the old GAF scores are

9  not evidence of Cremin's condition at the time benefits were discontinued.

10      Further, Cremin's contention that his activity level was consistent with a GAF score of 45

11  is inadmissible hearsay, unsupported, speculative, and improper expert opinion.  Accordingly, it

12  cannot be considered by this court.  The unsubstantiated medical opinion is also irrelevant

13  because Dr. Karalis never indicated that Cremin had a GAF of 45 at the time benefits were

14  discontinued or when surveillance was conducted.  Also contrary to his assertions, Cremin did not

15  "do nothing" on the surveillance video.  He was seen leaving and entering his house, driving his

16  vehicle and performing other activities consistent with his prior representations to Liberty that he

17  could perform the activities of daily living and inconsistent with his later report that he was in bed

18  16 hours a day, unable to sit for more than one hour.  As Dr. Mirkin noted, the ability to perform

19  the activities of daily living presented the same risk of another heart attack as performing

20  sedentary work. (CF-0115.)  Because plaintiff was able to perform the activities of daily living,

21  Cremin had the ability to perform sedentary work.

22      **3.     Dr. Mirkin's Report Is Competent Evidence That Plaintiff Was Not Disabled**

23      Dr. Mirkin concluded based on his review of the medical records that plaintiff's anxiety

24  and depression was at best mild and did not preclude him from sedentary work. (CF-0109.)

25  According to Dr. Mirkin, Dr. Karalis' statement in his October 18, 2002 letter to Cremin that

26  Cremin did not "possess the stabilization of moods and control of psychiatric symptomology

27  _____

28  [8] Cremin's assertion that Liberty was required to dispute the GAF scores in its denials letters is without merit.  The GAF scores were remote in time and contradicted by later information provided by Dr. Karalis and plaintiff.  Moreover, Dr. Karalis never mentioned the GAF scores in his October 2002 appeal letter.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    required to have predictably stable cognitive functioning to perform these jobs, which assumes

2    full cognitive functioning," was inaccurate because it was not supported in Dr. Karalis' office

3    notes. Dr. Mirkin specifically noted in his report that Dr. Karalis' opinions on appeal were based

4    on the results of a Zung Depression and Anxiety Test.

5         Cremin mischaracterizes Dr. Mirkin's eight-page report and has taken Liberty's and Dr.

6    Mirkin's reference to the lack of psychotropic medications out of context. Liberty did not deny

7    the claim because plaintiff was not taking psychotropic medication. Rather Liberty and Dr.

8    Mirkin concluded that the treatment provided by Cremin's treating psychiatrist Dr. Karalis was

9    consistent only with a finding of mild anxiety and depression that would not preclude Cremin

10   from performing a full-time sedentary occupation. It is undisputed that Dr. Karalis' treatment of

11   Cremin was sporadic; he was providing supportive therapy only; and he was not prescribing any

12   psychotropic medications. Dr. Mirkin correctly opined that if Cremin was suffering from serious

13   anxiety or major depression, it was medically imperative for that condition to be treated more

14   aggressively. The fact that such care was not being provided was evidence that Cremin was not

15   experiencing the level of anxiety or depression he claimed prevented him from working.

16        Indeed, the records show Dr. Karalis did not even know that Cremin was taking a low

17   dosage of Xanax prescribed by his cardiologist. Upon repeated questioning by Liberty, Dr.

18   Karalis denied Cremin was taking psychotropic medication. If, in fact, part of his psychiatric

19   treatment included such medication, even if it was prescribed by Dr. Gershengorn, Dr. Karalis

20   would have so stated. Accordingly, Cremin's assertions that Dr. Mirkin's findings are contrary to

21   the evidence before this court, are unsupported, speculative, inadmissible, and not material or

22   probative evidence that plaintiff was "disabled" after September 1, 2002.

23        **4.     Dr. Mirkin's Opinions Should Be Given More Weight**

24        Dr. Mirkin's opinions should be given more weight than the unsubstantiated opinions of

25   Dr. Karalis. Dr. Mirkin went through and analyzed in significant detail the reasons and bases for

26   his disagreements with Dr. Karalis' opinions, which were wholly conclusory and based on

27   subjective reports. Moreover, Dr. Karalis' credibility is highly questionable. Dr. Karalis'

28   opinions on appeal were vague, speculative, and contrary to his prior statements to Liberty and

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

LIBERTY'S OPPOSITION AND CROSS-MOTION
FOR JUDGMENT PURSUANT TO F.R.C..P. 52
CASE NO. C 04-04394 CW

1  his own medical records. He made repeated inconsistent statements to Liberty as compared to his

2  own records. Finally, the State Medical Board had put Dr. Karalis on probation and he had

3  completed his probation on June 9, 1998 – only three months before he began treating Cremin.

4  He had also been a member of the State Bar of California placed on probation on November 20,

5  1990 due to Medicaid fraud. Thus, Dr. Karalis has not shown himself to be a person of high

6  integrity by past actions and his conclusory and unsupported opinions should not be given greater

7  weight than the opinions of Dr. Mirkin.

8          **5.    The Surveillance Reports Are Not Evidence of Total Disability**

9          The surveillance videos do not support a finding that plaintiff was disabled after

10  September 1, 2002. Plaintiff's assertions to the contrary are unfounded, speculative and

11  irrelevant. Arguments in plaintiff's brief do not constitute competent evidence and should be

12  disregarded. The fact that on November 6, 2002 at 6:40 a.m. plaintiff backed out of his garage

13  and parked his car with the front end partially in the lane of traffic does not, as he claims, shows

14  that he lacks mental capacity. The fact that he is able to drive (a complex task requiring large and

15  small motor skills and a high level of cognitive skills) is evidence to the contrary. Similarly, the

16  surveillance video taken on November 9, 2002 at 10:09 a.m. is not evidence of cognitive

17  dysfunction. Backing a car up 150 feet is not uncommon if one wishes to turn a vehicle around

18  on a street lined with parked cars. Whatever the reason for his maneuver, it is unreasonable to

19  conclude he was without the mental capacity to operate a vehicle, as Cremin so suggests. In fact,

20  the arguments are disingenuous because if Cremin is as cognitively disabled as he now claims and

21  it affects his driving, he shouldn't be driving. Moreover, Cremin's ability to drive in San

22  Francisco would attest to his ability to operate a vehicle under very stressful and demanding

23  situations, contrary to his assertions. Thus, the surveillance taken of Cremin's driving is not

24  competent or persuasive evidence that Cremin was unable to perform sedentary work.

25  **C.    PLAINTIFF WAS NOT DISABLED UNDER THE MCKESSON PLAN**

26          Here, as in Russell v. Paul Revere Life Ins. Co., 288 F.3d 78 (3rd Cir. 2002), plaintiff's

27  own physicians opined that plaintiff was capable of performing some of his occupational duties

28  and working at least on a part-time basis. (Id. at 83.) In Russell, the district court granted Paul

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    Revere's motion for summary judgment finding the plaintiff was not totally disabled under the

2    group policy. (Id. at 81.) On appeal, the Third Circuit held, "Plaintiff has not provided any basis

3    for the payment of full benefits in the face of evidence that he is able to perform some of the

4    important duties of his occupation [at least on a part-time basis] but elected not to work at all and

5    spend his time in non-occupational tasks." (Id.; Accord, Cini v. The Paul Revere Life Ins. Co.,

6    50 F.Supp.2d 419 (E.D. Pa. 1999) [granting summary judgment in favor of insurer where

7    evidence showed that plaintiff was capable of performing the duties of his job on a part-time

8    basis]; Dym v. Provident Life and Accident Ins. Co., 19 F.Supp.2d 1147, 1150 (S.D. Cal. 1998).)

9    Accordingly, plaintiff's ability to work part-time in his prior position is evidence of his ability to

10   perform "any occupation" under the McKesson Plan.

11   **D.      THE SOCIAL SECURITY AWARD IS NOT EVIDENCE OF DISABILITY**

12         Cremin's award of social security benefits is not evidence that he was "disabled" as

13   defined in the McKesson Plan after September 1, 2002. Cremin was awarded Social Security

14   Disability on August 16, 1999. Liberty denied his claim for long term disability benefits on

15   August 30, 2002, three years after this determination, based on different, more recent evidence

16   than Social Security considered in 1999. Moreover, it is well established that an award of social

17   security is irrelevant to a finding of disability in ERISA. (See, Black & Decker Disability Plan v.

18   Nord, 538 U.S. 822, 123 S. Ct. 1965; 155 L. Ed. 2d 1034 (2003); Madden v. ITT Long Term

19   Disability Plan, supra, 914 F.2d at 1287; Boomis v. Metropolitan Life Ins. Co., 970 F.Supp. 584,

20   590 (E.D. Mich. 1997).) Employers have a "large leeway" to design plans, so unlike a Social

21   Security claim, the validity of a claim is "likely to turn in large part on interpretation of terms in

22   the plan at issue" rather than on a uniform set of criteria." (Black & Decker Disability Plan v.

23   Nord, 538 U.S. 822, 833 (2003).) Although the definitions of disability are similar, they are not

24   identical. (Id. at 832-833, noting critical differences.) Further, the evidence submitted in support

25   of a Social Security award is different from the information obtained by Liberty. Social Security

26   also applies a treating physician rule, which the United States Supreme Court has held is

27   inapplicable to ERISA disability claims. (Id.)

28         On the other hand, since the Social Security Award, Liberty was able to obtain updated

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/385853.1/KCC
11/7/05

- 22 -

LIBERTY'S OPPOSITION AND CROSS-MOTION
FOR JUDGMENT PURSUANT TO F.R.C.P. 52
CASE NO. C 04-04394 CW

1  medical records, conduct surveillance of plaintiff in a non-medical setting, discuss the claim with

2  plaintiff, discuss the medical records with plaintiff's treating psychiatrist, obtain opinions from

3  consulting nurses, obtain a vocational skills analysis and obtain a report from a board certified

4  and independent psychiatrist. Liberty also obtained information from plaintiff regarding his daily

5  activities and reported restrictions and limitations. Finally, plaintiff has failed to present any

6  evidence as to the basis for the SSI award, the evidence presented or even the findings made.

7  Thus, there is no basis for comparing the two proceeding or decisions here and the Social Security

8  Award is not competent evidence of continued disability after September 1, 2002.

9  **E.    JUDICIAL ESTOPPEL HAS NO APPLICATION HERE**

10      Liberty is not judicially estopped from discontinuing benefits. The doctrine of judicial

11  estoppel "precludes a party from gaining an advantage by asserting one position, and then later

12  seeking an advantage by taking a clearly inconsistent position." (Hamilton v. State Farm Fire &

13  Casualty Company, 270 F.3d 778, 782 (9th Cir. 2001); see also, Rissetto v. Plumbers & Steamers

14  Local 343, 94 F.3d 597, 600-601 (9th Cir. 1996); Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir.

15  1990).) In order to establish judicial estoppel, plaintiff must establish: (1) the party's later

16  position taken in court  was clearly inconsistent with its earlier position, (2) such that either the

17  first or the second court was misled; and (3) the party seeking to assert an inconsistent position

18  would derive an unfair advantage or impose an unfair detriment on the opposing party if not

19  estopped." (Hamilton, supra, 270 F.3d at 782-783, internal citations omitted.) Here, judicial

20  estoppel has no application because Liberty has not taken inconsistent position in any prior

21  judicial proceedings. As plaintiff admits, neither Liberty, Preferred Works or the McKesson Plan

22  was a party or participant in plaintiff's social security proceeding.

23      Moreover, neither Liberty, nor the McKesson Plan has taken any inconsistent positions.

24  The McKesson Plan specifically requires that a claimant receive social security benefits "in

25  addition to" being "disabled" under the Plan. (PLAN-0065.) It is an unreasonable interpretation

26  of the McKesson Plan to say that the receipt of social security benefits was conclusive proof of

27  disability as plaintiff now suggests. Cremin's reliance on Boyd v. Trustees of United Mine

28  Workers Health and Retirement Fund, 873 F.2d 57 (5th Cir. 1989) is misplaced, because the plan

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    in that case expressly provided that receipt of Social Security was <u>conclusive evidence</u> of

2    disability. Here, the receipt of Social Security benefits is but one of <u>two</u> conditions required to

3    establish disability; the other condition is the inability to work at any occupation for which the

4    claimant is reasonably qualified by training, education and experience. (Plan-0022.) The second

5    condition of disability is not met simply because Cremin received Social Security benefits.

6        Further, the doctrine of judicial estoppel is inapplicable here simply because benefits were

7    offset by his social security benefits. Numerous courts have upheld the offset for social security

8    benefits. (<u>Alessi v. Raybestos-Manhattan, Inc.</u>, 451 U.S. 504, 514-15, 101 S. Ct. 1895, 68

9    L.Ed.2d 402 (1981).) **No court has ever held**, as plaintiff argues, that the reduction for social

10   security benefits precludes a claim administrator from later denying the claim. Plaintiff ignores

11   the fact that the offset is taken <u>only if benefits are paid</u>, therefore, Liberty is not asserting

12   inconsistent positions or gaining an advantage to the detriment of plaintiff.

13       Plaintiff's reliance on <u>Darland v. Fortis Benefits Ins. Co.</u>, 317 F.3d 516 (6th Cir. 2003) is

14   misplaced. In <u>Darland</u>, the court held that taking an Social Security offset "does **not** provide an

15   independent basis" for judgment in favor of the claimant. (<u>Id.</u> at 530, 533, emphasis added.) In

16   <u>Darland</u>, the Court held only that a conflict of interest existed, not as plaintiff suggests that the

17   insurer was judicially estopped from denying the claim. Plaintiff's judicial estoppel argument

18   was also rejected by Judge Chesney in <u>Moskowite v. Everen Capital Long Term Disability</u>

19   <u>Income Plan</u>, 2005 U.S. Dist. LEXIS 20842 (N.D. Cal. 2005).)

20   **F.**    **LIBERTY WAS NOT REQUIRED TO OBTAIN AN IPE**

21       Plaintiff's assertion that Liberty had a duty to find evidence to support Cremin's disability

22   claim (e.g. Liberty had a duty to obtain an Independent Psychiatric Examination ["IPE"] and send

23   Dr. Mirkin's report to plaintiff's doctors for comment) is contrary to the terms of the McKesson

24   Plan, the law and this motion. It is incumbent on plaintiff to provide proof of continuing

25   disability, not the plan administrator. As the courts have acknowledged, "it is not inappropriate

26   for a plan to place an initial burden of proof on a claimants to prove disability." (<u>Jordan v.</u>

27   <u>Northrop Grumman Corp. Welfare Benefit Plan</u>, 63 F.Supp.2d 1145, 1158 (C.D. Cal. 1999),

28   *affirmed* <u>Jordan v. Northrop Grumman Corp. Welfare Benefit Plan</u>, 370 F.3d 869 (9th Cir. 2004;

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

LIBERTY'S OPPOSITION AND CROSS-MOTION
FOR JUDGMENT PURSUANT TO F.R.C..P. 52
CASE NO. C 04-04394 CW

1   Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 985 (6th Cir. 1991).) Because plaintiff's

2   treating cardiologist indicated he could work and his psychiatrist did not know whether or not he

3   could work, Liberty as the McKesson Plan administrator properly discontinued benefits based on

4   Cremin's failure to provide proof of continued disability after September 1, 2002.

5       The McKesson Plan does not require that an IME be performed, only that one may be

6   requested. (Plan-0044 and Plan-0046.) ERISA also does not require the insurer to have the

7   claimant independently examined. (Jordan v. Northrop, supra, 63 F.Supp.2d at 1158; Smith v.

8   Prudential Ins. Co. of Am., 2005 U.S. Dist. LEXIS 2000, fn 3 (D.N.J. 2005).) Moreover, under

9   the circumstances here an IPE was not required before Liberty denied the claim in August 2002,

10  because Liberty had all the information and records necessary to make a fully informed decision.

11  Indeed, Dr. Gershengorn had indicated Cremin had functional work capacity and Dr. Karalis

12  stated Cremin may have sedentary work capacity. Cremin had even stated he was considering

13  returning to work. Thus, at the time Liberty denied the claim there was no conflicting medical

14  evidence or opinion that would require resolution by an IPE. Nor was an IPE required on appeal.

15  After Cremin submitted a letter from Dr. Karalis, a qualified psychiatrist reviewed the claim file

16  and medical records and specifically addressed the opinions of Dr. Karalis' October 18, 2002

17  letter. Based on the treatment provided and his review of all of the information in the file, it was

18  unnecessary for Dr. Mirkin to conduct an IPE in order to ascertain plaintiff's level of mental

19  impairment as he explained in his report.

20      Knowing that he cannot meet his burden to prove that he was disabled after September 1,

21  2002, plaintiff now seeks to improperly and erroneously switch the burden of proof to Liberty

22  during the claim and during this action. Although Liberty's failure to obtain an IPE or send Dr.

23  Mirkin's report to Dr. Karalis for comment (obligations Liberty disputes it had) may be raised as

24  a basis to challenge an abuse of discretion standard of review as plaintiff's did here, it does not

25  and cannot satisfy the plaintiff's burden of proving that he was "disabled" within the meaning of

26  the McKesson Plan after September 1, 2002.

27  ## G.    THE APPROPRIATE REMEDY, IF ANY, IS REMAND

28      As set forth herein, plaintiff has not satisfied his burden of proving that he was disabled

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    after September 1, 2002. Thus, Liberty's decision cannot be overturned by the court and

2    retroactive benefits cannot be awarded. Should the court find that plaintiff is entitled to a remedy,

3    which he is not, the only appropriate remedy here is remand to Liberty. The proper remedy in an

4    ERISA action is to remand for further findings or explanations, unless it is "so clear cut that it

5    would be unreasonable for the plan administrator to deny the application for benefits on any

6    ground." (Gallo v. Amoco Corp., 102 F.3d 918, 923 (7th Cir. 1996), cert. denied, 521 U.S. 1129,

7    138 L. Ed. 2d 1031, 117 S. Ct. 2532 (1997); Miller v. United Welfare Fund, 72 F.3d 1066, 1073-

8    1074 (2nd Cir. 1995) [remand is proper when it is uncertain whether the only proper

9    determination was to grant the claim].)

## V.  CONCLUSION

11       Plaintiff has not and cannot prove that he was "disabled" as defined in the McKesson Plan

12   after September 1, 2002. Accordingly, even under the *de* novo standard of review, Liberty's

13   decision to discontinue benefits after September 1, 2002 should not be reversed by this court.

14   Dated: November 7, 2005          ROPERS, MAJESKI, KOHN & BENTLEY

16                                     By:
                                           PAMELA E. COGAN
17                                         KATHRYN C. CURRY
                                           ERIN A. CORNELL
18                                         Attorneys for Defendant LIBERTY LIFE
                                           ASSURANCE COMPANY OF BOSTON

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City