Laurence F. Padway, #89314
Law Offices of Laurence F. Padway
1516 Oak Street, Suite 109
Alameda, California 94501
Telephone: (510)814-6100
Facsimile : (510)814-0650

David J. Linden (SBN: 041221)
P.O. Box 5780
Napa, California 94581
Telephone: (707) 252-7007
Facsimile: (707) 252-7883

Attorneys for plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### (OAKLAND DIVISION)

| | |
|---|---|
| MICHAEL CREMIN, | No. C07-01302 CW |
| Plaintiff, | **PLAINTIFF'S OPENING TRIAL BRIEF** |
| vs. | Date: June 19, 2008 |
| | Time: 2:00 p.m. |
| MCKESSON CORPORATION EMPLOYEES' LONG TERM DISABILITY PLAN, | Crtrm: 2 (4th Floor) Judge: Honorable Claudia Wilkin |
| Defendant. | |
| _____/ | |
| LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, | |
| Real Party in Interest | |
| _____/ | |

1

# **TABLE OF CONTENTS**

2

3  TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

4  I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5  II. FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6        A.  Plan Provisions and Administration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

7        B.  Mr. Cremin's  History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

8        C.  Medical History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

9

10 III. STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       A. Review is De Novo by the Court's Order in the Previous Case. . . . . . . . . . . . . . . . . 12
11
       B. De Novo Review is Warranted In Any Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
12
           1. Liberty Failed to Adequately Investigate the Claim . . . . . . . . . . . . . . . . . . . . . . . 13
13
           2. Liberty Failed to Credit Reliable Evidence of Disability. . . . . . . . . . . . . . . . . . .14
14

15 V.   JUDGMENT SHOULD BE ENTERED FOR THE RELIEF REQUESTED. . . . . . . . . . . . . .17

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

3

CASES

4

*Abatie v. Alta Health & Life Insurance Co.*,
458 Fed.3d 955 (9th Cir. 2006)                                    13

5

*Baker v. General Motors Corp.*,
522 U.S. 222 (1998)                                              12

6

7

*Bilby v. Schweiker*,
762 Fed. 2d 716 (9th Cir. 1985)                                  16

8

*Black & Decker Disability Plan v. Nord*,
123 S.Ct. 1965 (2003)                                            14

9

10

*Booton v. Lockheed Medical Benefit Plan*,
110 Fed.3d 1461 (9th Cir. 1997)                                  13

11

*Calvert v. Firstar Finance, Inc.*,
409 Fed. 3d 286 (6th Cir. 2005)                                  14

12

13

*Egan v. Mutual of Omaha Insurance Co.*,
24 Cal.3d 809 (1979)                                             13

14

*Firestone v. Bruch*,
489 U.S. 101 (1989)                                              13

15

16

*Force v. Ameritech Corp., Inc.*,
452 Fed. Supp. 2d 744 (E. D. Mich., 2006)                        15

17

*Goodwin v. Gardner*,
250 Fed. Supp. 454 (N. D., Cal., 1966)                           16-17

18

19

*Hangartner v. Provident Life and Accident Insurance Co.*,
373 Fed. 3d 998  (9th Cir. 2004)                                 1

20

*Kirwan v. Marriott Corp.*,
10 Fed.3d 784 (11th Cir., 1994)                                  14

21

22

*Ladd v. ITT Corp.*,
148 Fed. 3d 753(7th Cir., 1998)                                  14

23

Lopes v. Metropolitan Life Insurance Co.,
 332 Fed. 3d 1(1st Cir. 2003)                                    14

24

25

*Moore v. American United Life Insurance Co.*,
150 Cal. App. 3d 610 (1984)                                      1

26

*Paese v. Hartford Life and Accident Insurance Co.*,
449 Fed. 3d 435(2nd Cir., 2006)                                  14

27

28

*Rodriguez v. Bowen*,
876 Fed. 2d 759 (9th Cir. 1989)                                    16

*Saffon v. Wells Fargo & Company Long Term Disability Plan*,
__ Fed. 3d. ___ (9th Cir., 2008) as modified April 16, 2008        7, 15

*Smith v. CMTA-IAM Pension Trust,*
746 Fed. 2d 589, 598 (9th Cir. 1984)                               17

*Tremain v. Bell Industries*,
196 Fed.3d 970 (9th Cir. 1999)                                     13

*Wible v. Aetna Life Insurance Co.*,
375 Fed. Supp. 2d 956 ©. D. Cal., 2005)                              14

<u>STATUTES</u>

29 U.S.C. § 1001                                                     1

<u>REGULATIONS</u>

29 C.F.R. § 2560.503-1(h)                                            14

# I. INTRODUCTION

Plaintiff Michael Cremin moves the Court, pursuant to Federal Rule of Civil Procedure 52, for an award of long term disability benefits under the McKesson Corporation Employees' Long Term Disability Benefit Plan (the "Plan").  The Plan is funded and benefits awarded by Liberty Life Assurance Company of Boston ("Liberty"), which operates under both a structural and actual conflict of interest, which this Court has previously determined requires *de novo* review.  The Plan is an employee welfare benefits plan subject to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq. ("ERISA").

# II. FACTS

## A. Plan Provisions and Administration.

1.  The Plan defines disability, as follows:

> "'Disability' shall mean any physical or mental condition arising from an illness, pregnancy or injury which renders a Participant incapable of performing work.  During the first (24) months of Disability, a Participant must be unable to perform the work of his or her regular occupation or any reasonably related occupation, and must not, except as provided in Section 3.4, be performing work or services of any kind for renumeration.  After twenty-four (24) months Disability, Participant must be unable to perform the work of any occupation for which he or she is or becomes qualified by training, education, or experience, and, in addition, be receiving Social Security benefits on account of his or her disability."  PLAN-0062[1]

California law clarifies that the incapacity to perform work is an incapacity to work "in the usual or customary way" and "with reasonable continuity."  *Moore v. American United Life Insurance Co.,* 150 Cal. App. 3d 610, 632 (1984).  As the Ninth Circuit explained in *Hangartner v. Provident Life and Accident Insurance Co.*, 373 Fed. 3d 998, 1006 (9th Cir. 2004):

> California law requires courts to deviate from the explicit policy definition of "total disability" in the occupational policy context [FN2] where it is necessary to "offer protection to the insured when he is no longer able to carry out the substantial and material functions of his occupation." Austero v. Nat'l Cas. Co., 84 Cal.App.3d 1, 148 Cal.Rptr. 653, 667 (1978) (emphasis added), overruled on other grounds by Egan v. Mut. of Omaha Ins. Co., 24 Cal.3d 809, 169 Cal.Rptr. 691,

---

[1]Citations with the prefixes PLAN, LC, and CF are to pages in the administrative record, to be filed with this Court by Liberty.

699 n. 7, 620 P.2d 141 (1979). Indeed, "California courts oppose strict adherence to a highly limited definition of 'total disability' in both non-occupational and general occupational disability policies." Id.; see also Moore v. American United Life Ins. Co., 150 Cal.App.3d 610, 197 Cal.Rptr. 878, 882-83 (1984) (stating that the unambiguous "policy language *misstated* California law as it has existed since [Erreca ]. When coverage provisions in general disability policies require total inability to perform 'any occupation,' the courts have assigned a common sense interpretation to the term 'total disability' " (emphasis by the Ninth Circuit)).

2.  The Plan provides that the Plan Administrator may require a Participant to submit to a medical examination, as follows:

"The Plan Administrator may require that a Participant applying for Disability benefits submit to an examination by a physician designated by the Plan Administrator, for a medical opinion as to whether such Participant is disabled so as to meet the eligibility requirements under the Plan . . . .Reexaminations of a Participant receiving Disability benefits may be directed by the Plan Administrator from time to time for the purpose of assisting the Plan Administrator in determining whether continued eligibility for such benefits exist."  PLAN–0083

3.  The Plan provides, in Section 3.2, PLAN-0071:

Pursuant to procedures established by the Plan Administrator, a determination shall be made whether a Disability exists with respect to a Participant on the basis of objective medical evidence.

4. The Plan provides, in Section 5.3, titled Medical Examinations, PLAN-0084:

The Plan Administrator may require that a Participant applying for Disability benefits submit to an examination by a physician designated by the Plan Administrator, for a medical opinion as to whether such Participant is disabled to as to meet the eligibility requirements under the Plan for Disability benefits, and whether the Disability has existed for the requisite elimination period.  Reexaminations of a Participant receiving Disability benefits may be directed by the Plan Administator from time to time for the purpose of assisting the Plan Administrator in determining whether continued eligibility for such benefits exists.  The fees of such Physician and the expenses of such examination shall be paid by the Plan.

5.  In the event of a denial, the Plan Administrator must provide a written notice,

"...such written notice shall set forth the specific reasons for such

1    determination, specify the provisions of the Plan upon which the denial
     is based, and describe any additional material or information
2    reasonably necessary for the Participant to perfect the claim."  PLAN-
     88.
3

4        6.  The "Plan Administrator" is defined as the "Employee Benefits Committee of the

5   Company," PLAN-62, which has no structural conflict and which is provided with discretion to

6   interpret the plan at PLAN- 94 which provides that the Plan Administrator has

7

8        "the exclusive rights to interpret the terms and provisions of the Plan
         and to determine any and all questions arising thereunder or in
9        connection with the administration thereof, including, without
         limitation, the right to remedy possible ambiguities, inconsistencies, or
10       omissions, and in doing so, it will endeavor to act in such a way, by
         general rule or particular decision, as not to discriminate inj favor of
11       any class of Employees or Participants.  The Plan Administrator shall
         have such powers and perform such duties as are necessary for the
12       proper operation of the Plan.  This shall include, from time to time,
         designating representatives who shall carry out the delegated
13       responsibilities...Contemplated designees include, but are not limited
         to a Claims Administrator.  All such designees shall serve at the
14       pleasure of the Plan Administrator, and, if employees, shall serve
         without compensation.  All interpretations, determinations, and
15       decisions of the Plan Administrator in respect of any matter or
         question hereunder shall be final, conclusive and binding...
16

17       7.  Under the buyout agreement  Liberty purported to assume from the Plan

18  Administrator,  by agreement with McKesson effective January 1, 2000, discretion to interpret the

19  Plan and determine benefit eligibility:

20

21       "Liberty has the authority in its sole discretion to construe the terms of
         the Plan and to determine benefit eligibility with respect to persons
22       claiming benefits under the Plan and pursuant to this Agreement."  LC-
         0003.
23

24       8.  But the buyout agreement also states at LC-2, Part II-A of the buyout Agreement
     that:
25

26       "...Liberty will provide long term disability benefits to all Claimants
         pursuant to the terms of the Plan and the terms of this Agreement."
27

28  Because the Plan was never amended to eliminate the Employee Benefits Committee as the Plan

1  Administrator, the documentation conflicts whether it is the Committee which retains discretionary

2  authority under the Plan, or whether that authority has been ceded to Liberty, is a structurally

3  conflicted fiduciary, since it both decides who to pay, and funds the payments.  Because the buyout

4  agreement deals with existing claims, i.e., vested benefits, it would be both factually and legally

5  inappropriate to permit a change from an unconflicted and independent fiduciary to a biased and

6  structurally conflicted one.


### B.  Mr. Cremin's History


9.  Mr. Cremin began working for McKesson Corporation  in 1977 as a Director of

Profitability Analyst, and he was a participant in the Plan. CF-0920.   He had a heart attack in 1988

and returned to work.


10.  Mr. Cremin documented a gradual downward spiral following his heart attack.

He submitted performance appraisals from work.  CF-112-131, 157-197.  These were all stellar up

until the mid-1990's, and then they began to decline.  He received numerous awards and was well

recognized for work and charitable activities.  CD 137-156, and this again fell off after the mid-

1990's.  Liberty Mutual ignores this consistent downward spiral as if it does not exist.  Mr. Cremin

attributes it to increasing anxiety.


11.  A 26 year San Francisco firefighter met Mr. Cremin coaching youth basketball

and baseball.  He described how Mr. Cremin withdrew from coaching in 1997 for health reasons and

then began to participate less and less in youth sports.  The two men had Warriors tickets together for

many years–but Mr. Cremin gave his up in 1998 because it was too hard for him to attend the games.

They would walk their dogs together three times a week, but it became apparent to this firefighter

that Mr. Cremin has "a very significant amount of difference in" his "physical capabilities from day

to day." One day he would walk briskly for forty minutes. The next day he would walk slowly or be unable to go at all. Walking uphill was a challenge. He recalls three occasions when Mr. Cremin needed to take nitroglycerin tablets. CF-134. This letter was simply ignored by Liberty Mutual.

12. Daniel Donoval, a Vice President at Morgan Stanley wrote to Liberty Mutual. He used to attend analyst presentations and professional association meetings with Mr. Cremin bimonthly. They would also meet about twice a month to exchange ideas, and they spoke regularly on the phone. He relied on Mr. Cremin to use personal computer models to provide rapid in-depth analysis which considered risk. He considered Mr. Cremin excellent at interpreting financial statements, especially the footnotes and technically complex items. In late 1997, Mr. Cremin stopped attending the briefings and professional meetings, apparently for health reasons. The two men still meet occasionally. "The major change in these discussions is that Mr. Cremin no longer has the ability to wade through the complex technical financial notes. This is not to say he does not realize there are potential issues. He definitely does, but no longer ferrets out the facts and accounting decisions that allow one to estimate risk and quantify it." "The final, and most surprising change is that Mr. Cremin no longer uses his PC. He was a pioneer in implementing computer assisted financial planning and analysis at McKesson Corporation. He fully understands the value and power of PCs relative to the financial functions, and yet he does not use his own." CF-0136. This letter was simply ignored by Liberty Mutual.

13. Mr. Cremin filed for long-term disability (LTD) benefits under the Plan because of coronary artery disease and secondary anxiety disorder on September 21, 1998. CF-0898.

14. Mr. Cremin was approved for Plan benefits on April 20, 1999. CF-0753. This occurred before the Liberty Mutual buyout.

15. Mr. Cremin was approved for Social Security disability benefits retroactive to January 1999. Liberty Mutual ignored this evidence of disability as if it did not exist. CF-0706.

16. Liberty began a review of Mr. Cremin's claim on December 28, 1999. CF-0684. This is prior to the effective date of the buyout.

17. After a paper file review and two sets of unproductive *sub rosa* surveillance[2] during which Mr. Cremin only was observed once going to the corner store, and once briefly exiting his residence– in other words **surveillance which objectively confirmed Mr. Cremin's description of his condition**, CF-004, Liberty terminated Mr. Cremin's LTD benefits by letter dated August 30, 2002. Because the *sub rosa* surveillance confirmed Mr. Cremin's report of his condition[3], Liberty Mutual ignored it. CF-0515-19.

18. Liberty also ignored its own observation of Mr. Cremin's demeanor. When Liberty's nurse called Mr. Cremin, she noted: "voice very soft", "slow monotone," which would seem to make sense with his report to the nurse that "he has no energy," "does have chest pain with walking up stairs." CF-14. This evidence, of course, was not mentioned by Liberty Mutual in its decision.

---

[2]In one five day period, Mr Cremin was only observed once going to the corner store and once briefly exiting his residence. CF-004. During another five days of surveillance, he went out to a restaurant once and stopped at a craft store, and on another occasion left home for less than an hour. CF-12. The Liberty file reflects the investigator called and asked what to do since Mr. Cremin was "not real active." CF-13.

[3]

19. By letter to Liberty dated October 10, 2002, Mr. Cremin appealed the termination of his benefits, explaining in part: "I have heart disease, suffer regular chest pains, shortness of breath, and lack stamina . Additionally, I suffer from acute anxiety and depression, lack energy and have a great degree of difficulty performing many routine tasks." CF-0513. Liberty never gave any credence to Mr. Cremin's description of his own capacities, of his pain or his fatigue, but instead simply ignored it. Subjective complaints of disabling conditions should be credited when they are supported by medical impairment and there is no reason to discredit the insured, an analytical paradigm imported into ERISA from social security disability litigation.[4]

20. Liberty denied Mr. Cremin's appeal by letter dated December 6, 2002.  CF-0461-65.

21. After obtaining a paper file review by Dr. Peter Mirkin, a psychiatrist, Liberty upheld its decision to deny Mr. Cremin's appeal by letter dated December 31, 2002. Liberty preferred Dr. Mirkin's paper review to the reports of treating physicians not because it was more persuasive, but simply because it favored Liberty's position. CF–0442.

---

[4]    "In this regard we note our case law in Social Security disability cases, *e.g., Cotton v. Bowen,* 799 Fed.2d 1403, 1407 (9th Cir.1986) (per curiam), where we have noted that individual reactions to pain are subjective and not easily determined by reference to objective measurements. *See also Bunnell v. Sullivan,* 947 Fed.2d 341, 348 (9th Cir.1991) (en banc) (affirming *Cotton); Fair v. Bowen,* 885 Fed.2d 597, 601 (9th Cir.1989) ("[P]ain is a completely subjective phenomenon" and "cannot be objectively verified or measured.").[FN3]

"FN3. While the rules and presumptions of our Social Security case law do not apply to ERISA benefits determinations, see *Black & Decker Disability Plan v. Nord,* 538 U.S. 822 (2003), our Social Security precedents are relevant for the factual observation that disabling pain cannot always be measured objectively-which is as true for ERISA beneficiaries as it is for Social Security claimants.

*Saffon v. Wells Fargo & Company Long Term Disability Plan,* __ Fed. 3d. ___ (9th Cir., 2008) as modified April 16, 2008

22.  Mr. Cremin commenced an action in this Court to recover his back benefits and to be reinstated for future benefits under the Plan.   Mr. Cremin's action was designated Case Number C04-04394 (the "Previous Case").

23.  In the Previous Case, the Court entered two orders: (1) granting Plaintiff's partial summary adjudication motion for a de novo standard of review (Previous Case, Docket 58, filed October 3, 2005); (2) granting Defendant's motion to remand the case to the Plan Administrator for further investigation of Mr. Cremin's claim (Previous Case, Docket 67, filed December 21, 2005).

24.  By letter dated October 10, 2006, after obtaining a paper file review by Dr. Dianne Zwicke, a cardiologist, and a clarification of his 2002 report from Dr.Mirkin, Liberty made an adverse determination upholding the termination of  Mr. Cremin's benefits on remand.  Mr. Cremin requested that Liberty wait for a forthcoming psychological report that was in preparation, but Liberty refused to do so. CF-0042-48.

25.  By letter dated January 10, 2007,  Liberty declined Mr. Cremin's request to initiate an appeal of the adverse determination on remand, and it declined to consider the now available psychological report, which provided objective evidence proving a secondary anxiety disorder which prevents Mr. Cremin from working.  CF-0021-22.

This action follows.

**C.  Medical History**

26.  Cardiologist Kent Gershengorn objectively documents ongoing cardiac disease with perfusion defects and an area of infarct.  CF-242, 248.  Angiography shows  "total occlusion of

1    a probably non-dominant right coronary artery with collateral filling from left."  CF-252.

2

3

4        27.  Dr.  Gershengorn also documents ongoing complaints of chest pain.  CF-201 -

     CF-216.  Common sense suggests that some people, continually reminded of their cardiac status by
5
     recurring chest pain, would become depressed or anxious as a result, sometimes more than the
6
     cardiac disease itself might seem to justify.
7

8

9        28.  Dr. Gershengorn notes that "[m]ajor depression/anxiety has been shown to be the

10   strongest predictor of adverse outcome (MI, CABG, angioplasty) on patients with coronary artery

11   disease. CF-234.  In other words, Mr. Cremin's anxiety really gives him something to worry about.

12   Dr. Gershengorn provided Liberty Mutual with a graphic overview of normal and abnormal stress

13   reactions to cardiac events to illustrate what happened to Mr. Cremin.  CF-317.  Liberty Mutual

14   ignored this entire analysis.

15

16       29.  By letter dated December 4, 2002, Dr. Gershengorn advised Liberty Mutual CF-

17   234:

18
         "Michael Cremin worked part-time at McKesson Corporation from
19       January 1997 through August 1998.  Subsequently, he was deemed
         disabled by SSDI because of his cardiac condition and severe anxiety
20       disorder.  Mr. Cremin has the exertional limitations indicated on your
         form.  However, he also has exertional limits due to his medical
21       conditions.  Examples of non-exertional activities that could be
         harmful to him are structured schedules, deadlines, adversarial
22       relationships, and commuting to work."

23
         "His condition is stable.  He remains on cardiac medications (atenolol,
24       Lipitor, Imdur, Niaspan, occasional nitroglycerin)  and Xanax, and he
         remains in therapy for his anxiety disorder.  I am unaware of any
25       dramatic improvement in Mr. Cremin's medical condition that
         warrants reversal of the previous decision, which found him to be
26       disabled."

27   27.   In July, 2006, Dr. Gershengorn supplemented this opinion (CF-205) and explained the

28

**objective basis of disability**:

> Mr. Cremin develops rather severe fatigue with emotional as well as physical stress. When he is under stress, such as that experienced at work, he develops extreme fatigue.  He also has this problems with physical activity.  Mr. Cremin has clinical angina with at least mild myocardial ischemia, possibly related to his prior myocardial infarction and/or small vessel disease.  I believe his fatigue is secondary to his underlying ischemic heart disease with his prior extensive myocardial infarction.

> It is somewhat difficult to objectively show medical evidence that his nonexertional limitations were precluding him from returning to any full-time work.  He clearly has symptoms which he reports during exertion and the symptoms are intermittent.  There are times when he is able to walk without difficulty but at other times he develops rather severe fatigue and angina.  Part of his fatigue is undoubtedly related to his reaction to his mediation, specifically beta-blocker, which he needs to control his chest pain and he also needs to protect his heart from further damage.

28.  Dr. Gershengorn referred Mr. Cremin to The TAM Program to treat his anxiety. Their report, at CF-239, states:

> "Psychological screening pre-TAM suggested moderate depression and severe anxiety...Mike currently sees a psychiatrist for talk therapy.  I have encouraged Mike to continue with mental health follow-up as stress and anxiety remain major issues for him.  In fact, obstacles to his cardiac recovery."

29.  Mr. Cremin was treated by Dr. George Karalis.  Unknown to Mr. Cremin, Dr. Karalis was convicted of fraud, and for that reason, we do not rely on him.

30.      Roxanne Morse, Ph.D., a psychologist, sought to measure objectively the extent of Mr. Cremin's anxiety, and to demonstrate that his disability is not the result of malingering. Testing consumed eight hours over two days.  CF-28.  She administered the following tests:

**Test of Memory Malingering III (TOMM III)**

> "The results of this test indicate that Mr. Cremin ... has not portrayed himself in an exaggerated light...Mr. Cremin is <u>not malingering</u>."

**M-FAST**

"This test was administered to assess symptom exaggeration and symptom inconsistency in Mr. Cremin's self-report of anxiety. Mr. Cremin's profile on this test indicates that he has responded to the test in a frank and honest manner with <u>no tendency to exaggerate</u> his subjective experience of his anxiety disorder."

**Wechsler Adult Intelligence Scale III (WAIS III)**

Full Scale IQ = Average (70th percentile)

Verbal IQ = Superior (95th percentile)

Performance IQ = Low Average (19th percentile)

Subtests showed wide scatter from 15 on information and vocabulary to 7 on picture completion. te "processing speed index" scored in the "mild mental retardation" (1st percentile) which

"speaks to some of the challenges Mr. Cremin may experience with regard to timed tasks in his day to day life. Specifically domains involving activities which have deadlines and working under time pressure seem to be a challenge for Mr. Cremin, all of which is negatively impacted by anxiety disorders."

"His low performance on Digit Symbol is directly related to his level of anxiety and its impact on eye hand coordination and ability to concentrate and remain focused."

**Millon Clinical Multiaxial Inventory III**

"There was no evidence of malingering." "He appears to have responded to the test in a frank and self-revealing manner." "Mr. Cremin's profile is indicative of a person with a severe anxiety disorder."

Dr. Morse concluded the following:

"The medication that Mr. Cremin is currently prescribed for his cardiac condition has as a side effect fatigue. This side effect (fatigue) is in addition to the fatigue already created by the cardiac condition in and of itself. Additionally, chronic anxiety also causes fatigue. In order for Mr .Cremin to manage his anxiety and cardiac condition simultaneously he must be mindful of both fatigue and psychological stressors; both factors that would be related to work performance and productivity . Mr. Cremin is disabled by his condition from working at any occupation, and has been since he left his employment with McKesson Corporation.

"I concur with the part of Dr. Gershengorn's assessment that states that 'non-exertional limitations' put Mr .Cremin at risk for additional cardiovascular complications and make him disabled.  These non-exertional limitations include Mr. Cremin's Generalized Anxiety Disorder which is primarily secondary to his cardiovascular status." CF-0024-32.

## III.  STANDARD OF REVIEW

### A.  Review is <u>De Novo</u> by the Court's Order in the Previous Case.

In this current action, the Court reviews <u>de novo</u> Liberty's adverse determination to terminate Mr. Cremin's benefits.  The parties fully litigated the standard of review in the prior case, and the Court held on October 3, 2005, that it would review Mr. Cremin's benefit termination under a <u>de novo</u> standard.  Docket 58, p. 15.   As that Order is final, issue preclusion mandates a <u>de novo</u> standard of review now.  *Baker v. General Motors Corp.*, 522 U.S. 222, 233 n.5 (1998)(an issue actually litigated and resolved by  final judgment will bind the parties in a subsequent action on the same claim).

### B.  <u>De Novo</u> Review is Warranted In Any Case.

Even if the Previous Case had not settled the standard of review, there is no adequate delegation of discretion to Liberty.  The buyout agreement does not make Liberty the Plan Administrator, and it would be a manifest breach of duty for an independent, unconflicted Plan Administrator such as the Employee Benefits Committee to appoint a biased, conflicted trustee in its place, particularly to handle claims which had already vested.  This is not a case where the claims were inchoate and so the plan subject to whatever modification the plan sponsor wanted to make. The claims subject to the buyout were already existing disability claims, so that the rights of the employees had vested.  The plan sponsor cannot change the benefits due to those who are already disabled.

1    Further, even if there had been an effective delegation of discretion to Liberty, the

2    Court would afford little or no deference to Liberty's reasons for terminating Mr. Cremin's benefits.

3    Liberty labors under an inherent conflict of interest because it both administers the Plan and funds

4    the claims. See *Firestone v. Bruch*, 489 U.S. 101, 105 (1989)(suggesting a possible conflict of

5    interest exists when a plan administrator is also the sole source of funding for an unfunded plan);

6    *Tremain v. Bell Industries, Inc.*, 196 Fed. 3d 970, 976 (structural conflict of interest exists when an

7    insurer both administers and funds an ERISA plan). Such a conflict weighs more heavily toward de

8    novo review when the record shows that the administrator "fails adequately to investigate a claim" or

9    "fails to credit a claimant's reliable evidence." *Abatie v. Alta Health & Life Insurance Co.*, 458

10   Fed.3d 955, 968 (9th Cir. 2006)(citations omitted). In addition, procedural irregularities in processing

11   a claim weigh in favor of less deferential review. *Id.* at 972-73. All of these factors are present here.

12

13   **1. Liberty Failed to Adequately Investigate the Claim.**

14

15   An insurer has a duty to thoroughly investigate every possible basis for a claim. *Egan*

16   *v. Mutual of Omaha Insurance Co.*, 24 Cal.3d 809, 819 (1979). In the same way, the administrator

17   of an ERISA plan must take the steps necessary to obtain information that will help substantiate a

18   claim. *Booton v. Lockheed Medical Benefit Plan*, 110 Fed.3d 1461, 1463 (9th Cir. 1997)(insurer must

19   ask for information that might support a benefit claim).

20

21   Upon de novo review of the termination of Mr. Cremin's benefits, this Court found

22   that because of "gaps in the record," it could not make a final judgment regarding Mr .Cremin's

23   claim. The Court then remanded Mr. Cremin's claim to Liberty for additional investigation.

24

25   Medical examinations are essential to substantiate a disability, and they are commonly

26   ordered by plan administrators investigating disability claims. Here, under Section 5.3 of the Plan,

27   Liberty undisputedly had the authority to require Mr. Cremin to be examined by as many

28

1   cardiologists, psychiatrists, and other specialists as it desired.  Nevertheless, in the six years that his

2   disability has been at issue, Liberty never ordered a medical examination of Mr. Cremin.  While the

3   Plan provides for the Claims Administrator to request a medical examination of the insured, it has no

4   provision to substitute a paper review for the opinion of an examining physician.  The plan gives

5   fairly detailed instructions.  It requires objective medical evidence.  It provides for examination by a

6   physician.  It does not provide for reviewing physicians who do not examine the insured.  *Expresso*

7   *unius est exclusio alterius*.  The opinions of non-examining physicians should be disregarded under

8   the terms of this plan.

9

10  **2.  Liberty Failed to Credit Reliable Evidence of Disability.**

11

12

13         Under the ERISA claims reguilations, a plan administrator must consider all

14  information submitted by a claimant.   29 C.F.R. § 2560.503-1(h)(iv).    A plan administrator may

15  not arbitrarily refuse to credit a claimant's reliable evidence that may support disability.  *Black &*

16  *Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

17

18         Liberty went to great pains to simply ignore the evidence that did not fit into the

19  decision it wanted to reach.  It does not even mention the social security disability decision.

20  Disability decisions by Administrative Law Judges and by the Social Security Administration are

21  relevant evidence of disability in ERISA cases, and they ought to be considered both by Plan

22  Administrators (*Calvert v. Firstar Finance, Inc.*, 409 Fed. 3d 286, 294 (6th Cir. 2005), *Ladd v. ITT*

23  *Corp.*, 148 Fed. 3d 753, 756 (7th Cir., 1998), *Wible v. Aetna Life Insurance Co.*, 375 Fed. Supp. 2d

24  956, 971 ©. D. Cal., 2005),  and by Courts reviewing ERISA Plan decisions. *Kirwan v. Marriott*

25  *Corp.,* 10 Fed.3d 784, 790 (11th Cir., 1994), *Lopes v. Metropolitan Life Insurance Co.,* 332 Fed. 3d

26  1, 6 n.9 (1st Cir. 2003), *Paese v. Hartford Life and Accident Insurance Co.,* 449 Fed. 3d 435, 442-443

27  (2nd Cir., 2006).  The Social Security administration's disability decision, particularly where based

28

upon the same criteria as used by the Plan, "is highly relevant." *Force v. Ameritech Corp., Inc.,* 452 Fed. Supp. 2d 744, 750 (E. D. Mich., 2006).

Courts accept disability determinations by the Social Security Administration as relevant because:

> "SSA benefits are not given to malingerers or people who suffer from a few aches and pains; they are reserved for seriously disabled workers."
>
> *Force v. Ameritech Corp., Inc.,* 452 Fed. Supp. 2d 744, 750-751 (E. D. Mich., 2006).

In short, the Social Security Administration, which has long and carefully researched the medical and industrial issues associated with work disability, has developed respect for its work, and to that extent its opinions are relevant to disability decisions in ERISA cases.

Liberty similarly disregarded Dr. Morse's report, in its entirety, which constitutes clear, objective, evidence of disability.

Liberty failed to consider *anything* that did not come from a physician.  It did not consider the results of its own surveillance which showed Mr. Cremin living a very inactive and limited lifestyle, it did not consider Mr. Cremin's work history and its downward spiral, it did not consider anything Mr. Cremin said and it did not consider anything said by law witnesses to the change in his lifestyle.

Justice Kozinski in *Saffon v. Wells Fargo & Company Long Term Disability Plan*, __ Fed. 3d. ___ (9th Cir., 2008) as modified April 16, 2008, suggested looking to the analysis done in

1    social security cases to assess the subjective components of disability such as chronic pain (see

2    footnote 4, supra.  Under that analysis, Mr. Cremin's disability is readily demonstrated:

3

4           In order to qualify for social security disability benefits, a claimant
       must establish that a medically determinable physical or mental

5           impairment prevents him from engaging in substantial gainful activity.
       Perry v. Heckler, 722 Fed.2d 461, 464 (9th Cir.1983); 42 U.S.C. §

6           423(d)(1)(A) (1982). The impairment must result from abnormalities
       that are demonstrable by medically acceptable clinical or laboratory

7           diagnostic techniques. 42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)©
       (1982).

8

9           *Bilby v. Schweiker*, 762 Fed. 2d 716, 718 (9th Cir. 1985).

10

11          "Disability may be proved by medically-acceptable clinical diagnoses,
       as well as by objective laboratory findings."

12

13          *Day v. Weinberger*, 522 Fed. 2d 1154, 1156 (9th Cir., 1975), quoted in
       *Rodriguez v. Bowen*, 876 Fed. 2d 759, 762 (9th Cir. 1989).

14

15

16          "The question of a disability claimant's right to relief because of
       subjective complaints of pain, when those complaints are not sustained

17          by objective findings, has been the subject of considerable review in
       recent years. Out of the judicial attention the problem has received,

18          some basic guidelines have begun to emerge. The case of Butler v.
       Flemming, 288 Fed.2d 591 (5th Cir. 1961), enunciated the proposition

19          that a claimant has shown disability within the meaning of the Act
       when he shows that to work causes him great pain. 'Congress has in

20          effect stated that if a person is unable except under great pain to
       engage in any substantial gainful activity in which he might be

21          employable, taking into consideration his age, training, work
       experience and physical and mental capacities, he shall be deemed to

22          be disabled for the purposes of this Act.' 288 Fed.2d at 595. In so
       holding the court rejected an alternative standard that would deem a

23          claimant not disabled by pain unless the pain, in addition to causing
       him discomfort, also aggravated his physical or mental impairment.

24          See Theberge v. United States, 87 Fed.2d 697 (2d Cir. 1937).

25          "In Hayes v. Celebrezze, 311 Fed.2d 648 (5th Cir. 1963), the court was

26          confronted with a situation very much like the one at bar. The
       claimant's complaints of pain were not well substantiated objectively,

27          and the hearing examiner had denied the claim. The court remanded
       with instructions that the examiner make specific findings on the issue

28          of claimant's credibility and the genuineness of his complaints of pain.

To the Secretary's argument that subjective pain is insignificant unless supported by objective findings, the court responded as follows:

‘But the statute does not require that disability or its cause be ‘substantiated objectively.’ Of course it must be ‘by reason of any medically determinable physical or mental impairment.’ But modern medicine is neither so scientific nor so helpless today that it either does, or must, evaluate only objective factors.' 311 Fed.2d at 654.

*Goodwin v. Gardner*, 250 Fed. Supp. 454, 457 (N. D., Cal., 1966).

Mr. Cremin suffers from objectively documented medical impairments, including a cardiac condition likely to cause some fatigue, and likely to cause some anxiety. Perhaps he has more than expected– but it cannot seriously be doubted that he suffers from the fatigue and the anxiety, and that it has disabled him.

## V. JUDGMENT SHOULD BE ENTERED FOR THE RELIEF REQUESTED

The gross monthly benefit due is $4,655 from which is deducted $1,455 SSDI for a net monthly benefit of $3,200. This is payable from August 30, 2002 to April 30, 2008 (69 months) for a total of $220,800 plus interest at 10 per cent per annum of $74,880. interest for a total past benefit due of $295,760. Mr. Cremin should be awarded the past due benefit plus restored to active claim status.

He should, in addition, be awarded costs and attorneys fees for both actions. *Smith v. CMTA-IAM Pension Trust,* 746 Fed 2d 589, 598 (9th Cir. 1984).

April 21, 2008

_____
Laurence F. Padway
Attorney for Michael Cremin