1  PAMELA E. COGAN (SBN 105089)
   KATHRYN C. CURRY (SBN 157099)
2  JENNIFER A. WILLIAMS (SBN 244707)
   ROPERS, MAJESKI, KOHN & BENTLEY
3  1001 Marshall Street, Suite 300
   Redwood City, CA  94063
4  Telephone:    (650) 364-8200
   Facsimile:    (650) 780-1701
5
   Attorneys for Defendant McKESSON
6  CORPORATION EMPLOYEES' LONG TERM
   DISABILITY BENEFIT PLAN and Real Party In
7  Interest LIBERTY LIFE ASSURANCE COMPANY
   OF BOSTON
8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

12 MICHAEL CREMIN,                    CASE NO.  C 07-1302-CW

13           Plaintiff,               **DEFENDANT AND REAL PARTY IN
                                      INTEREST'S RESPONSE TO
14 v.                                 PLAINTIFF'S MOTION FOR JUDGMENT
                                      AND CROSS MOTION FOR JUDGMENT**
15 McKESSON CORPORATION
   EMPLOYEES' LONG TERM               **[Fed.R.Civ.P. 52]**
16 DISABILITY BENEFIT PLAN;
                                      Date:      June 19, 2008
17          Defendant.                Time:      2:00 p.m.
                                      Dept.:     Courtroom 2, 4th Floor
18
19                                    **Judge:    Honorable Claudia Wilken**

20 ┌─────────────────────────────
   LIBERTY LIFE ASSURANCE
21 COMPANY OF BOSTON

22 Real Party In Interest.

23

24

25

26

27

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

# TABLE OF CONTENTS

                                                                                        **Page**

I.   INTRODUCTION ..................................................................................................1

II.  STATEMENT OF FACTS ....................................................................................1

     A.   BACKGROUND ........................................................................................1

     B.   PLAINTIFF'S CLAIM FOR BENEFITS ................................................2

     C.   LIBERTY BECOMES THE CLAIMS ADMINISTRATOR......................3

     D.   Liberty Denies Plaintiff's Claim and Plaintiff Appeals............................5

     E.   Plaintiff Files Suit ....................................................................................6

     F.   Liberty's Additional Investigation Following Remand .............................6

     G.   LIBERTY REFERS THE CLAIM TO A CARDIOLOGIST FOR AN
          INDEPENDENT MEDICAL REVIEW ......................................................9

          1.   Dr. Zwicke Speaks With Dr. Gershengorn ....................................9

          2.   Dr. Gershengorn Agrees With the Opinions of Dr. Zwicke ........10

     H.   DR. MIRKIN CLARIFIES HIS PRIOR REPORT ...............................10

     I.   LIBERTY CONCLUDES ITS INVESTIGATION AND DENIES THE
          CLAIM......................................................................................................10

III. THE MCKESSON PLAN ....................................................................................11

IV.  LEGAL ARGUMENT ........................................................................................12

     A.   THE APPLICABLE STANDARD OF REVIEW IS AN ABUSE OF
          DISRCETION .........................................................................................12

          1.   The Plan and Policy Confer Discretion on Liberty to Interpret the
               Plan and Make Eligibility Decisions ...........................................12

          2.   The Plan Administrator Properly Delegated Discretion to Liberty as
               the Claim Administrator to Make Eligibility Determinations ......13

          3.   The Court's Prior Ruling that the De Novo Standard of Review
               Applies is Not Res Judicata in this Action ..................................15

     B.   LIBERTY'S DECISION IS ENTITLED TO SUBSTANTIAL
          DEFERENCE ..........................................................................................17

          1.   Liberty Conducted a Complete, Thorough, and Objective
               Investigation..............................................................................17

               a.   Liberty Was Not Required To Consider Dr. Morse's
                    Untimely Report ............................................................19

               b.   A Medical Examination Was Neither Warranted, Nor
                    Required.........................................................................19

               c.   Liberty Did Not Fail to Credit Any Reliable Evidence of
                    Disability........................................................................20

     C.   LIBERTY DID NOT ABUSE ITS DISCRETION .................................21

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

DEFENDANT'S AND REAL PARTY IN
INTEREST'S CROSS MOTION FOR JUDGMENT
CASE NO.  C 07-1302-CW (JL)

**TABLE OF CONTENTS**
(continued)

Page

D.  PLAINTIFF HAS NOT AND CANNOT PROVE THAT HE WAS "DISABLED" FROM ANY OCCUPATION AS OF SEPTEMBER 1, 2002 .................................................................................................22

  1.  The 1999 Social Security Award is Not Medical Evidence of Disability in 2002.........................................................................23

  2.  The Personnel Records and Letters Are Not Evidence of Disability in 2002 .................................................................................24

  3.  Dr. Morse's September 6, 2006 Report is Untimely, Irrelevant and Insufficient Evidence of Disability in 2002 .................................24

V.  CONCLUSION.................................................................................................25

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANT'S AND REAL PARTY IN INTEREST'S CROSS MOTION FOR JUDGMENT CASE NO.  C 07-1302-CW (JL)

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3

4
*Abatie v. Alta Health & Life Insurance Co.,*
458 F.3d 955 (9th Cir. 2006) ....................................................................passim

5
*Alford v. DCH Foundation Group Long Term Disability,*
311 F.3d 955 (9th Cir. 2002) ...........................................................................19

6

7
*Baker v. General Motors Corp.,*
522 U.S. 222, 118 S. Ct. 657 (1998)................................................................16

8
*Becker v. Mack Trucks, Inc.,*
281 F.3d 372 (3d Cir. 2002), cert. denied,

9
537 U.S. 818, 154 L. Ed. 2d 24, 123 S. Ct. 93 (2002).....................................14

10
*Bendixen v. Standard Insurance Co.,*
185 F.3d 939 (9th Cir. 1999) .....................................................13, 19, 21, 24

11

12
*Black & Decker Disability Plan v. Nord,*
538 U.S. 822, 123 S. Ct. 1965 .........................................................................23

13
*Boomis v. Metropolitan Life Insurance Co.,*
970 F. Supp. 584 (E.D. Mich. 1997).................................................................23

14

15
*Booton v. Lockheed Medical Benefit Plan,*
110 F.3d 1461 (9th Cir. 1997) ..........................................................................18

16
*Clark v. Wash. Teamsters Welfare Trust,*
8 F.3d 1429 (9th Cir. 1993) ..............................................................................21

17

18
*Curtiss-Wright Corp. v. Schoonejongen,*
514 U.S. 73, 131 L. Ed. 2d 94, 115 S. Ct. 1223 (1995)...................................14

19
*De Gurules v. Immigration & Naturalization Serv.,*
833 F.2d 861 (9th Cir. 1987) ............................................................................16

20

21
*Doe v. Travelers Insurance Co.,*
971 F. Supp. 623 (D.C. Mass. 1997) ...............................................................13

22
*Dowden v. Blue Cross & Blue Shield of Texas, Inc.,*
126 F.3d 641 (5th Cir. 1997) ............................................................................21

23

24
*EEOC v. Sears, Roebuck & Co.,*
417 F.3d 789 (7th Cir. 2005) ............................................................................16

25
*Firestone Tire & Rubber Co. v. Bruch,*
489 U.S. 101, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989)...................................12

26

27
*Frost v. Met Life Insurance Co., et al.,*
470 F. Supp. 2d 1101 (C.D. Cal 2007) ............................................................20

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/5108855.TOA/KCC

- iii -

DEFENDANT'S REPONSE AND CROSS
MOTION FOR JUDGMENT –
CASE NO. C 07-1302 CW

*Grosz-Salomon v. Paul Revere Life Insurance Co.*,
    237 F.3d 1154 (9th Cir. 2001) ..................................................................14, 15

*Hensley v. Northwest Permanente P.C. Retirement Plan & Trust*,
    258 F.3d 986 (9th Cir. 2001) ............................................................................17

*Horton v. Reliance Standard Life Insurance Co.*,
    141 F.3d 1038 (11th Cir. 1998) ........................................................................22

*Hutchins v. Champion Intern. Corp.*,
    110 F.3d 1341 (8th Cir. 1997) ..........................................................................15

*International Association of Machinists and Aerospace Workers, Woodworkers*
    *Division, AFL-CIO v. Masonite Corp.*,
    122 F.3d 228 (5th Cir. 1997) ............................................................................14

*International Union, United Automobile, Aerospace & Agr. Implement Workers of*
    *America, U.A.W. v. Skinner Engine Co.*,
    188 F.3d 130 (3d Cir. 1999) .............................................................................14

*John Morrell & Co. v. United Food & Commercial Workers International Union*,
    37 F.3d 1302 (8th Cir. 1994) ............................................................................15

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*,
    63 F. Supp. 2d 1145 (C.D. Cal. 1999) ..............................................................18

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*,
    370 F.3d 869 (9th Cir. 2004) .......................................................................21, 23

*Kaiser v. Standard Insurance Co. et al.*,
    2007 U.S. Dist. LEXIS 2239 (N.D. Cal. 2007) ..........................................20, 21

*Kearney v. Standard Insurance Co.*,
    175 F.3d 1084 (9th Cir. 1999) ..........................................................................13

*Madden v. ITT Long Term Disability Plan*,
    914 F.2d 1279 (9th Cir. 1990),
    cert. denied, 498 U.S. 1087, 112 L. Ed. 2d 1051, 111 S. Ct. 963 (1991) ........13, 14, 23

*McDaniel v. The Chevron Corp.*,
    203 F.3d 1099 (9th Cir. 2000) ..........................................................................13

*McKenzie v. General Telegraph Co. of Cal.*,
    41 F.3d 1310 (9th Cir. 1994) ............................................................................22

*Meyers v. Hartford Life and Accident Insurance Co.*,
    489 F.3d 348 (8th Cir. 2007) ............................................................................22

*Miller v. Metropolitan Life Insurance Co.*,
    925 F.2d 979 (6th Cir. 1991) .......................................................................18, 19

*Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*,
    986 F.2d 580 (1st Cir. 1993) .......................................................................13, 14

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RCI/5108855.TOA/KCC

- iv -

DEFENDANT'S REPONSE AND CROSS
MOTION FOR JUDGMENT –
CASE NO. C 07-1302 CW

*Saffon v. Wells Fargo Long Term Disability Plan,*
   511 F.3d 1206 (9th Cir. 2008) ...................................................................18, 20

*Estate of Shockley v. Alyeska Pipeline Serv. Co.,*
   130 F.3d 403 (9th Cir. 1997) ............................................................................21

*In re Smithkline Beecham Clinical Laboratory,* 1
   08 F. Supp. 2d 84, fn. 42 (D.C. Conn. 1999) .................................................13

*Wopsock v. Natchees,*
   454 F.3d 1327 (Fed. Cir. 2006) .......................................................................16

## FEDERAL STATUTES

29 U.S.C. §§ 1051-1061 .........................................................................................14

Fed.R.Civ.P. 52.........................................................................................................1

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

DEFENDANT'S REPONSE AND CROSS
MOTION FOR JUDGMENT –
CASE NO. C 07-1302 CW

# I. INTRODUCTION

This is the second time the court has been asked to review this claim. Previously, the Court denied plaintiff's Rule 52 motion for judgment and remanded the claim to Liberty Life Assurance Company of Boston ("Liberty") for further investigation because plaintiff failed to prove he was disabled under the McKesson Corporation Long Term Disability Plan ("Plan") after September 1, 2002, which expressly requires objective medical proof of disability. Liberty promptly conducted a further investigation, including contacting plaintiff's treating doctors, and obtaining a review from an independent cardiologist and clarification from a psychiatrist to address the Court's concerns. Based on its additional investigation, Liberty upheld its denial.

Pursuant to Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 958 (9th Cir. 2006), Liberty's decision to deny the claim after completing the investigation on remand must be reviewed for an abuse of discretion. Because Liberty's investigation was reasonable, thorough, and objective; and its decision was supported by substantial evidence, including the opinions of plaintiff's treating cardiologist, an independent psychiatrist, and an independent cardiologist, Liberty did not abuse its discretion by concluding that plaintiff was no longer disabled after September 1, 2002. Regardless, even if the de novo standard of review is applied, the Plan is entitled to judgment in its favor because, once again, plaintiff has not and cannot prove that he was "disabled" from any occupation as of September 1, 2002, when Liberty denied the claim.

No longer relying on the only doctor who previously certified plaintiff's disability under the Plan (Dr. Karalis) because he is admittedly unreliable, the only alleged "objective" evidence of disability plaintiff presents to the court is an untimely independent psychological evaluation report outside the administrative record prepared on September 6, 2006—four years after the claim was denied; and plaintiff's 1999 award of Social Security. Neither, however, is sufficient to establish disability within the meaning of the Plan regardless which standard of review applies.

# II. STATEMENT OF FACTS

## A.    BACKGROUND

Plaintiff has a Bachelor of Science degree in Business Administration from the University

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/5108855.2/KCC

DEFENDANT'S RESPONSE AND CROSS MOTION FOR JUDGMENT --
CASE NO. C 07-1302-CW (JL)

1    of San Francisco and an MBA from Golden Gate University. (CF-659.)[1]  He began working at

2    McKesson Corporation ("McKesson") in 1980 as a Manager of Financial Analysis and in 1986

3    was promoted to Director of Profitability Analyst. (CF-659.)  In 1988, he had a heart attack,

4    recovered, and returned to work full-time as a Director of Profitability Analyst for ten years until

5    when he left due to alleged coronary artery disease and anxiety on or about January 26, 1998.

6    (CF-815, CF-898.)  He returned to part-time work on February 10, 1998 and continued to work

7    part-time until August 1998, when he was told he either had to return to work full-time or move

8    to another department. (CF-477, 920, 815.)  Plaintiff then took a personal leave of absence, went

9    on vacation, and filed a claim for disability. (CF-804, 815, 898.)

10   **B.    PLAINTIFF'S CLAIM FOR BENEFITS**

11          On September 21, 1998, plaintiff submitted a claim for long-term disability benefits under

12   the McKesson Plan. (CF-898 to 900.)  Although plaintiff stated his claim was based on coronary

13   artery disease and anxiety and his attending physician was identified as cardiologist, Kent

14   Gershengorn, M.D., the accompanying Attending Physician's Statement ("APS") submitted was

15   completed instead by Dr. George Karalis, his psychiatrist, on September 10, 1998. (CF-900.)

16   Pursuant to the APS, Dr. Karalis first saw plaintiff on September 9, 1998, after plaintiff stopped

17   working at McKesson.  Plaintiff reported he was unable to work because of anxiety and fear that

18   he would have another heart attack. (CF-900.)  Although Dr. Karalis opined plaintiff would be

19   able to return to work in a month, he continued to extend plaintiff's return to work date in

20   subsequent reports to Preferred Works, the Plan's claim administrator. (CF-792, 811, 819.)

21          On April 20, 1999, Preferred Works approved plaintiff's claim for long term disability.

22   (CF-753 to 754.)  At that time, plaintiff was advised that if he remained totally disabled for more

23   than 24 months, his benefits would continue only if objective medical evidence showed he was

24   prevented from performing any occupation for which he was reasonably qualified by training,

25   education and experience. (CF-753.)

26          On August 16, 1999, the Social Security approved plaintiff's disability claim, awarding

27   him monthly social security benefits in the amount of $1,455. (CF-711.)  Only the award letter

28   _____
[1] The claim file ("CF") [manually filed with the court] is attached as Exhibit C to the Declaration of Paula McGee.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    was provided to Preferred Works, nothing else (e.g. findings of facts or supporting evidence).

2    **C.    LIBERTY BECOMES THE CLAIMS ADMINISTRATOR**

3    On January 1, 2000, Liberty became the Claims Administrator for the McKesson Plan and

4    took over the handling of plaintiff's claim from Preferred Works. (CF-684.) Liberty reviewed all

5    medical records and continued to monitor plaintiff's claim, including periodically requesting

6    updated medical information from his treating physicians.

7    On March 10, 2000, Liberty received an updated Restrictions Form and APS from Dr.

8    Karalis reporting that he only saw plaintiff "as needed." (CF-660, 661.) Although Dr. Karalis

9    was asked to identify specific restrictions and limitations, Dr. Karalis simply wrote, "totally

10   disabled." (CF-660.) Dr. Karalis reported **no** physical impairment or cardiac impairment and the

11   only medication plaintiff was taking was his cardiac medication. (CF-662.) Dr. Karalis' office

12   notes for the time period were very brief, indicating only that plaintiff remained anxious and

13   fearful of sudden death for which Dr. Karalis provided "supportive therapy." (CF-663 to 668.)

14   On March 10, 2000, Liberty also received a Mental Disorder Questionnaire completed by

15   Dr. Karalis indicating plaintiff had good intellect function and could perform daily activities as

16   long as he was careful not to overstress himself physically. (CF-673 to 677.) Dr. Karalis,

17   however, concluded without explanation that plaintiff was "totally disabled for at least another 3

18   years." (CF-677.)

19   On May 9, 2000, Liberty received an Activities Questionnaire from plaintiff, wherein he

20   reported he was able to perform the activities of daily living as well as most household activities.

21   (CF-655 to 657.) On March 27, 2001, Liberty received updated forms from Dr. Karalis,

22   indicating he only provided "psychotherapy as needed." (CF-639, 641.) Dr. Karalis again noted

23   there was no cardiac impairment. (CF-641.) Although Dr. Karalis specifically acknowledged

24   plaintiff's condition had "not worsened while in treatment here," he inexplicably changed the

25   estimated return to work date to "never." (CF-638.) The accompanying office notes indicated

26   that between May 2000 and March 2001, plaintiff saw Dr. Karalis only twice. (CF-643.)

27   On December 17, 2001, after numerous requests for information from his cardiologist,

28   Liberty finally received updated medical information from Dr. Gershengorn including a

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RCI/5108855.2/KCC                    - 3 -                    DEFENDANT'S AND REAL PARTY IN
                                                              INTEREST'S CROSS MOTION FOR JUDGMENT
                                                              CASE NO.  C 07-1302-CW (JL)

1   completed Physical Capacities form and office notes. (CF-19, CF-628 to 634.) In the Physical

2   Capacities form completed on December 4, 2001, Dr. Gershengorn specifically indicated that

3   plaintiff **could work eight hours in a workday**. (CF-628.) Plaintiff could sit for eight hours per

4   day with routine breaks, stand for 2 hours, walk or kneel for one hour, climb stairs for half an

5   hour and perform on the job driving for 4 hours in an 8-hour workday. (CF-628.)

6          On February 4, 2002, plaintiff returned an updated Activities Questionnaire to Liberty.

7   (CF-616 to 618.) Contrary to Dr. Gershengorn's opinions, plaintiff claimed he could not work

8   because job-related stress caused anxiety, which created heart-related problems. (CF-618.)

9   Plaintiff also stated he was unable to exercise or pursue his hobbies. (CF-617.)

10         On February 7, 2002, Liberty told plaintiff that based on the information it had recently

11  received from Dr. Gershengorn, he was not disabled from a cardiac perspective and at this point

12  the only issues potentially restricting him from working were his anxiety and depression. (CF-18,

13  Note 12.) Liberty also asked plaintiff about his plans to return to work. (CF-18.) He responded

14  that he had been thinking about returning to work but had torn some ligaments in his ankle while

15  exercising and he was just getting over that injury. (CF-18.)

16         On February 7, 2002, Liberty requested updated information from Dr. Karalis. In

17  response to Liberty's request for updated information, Dr. Karalis simply referred back to his

18  March 20, 2001 form stating it was an accurate reflection of plaintiff's current status. (CF-606.)

19  Plaintiff's estimated return to work date remained "never" and he was providing therapy "as

20  needed." (CF-606 to 607.) He confirmed that over the last year he saw plaintiff only three times

21  – on March 20, 2001; July 19, 2001; and February 5, 2002. (CF-606.) In a subsequent telephone

22  call, plaintiff confirmed he only saw Dr. Karalis sporadically. (CF-14.)

23         On March 9, 2002, Liberty sent the claim file to its Managed Disability Services Unit

24  ("MDS") for a medical review and assessment. (CF-18, 588, 605.) Susan Leonardos, R.N.

25  reviewed the medical records and telephoned Dr. Karalis to discuss plaintiff's condition. (CF-16

26  to 17.) During the conversation, Dr. Karalis confirmed he had not prescribed any antidepressants

27  or anti-anxiety medications. Dr. Karalis also reported plaintiff's overall condition was improved,

28  he only saw him every few months, and he had never been in therapy. (CF-16.)

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RCI/5108855.2/KCC                                     - 4 -                    DEFENDANT'S AND REAL PARTY IN
                                                                              INTEREST'S CROSS MOTION FOR JUDGMENT
                                                                              CASE NO. C 07-1302-CW (JL)

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   On May 7, 2002, Liberty learned the State Medical Board had put Dr. Karalis on

2   probation and that he had completed his probation on June 9, 1998 – only three months before he

3   began treating plaintiff. (CF-574.) Dr. Karalis had also been a member of the State Bar of

4   California, but was put on probation on November 20, 1990 due to <u>Medicaid fraud</u>. (CF-574.) He

5   completed this probation in 1995 and voluntarily resigned on November 10, 1997. (CF-574.)

6   On August 6, 2002, Nurse Leonardos again spoke with Dr. Karalis. Dr. Karalis told her

7   he had not seen plaintiff <u>since February 2002</u>. (CF-10.) When asked about plaintiff's ability to

8   return to work, Dr. Karalis responded that he did not know -- <u>he was not saying that plaintiff</u>

9   <u>could not return to work and agreed he may have sedentary capacity</u>. (CF-10.)

10   After two requests on May 7, 2002 and July 5, 2002, Liberty finally received a Functional

11   Capacities form completed by Dr. Gershengorn on August 12, 2002. (CF-528, 579, 583.) No

12   restrictions were given for sitting, plaintiff could stand for 1/3 to 2/3 of the day, and he could

13   walk up to 1/3 of the day. (CF-528.)

14   After reviewing updated information, Nurse Leonardos concluded plaintiff should be able

15   to perform sedentary work because the medical information from Dr. Gershengorn appeared to

16   support sedentary activity and the records from Dr. Karalis did not support a finding of disability.

17   (CF-7.) Liberty requested a Transferable Skills Analysis and Labor Market Survey, which it

18   received on August 23, 2002 identifying several sedentary vocational alternatives for plaintiff

19   consistent with his education, work experience, and skills, in which he would be a sole

20   contributor, thus eliminating supervisory or managerial responsibilities. (CF-524 to 525.)

21   **D.    Liberty Denies Plaintiff's Claim and Plaintiff Appeals**

22   On August 30, 2002, Liberty sent plaintiff a letter denying his claim for long term

23   disability benefits after September 1, 2002 because it had determined he was capable of

24   performing the material and substantial duties of several other occupations for which he was

25   reasonably suited by education, training, and experience. (CF-515 to 520.)

26   On October 15, 2002, plaintiff sent a letter appealing the denial. (CF-513.) On October

27   24, 2002, Liberty received another letter from plaintiff along with a letter from Dr. Karalis

28   disagreeing with Liberty's determination that plaintiff was not disabled. (CF-499 to 502.) After

DEFENDANT'S AND REAL PARTY IN
INTEREST'S CROSS MOTION FOR JUDGMENT
CASE NO. C 07-1302-CW (JL)

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   receiving Dr. Karalis' letter, which contradicted his prior conversation with Liberty in which he

2   stated he did not know whether plaintiff could work, Liberty referred the claim to an independent

3   psychiatrist to review the information in the file and comment on Dr. Karalis' opinions and

4   treatment. (CF-477 to 478.) On November 30, 2002, Liberty received a report prepared by

5   psychiatrist Peter Mirkin, M.D., M.B.A., LLC. (CF-468 to 475.) Based on the cardiac

6   evaluations and the notes of Dr. Gershengorn, Dr. Mirkin concluded there was no indication of

7   imminent threat due to plaintiff's cardiac disease. Dr. Mirkin also concluded that plaintiff's

8   anxiety was not disabling. (CF-468.) "Supportive therapy" was appropriate for treating mild

9   anxiety only, not for someone who was experiencing overwhelming anxiety that limited his

10  capacity to function. (CF-468.) He also stated that if the symptoms were as severe as Dr. Karalis

11  now reported, then he should have prescribed more intensive psychotherapy, psychotropic

12  medication, and collaborated with plaintiff's cardiologist on his care, which he did not do. (CF-

13  468 to 469.)

14          On December 6, 2002, Liberty sent plaintiff a letter upholding its decision to discontinue

15  long term disability benefits after September 1, 2002, setting forth a detailed explanation for its

16  decision. (CF-461 to CF-465.)

17  **E.      Plaintiff Files Suit**

18          On October 18, 2004, plaintiff filed suit against the Plan and Liberty. (Request for

19  Judicial Notice ("RJN") Ex. 1.) Plaintiff moved the Court, pursuant to Federal Rule of Civil

20  Procedure 52, for judgment in his favor and an order overturning the decision to terminate

21  benefits. Liberty filed an Opposition and Cross-Motion, including a request, in the alternative,

22  for remand to Liberty for further findings or explanation. On December 21, 2005, the court

23  issued its ruling concluding that plaintiff had not met his burden to show that he was disabled as

24  of September 1, 2002, but finding that the record was unclear as to whether plaintiff was disabled.

25  The court, therefore, denied plaintiff's motion and remanded the claim back to Liberty for further

26  investigation. (Ex. 2 to RJN.)

27  **F.      Liberty's Additional Investigation Following Remand**

28          In March 2006, in compliance with the court's order, Liberty began its further

DEFENDANT'S AND REAL PARTY IN
INTEREST'S CROSS MOTION FOR JUDGMENT
CASE NO. C 07-1302-CW (JL)

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1  investigation.  Liberty sent medical authorizations to plaintiff's counsel[2] for signature in order to

2  contact plaintiff's treating physicians to obtain additional medical information and documents.

3  (CF-369.)  Liberty explained it would contact Dr. Karalis and Dr. Gershengorn to discuss the

4  claim and obtain additional medical information.  Liberty also advised that plaintiff could submit

5  any additional evidence he wanted considered in support of his appeal.  (CF-372 to 373.)  Liberty

6  asked for the names and contact information for all health care professionals from whom he

7  received treatment since 2002.

8        Three months later, after repeated requests (CF-352, 361, 368), Liberty finally received

9  signed authorizations from plaintiff's attorney on June 8, 2006.  (CF-348 to 350.)  In the

10 accompanying letter, plaintiff's counsel, Larry Padway, stated plaintiff was undergoing an

11 additional mental health evaluation and he expected a report to be completed by "the end of the

12 month." (CF-348.)  That day, Liberty sent letters to Dr. Karalis and Dr. Gershengorn requesting

13 responses to specific questions and requesting additional medical records by July 6, 2006.  (CF-

14 331 to346.)  Liberty also sent a copy of Dr. Mirkin's report to Dr. Karalis for his review and

15 comment.  (CF-331, CF-335 to 342.)  On June 15, 2006, Liberty sent a letter to plaintiff's counsel

16 enclosing copies of the requests that were sent to Dr.'s Karalis and Gershengorn.  Liberty also

17 explained that if nothing additional was received by July 6, 2006, Liberty would conduct its

18 review based on the information contained in the file.  (CF-327.)

19       On July 6, 2006, Liberty received a letter from Dr. Gershengorn responding to some of the

20 questions posed.  (CF-325 to 326.)  Dr. Gershengorn stated plaintiff has been his patient for

21 almost 20 years and that he has been disabled from work for several years.  The non-exertional

22 activities which could be harmful to plaintiff included structured schedules, deadlines, advisory

23 relationships, and commuting to work.  Apparently, plaintiff develops rather severe fatigue with

24 emotional as well as physical stress.  Dr. Gershengorn found it somewhat difficult to objectively

25 show medical evidence that plaintiff's non-exertional limitations were precluding him from

26 returning to any full-time work.  Plaintiff reports intermittent symptoms during exertion.  At

27 times he reports he is able to walk without difficulty but at other times he claims he develops

28

---

[2]  Plaintiff was represented by new counsel during the further administrative review.

DEFENDANT'S AND REAL PARTY IN
INTEREST'S CROSS MOTION FOR JUDGMENT
CASE NO. C 07-1302-CW (JL)

1   rather severe fatigue and angina. (CF-325 to 326.)

2        Having received no response from Dr. Karalis, Liberty called him on July 7, 2006. (CF-
3   321 to 322.) During the conversation, Dr. Karalis acknowledged he had received Liberty's
4   letters, but he was waiting to hear back from plaintiff's attorney as to how he should respond.
5   (CF-321 to 322.) Liberty then sent another letter to Dr. Karalis enclosing another copy of Dr.
6   Mirkin's report and requested he provide Liberty with his own independent medical opinions, not
7   the opinions of plaintiff's attorney. (CF-321 to 322.) The letter was copied to plaintiff's counsel.
8   (CF-322.) Dr. Karalis, however, refused all requests for information stating he was not
9   authorized to release anything further to Liberty despite the authorization sent to him that plaintiff
10  had signed. (CF-299.)

11       Dr. Karalis then sent a handwritten letter to Liberty stating he has not been authorized to
12  release anything further to Liberty and because the authorization is revocable, he needs to confirm
13  that the patient is still consenting to the release of information. (CF-299.) He also insisted that
14  the authorization affects only existing documents and did not give authority to compel any new
15  writings. Thus, the authorization cannot compel him to write a new report. (CF-299.)

16       On July 10, 2006, Mr. Padway sent a letter to Liberty stating it was not possible to meet
17  Liberty's deadline of July 12 for receipt of the information from Dr. Karalis. He requested
18  another extension of time to provide information from Dr. Karalis. (CF-295.) He also stated he
19  had additional items to submit, including plaintiff's work records, psychological test results and
20  reports that would be provided "within a week." (CF-295.)

21       Liberty never received any further information from Dr. Karalis.

22       On July 10, 2006 Liberty faxed a letter to Dr. Gershengorn regarding his July 4, 2006
23  letter. (CF-305 to 307.) Because his letter did not respond to all of the medical questions posed
24  in Liberty's June 8, 2006 letter, Liberty requested that Dr. Gershengorn answer all of the specific
25  questions posed in the June 8, 2006 letter. Liberty also requested a copy of Dr. Gershengorn's
26  complete medical file for plaintiff from January 1, 2002, through the present. (CF-307.)
27  Although Dr. Gershengorn did not provide a further written response to Liberty, his office did
28  forward the requested medical records. (CF-239 to 291.)

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

DEFENDANT'S AND REAL PARTY IN
INTEREST'S CROSS MOTION FOR JUDGMENT
CASE NO. C 07-1302-CW (JL)

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1  On August 16, 2006, plaintiff's counsel sent a letter to Liberty apologizing for the further

2  delay stating he was still waiting for "a few medical reports." (CF-111.)  Although no additional

3  medical records or reports were provided, enclosed with the letter were plaintiff's work

4  performance evaluations from McKesson and various articles and letters from friends and

5  acquaintances, which Liberty reviewed and considered. (CF-112 to 198.)  Although Mr. Padway

6  asserted the personnel records demonstrated that his work performance deteriorated with his

7  illness, in each year from July 21, 1980 through March 31, 1986, plaintiff's overall performance

8  rating was "exceeds most objectives" and he received the same rating for his last two evaluations

9  from March 1, 1996 through August 31, 1996 and September 1, 1996 through August 31, 1997.

10  (CF-117 to 121, CF-122 to 126.)

11  **G.    LIBERTY REFERS THE CLAIM TO A CARDIOLOGIST FOR AN INDEPENDENT MEDICAL REVIEW**

12  In order to fully assess any restrictions and limitations plaintiff might have due to his

13  cardiac history, Liberty sent the medical records from Dr. Gershengorn to an independent Board

14  Certified Cardiologist, Dianne Zwicke, M.D., for review and assessment. (CF-109.)  Dr. Zwicke

15  concluded plaintiff had mild coronary artery disease and acceptable coronary anatomy, with no

16  interventional procedures or significant change in medical therapy. (CF-104 to 106.)  She also

17  noted that plaintiff had demonstrated stability in his cardiac status for eight years. (CF-105.)

18  Based on his cardiac condition, Dr. Zwicke concluded plaintiff could perform physical activities

19  in the medium strength category and plaintiff was not experiencing any side effects from his

20  medications. (CF-105 to 106.)

21  **1.    Dr. Zwicke Speaks With Dr. Gershengorn**

22  Prior to completing her report, Dr. Zwicke attempted to speak with Dr. Gershengorn to

23  discuss plaintiff's condition but she had an incorrect phone number. (CF-106.)  Upon receipt of

24  Dr. Zwicke's report, Liberty provided Dr. Zwicke with Dr. Gershengorn's correct phone number

25  and asked that she attempt to contact Dr. Gershengorn again.  After speaking with Dr.

26  Gershengorn on September 11, 2006, Dr. Zwicke sent Liberty an addendum to her report. (CF-98

27  to 100.)  During their conversation, Dr. Gershengorn confirmed he felt plaintiff was able to walk

28

DEFENDANT'S AND REAL PARTY IN
INTEREST'S CROSS MOTION FOR JUDGMENT
CASE NO. C 07-1302-CW (JL)

1    at frequent intervals, sit for reasonable periods of time, and perform activities with his hands and

2    feet, stand, walk, push, pull, reach, and lift within a sedentary or light physical labor job

3    description. (CF-99.) Additionally, <u>performing work in the light or sedentary category would</u>

4    <u>pose no danger to plaintiff's cardiac status.</u> (CF-99.) Dr. Gershengorn stated plaintiff

5    "subjectively" complained of chest pain and that he fatigued easily, but Dr. Gershengorn had no

6    objective cardiac data to support the inability to perform work in the sedentary or light category.

7    (CF-99.) While plaintiff had also reported significant stress-related symptoms, Dr. Gershengorn

8    was unable to comment on that aspect of his health care. (CF-99.)

9        **2.**    **Dr. Gershengorn Agrees With the Opinions of Dr. Zwicke**

10        Liberty sent a letter to Dr. Gershengorn enclosing a copy of Dr. Zwicke's report and her

11    addendum report for his review and comment. (CF-86.) <u>On September 26, 2006, Dr.</u>

12    <u>Gershengorn faxed back Liberty's letter that he signed stating he agreed with Dr. Zwicke's</u>

13    <u>opinions.</u> (CF-82.) Two days later, Mr. Padway wrote to Liberty acknowledging receipt of the

14    letter to Dr. Gershengorn. He stated he would like Dr. Gershengorn to respond (which he had

15    already done). He asked Liberty to hold off making a decision for two weeks. He also stated yet

16    again that he was waiting for the psychologist report, that would arrive "shortly." (CF-51.)

17    **H.**    <u>**DR. MIRKIN CLARIFIES HIS PRIOR REPORT**</u>

18        Because this Court had found ambiguities in his report, Liberty also asked Dr. Mirkin to

19    clarify his opinions provided in his November 30, 2002 report. (CF-66.) The clarification was

20    provided to Liberty on October 4, 2006. (CF-49 to 50.) Dr. Mirkin explained there was

21    insufficient evidence to support plaintiff's claim that he was limited in his functional capacity by

22    his depression and anxiety symptoms. (CF-49.) Neither Dr. Karalis' office notes, nor his clinical

23    treatment indicated that plaintiff had symptoms of a psychological condition at a level of severity

24    that would limit plaintiff occupationally. (CF-50.)

25    **I.**    <u>**LIBERTY CONCLUDES ITS INVESTIGATION AND DENIES THE CLAIM**</u>

26        During the investigation, plaintiff's counsel repeatedly notified Liberty he would be

27    sending psychological test results and reports for over three months. (CF-51, 111, 301, 348, 352,

28    370.) Liberty waited the additional two weeks as requested by counsel, but no additional

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   information was provided.  Thereafter, Liberty determined its investigation was complete based

2   on the information it had received, having kept the investigation open for seven months.  On

3   October 10, 2006, Liberty upheld its decision to deny benefits effective September 1, 2002 and

4   sent a letter detailing the basis of its decision.  (CF-42 to 48.)

5       In December 2006, two months <u>after</u> the decision following remand, plaintiff sent Liberty

6   a report dated September 6, 2006 from Roxanne Morse, Ph.D.  (CF-23 to 37.)  Liberty declined to

7   consider the report, however, because it was untimely and documented a September 6, 2006

8   psychological interview and assessment, which was not relevant to the time period under

9   consideration -- September 2002, the date of the denial.  (CF-21 to 22.)

10      On March 6, 2007, plaintiff filed this instant action.

11   ### III. <u>THE MCKESSON PLAN</u>

12      On December 1, 1976, McKesson Corporation established the McKesson Plan.  (McGee

13   Decl., Ex. B, Plan-001.)  As a benefit of his employment, plaintiff became a participant in the

14   McKesson Plan.  The McKesson Plan provides in part:

15       8.1. . . The Plan Administrator shall have the exclusive rights to
       interpret the terms and provisions of the Plan and to determine any
16       and all questions arising thereunder or in connection with the
       administration. . . . (Plan-0094.)

17   The Plan defines "Disability" as:

18
19       'Disability' shall mean any physical or mental condition arising
       from an illness, pregnancy or injury which renders a Participant
20       incapable of performing work.  During the first twenty-four (24)
       months of Disability, a Participant must be unable to perform the
       work of his or her regular occupation or any reasonably related
21       occupation, and must not, except as provided in Section 3.4
       [rehabilitative employment], be performing work or services of any
22       kind for remuneration.  After twenty-four (24) months of Disability,
       a Participant must be unable to perform the work of any occupation
23       for which he or she is or becomes reasonably qualified by training,
       education or experience, and, in addition, be receiving Social
24       Security benefits on account of his or her disability." (Plan-0022.)

25   The Plan further provides:

26       Pursuant to procedures established by the Plan Administrator, a
       determination shall be made whether a Disability exists with respect
27       to a Participant on the basis of <u>objective medical evidence</u>. (Plan-
       0072, §3.2, emphasis added.)

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1  Prior to January 1, 2000, the McKesson Plan was self-insured by McKesson HBOC, Inc.

2  and the third party claims administrator was Preferred Works. (McGee Decl., ¶2.) Effective

3  January 1, 2000, Liberty entered into a Reserve Buy Out Agreement ("RBO Agreement") with

4  McKesson HBOC, Inc., the McKesson Plan and McKesson HBOC, Inc. Employees' Long Term

5  Disability Plan Trust.[3] (McGee Decl. ¶4.) The RBO Agreement provided in part:

> As of the effective date of this Agreement Liberty will make all
> decisions as to coverage, amount and continued eligibility of
> benefit payments with respect to all Claimants. Liberty has the
> right to investigate these claims arising under the Plan and the
> Employer, the Plan and/or Trust hereby assign to Liberty all of their
> rights to investigate these claims. The provisions in the Plan
> regarding proof of loss and notice of claim will apply to such
> claims. **Liberty has the authority in its sole discretion to
> construe the terms of the Plan and to determine benefit
> eligibility with respect to persons claiming benefits under the
> Plan and pursuant to this Agreement. Decisions of Liberty
> regarding construction of the terms of the Plan and benefit
> eligibility are conclusive and binding."** (McGee Decl., Ex. A,
> LC-003, emphasis added.)

### IV. LEGAL ARGUMENT

**A.    THE APPLICABLE STANDARD OF REVIEW IS AN ABUSE OF DISRCETION**

    **1.    The Plan and Policy Confer Discretion on Liberty to Interpret the Plan and Make Eligibility Decisions**

A claims administrator's decision to deny benefits under an ERISA plan is reviewed *de novo* by the court "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." (Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 103 L.Ed.2d 80, 109 S.Ct. 948 (1989); Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 958 (9th Cir. 2006).) In Abatie, the Ninth Circuit observed that Firestone "appears to provide for only two alternatives" concerning the standard of review. (Abatie, 458 F.3d at 965.) Thus, the Court held, "When a plan confers discretion, abuse of discretion review applies; when it does not, *de novo* review applies." (Id.) Here, the Plan and the RBO Agreement confer discretionary authority to interpret the Plan and make eligibility determinations. The Plan provides:

---

[3]  On January 1, 2000, Liberty also issued a Group Disability Income Policy to McKesson HBOC, Inc. insuring the Plan with respect to claims incurred after January 1, 2000. (McGee Decl., ¶3.)

- 12 -

DEFENDANT'S AND REAL PARTY IN
INTEREST'S CROSS MOTION FOR JUDGMENT
CASE NO. C 07-1302-CW (JL)

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1
2
3

> The Plan Administrator shall have the exclusive rights to interpret the terms and provisions of the Plan and to determine any and all questions arising thereunder or in connection with the administration. . . . (Ex. B to McGee Decl., Plan-0007.)

The RBO Agreement provides:

4
5
6
7

> Liberty has the authority in its sole discretion to construe the terms of the Plan and to determine benefit eligibility with respect to persons claiming benefits under the Plan and pursuant to this Agreement. Decisions of Liberty regarding construction of the terms of the Plan and benefit eligibility are conclusive and binding. (Ex. A to McGee Decl., LC-003.)

8    The language above is sufficiently clear to merit application of the abuse of discretion

9   standard of review. (See, McDaniel v. The Chevron Corp., 203 F.3d 1099, 1107 (9th Cir. 2000);

10  also, Bendixen v. Standard Ins. Co., 185 F.3d 939 (9th Cir. 1999); Kearney v. Standard Ins. Co.,

11  175 F.3d 1084 (9th Cir. 1999) (en banc); Abatie, supra,, 458 F.3d at 963-965.)

12      **2.      The Plan Administrator Properly Delegated Discretion to Liberty as the**
         ***Claim* Administrator to Make Eligibility Determinations**

13      Contrary to plaintiff's assertions, the Plan properly delegated discretion to Liberty in the

14  RBO Agreement. To properly delegate fiduciary authority, the Plan must either expressly

15  identify the fiduciary to whom the authority is delegated or set forth a procedure for such

16  delegation by the Plan Administrator. (Madden v. ITT Long Term Disability Plan, 914 F.2d

17  1279, 1282-1284 (9th Cir. 1990), cert. denied, 498 U.S. 1087, 112 L. Ed. 2d 1051, 111 S. Ct. 963

18  (1991); In re Smithkline Beecham Clinical Lab, 108 F.Supp.2d 84, fn. 42 (D.C. Conn. 1999);

19  Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 584 (1st Cir. 1993); Doe v.

20  Travelers Ins. Co., 971 F.Supp. 623, 635 (D.C. Mass. 1997).) Here, the Plan expressly authorizes

21  the delegation of authority to various designees, including a claims administrator:

22
23
24
25
26

> . . .The Plan Administrator shall have such powers and perform such duties as are necessary for the proper operation of the Plan. This shall include, from time to time, designating representative who shall carry out the delegated responsibilities on behalf of the Plan Administrator. Contemplated designees include, but are not limited to, a Claims Administrator. All such designees shall serve at the pleasure of the Plan Administrator and, if employees, shall serve without compensation. (Ex. B, PLAN-0054, § 8.1.)

27      Pursuant to the terms of the RBO Agreement, the Plan delegated authority to Liberty to

28  act as the claims administrator:

RCl/5108855.2/KCC                              - 13 -          DEFENDANT'S AND REAL PARTY IN
                                                              INTEREST'S CROSS MOTION FOR JUDGMENT
                                                              CASE NO. C 07-1302-CW (JL)

As of the effective date of this Agreement Liberty will make all decisions as to coverage, amount and continued eligibility of benefit payments with respect to all Claimants. (LC-0003.)

Where, as here, discretionary authority is properly delegated to an ERISA fiduciary, the decisions of the ERISA fiduciary also qualify for review under the abuse of discretion standard. (Madden v. ITT Long Term Disability Plan, supra, 914 F.2d at 1283-1284; Rodriguez-Abreu v. Chase Manhattan Bank N.A., supra, 986 F.2d at 584.) Accordingly, Liberty's decision must be reviewed by the court for an abuse of discretion.

Plaintiff's assertion that the Plan was precluded from changing claims administrators[4] (from Preferred Works to Liberty) during his claim is without merit. Not only does plaintiff fail to cite *any* legal authority for his position, it is contrary to the terms of the Plan and the law. Under the Plan, the Plan Administrator had "such powers and [could] perform such duties as are necessary for the proper operation of the Plan." (PLAN-0097.) Thus, the Plan was free to change claims administrators or insurers at any time.

Moreover, disability benefits are **not** a "vested right," as plaintiff asserts. Therefore, a Plan administrator can make procedural, or even substantive, changes to the Plan at any time even after a claim has arisen, including reducing or terminating benefits altogether. Under ERISA, "vested right" is a term of art. The provisions governing welfare benefit plans, unlike those governing pension plans, see 29 U.S.C. §§ 1051-1061, do not provide for the automatic vesting of welfare benefit rights. (International Union, United Auto., Aerospace & Agr. Implement Workers of America, U.A.W. v. Skinner Engine Co., 188 F.3d 130, 137-38 (3d Cir. 1999).) Thus, in the absence of a clear and express provision in the Plan vesting such rights, an employer is free to amend or terminate a welfare benefit plan at anytime. (Id. at 137; See, Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1160-61 (9th Cir. 2001); Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 79-81, 131 L. Ed. 2d 94, 115 S. Ct. 1223 (1995); Becker v. Mack Trucks, Inc., 281 F.3d 372, 379 (3d Cir. 2002), cert. denied, 537 U.S. 818, 154 L. Ed. 2d 24, 123 S. Ct. 93 (2002); International Ass'n of Machinists and Aerospace Workers, Woodworkers Div.,

---

[4] In his motion, plaintiff confuses a Plan Administrator with a Claims Administrator, which is responsible only for administrating claims, not the administration of the Plan.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

DEFENDANT'S AND REAL PARTY IN INTEREST'S CROSS MOTION FOR JUDGMENT CASE NO. C 07-1302-CW (JL)

1   AFL-CIO v. Masonite Corp., 122 F.3d 228, 234 n. 4 (5th Cir. 1997); John Morrell & Co. v.

2   United Food & Commercial Workers Int'l Union, 37 F.3d 1302, 1308 (8th Cir. 1994).)  Thus,

3   where, as here, the plan specifically reserves the right to amend, terminate, or modify it (Ex. B,

4   PLAN-0055), a participant's disability benefits do not vest under the terms of an ERISA benefits

5   plan.  (Hutchins v. Champion Intern. Corp., 110 F.3d 1341, 1345 (8th Cir. 1997).)

6        In Grosz-Salomon v. Paul Revere Life Ins. Co., supra, 237 F.3d 1154, the Ninth Circuit

7   rejected plaintiff's argument that the Plan in force at the time of the disability claim was

8   submitted (which provided for a non-discretionary standard of review) applied to her claim rather

9   than the policy in force at the time benefits were denied (which had been amended to provide for

10  discretionary review).  In its decision, the Court held:

11          "In McGann v. H&H Music Co., [946 F.2d 401 (5th Cir. 1991)] the
            Fifth Circuit made the malleability of welfare benefit plans brutally
12          clear.  When McGann was diagnosed with AIDS, and when he
            made his first claims against his employer's welfare benefit plan,
13          the plan provided lifetime medical benefits of up to $ 1,000,000 per
            employee.  Shortly thereafter, H&H changed the plan to limit
14          benefits payable for AIDS-related claims to a lifetime maximum of
            $ 5,000.  [Id. at 403.]  The court found no cause of action: 'The
15          continued availability of the $ 1,000,000 limit was not a right to
            which McGann may have become entitled for the purposes of
16          [ERISA]' because "ERISA does not require . . . vesting of the right
            to a continued level of the same medical benefits once those are
17          ever included in a welfare plan."  Under similar circumstances, the
            Eleventh Circuit came to the same conclusion.  [Id. at 405.]  Simply
18          put, an employee's rights under an ERISA welfare benefit plan do
            not vest unless and until the employer says they do."  (Grosz-
19          Salomon, supra, 237 F.3d at 1160-61.)

20       Therefore, contrary to plaintiff's assertions, his benefits had not "vested" and the Plan had

21  the requisite authority to make any changes to the Plan during plaintiff's claim, including

22  changing claims administrators.

23       **3.     The Court's Prior Ruling that the *De Novo* Standard of Review Applies is *Not*
                  *Res Judicata* in this Action**

24       Contrary to plaintiff's assertion, the court's prior ruling that the standard of review is *de*

25  *novo* is not *res judicata* in this action, because this case involves the judicial review of a different

26  administrative decision, with additional facts in the expanded administrative record, and a

27  substantive change in the law.  In the prior action, the court reviewed the propriety of Liberty's

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   December 6, 2003 decision upholding the denial of plaintiff's claim for benefits.  Here, on the

2   other hand, the Court is reviewing the propriety of Liberty's October 10, 2006 decision after

3   concluding the court-ordered investigation on remand.

4           Moreover, the Court's prior ruling failed to take into consideration the Ninth Circuit

5   decision in <u>Abatie v. Alta Health & Life Ins. Co.</u>, <u>supra</u>, 458 F.3d 955, which significantly

6   changed how the standard of review was determined and applied by the district courts.  A court

7   may exercise its discretion to reconsider a previously decided issue when there has been an

8   intervening change in law.  (<u>See</u>, e.g. <u>Wopsock v. Natchees</u>, 454 F.3d 1327, 1333 (Fed. Cir. 2006)

9   ("law-of-the-case principles do not bar a court from departing from earlier rulings when there is

10  'an intervening change of controlling legal authority"); <u>see</u> <u>also</u>, <u>EEOC v. Sears, Roebuck & Co.</u>,

11  417 F.3d 789, 796 (7th Cir. 2005) ("[a]n appellate mandate does not turn a district judge into a

12  robot, mechanically carrying out orders that become inappropriate in light of subsequent factual

13  discoveries or changes in the law.").)  The fundamental principle of our jurisprudence is that a

14  court will apply the law as it exists when rendering its decision.  (<u>De Gurules v. Immigration &</u>

15  <u>Naturalization Serv.</u>, 833 F.2d 861, 863 (9th Cir. 1987).)  Thus, not only should the court

16  consider and apply <u>Abatie</u>, it would be error not to do so.  (<u>See</u>, <u>Volynskaya v. Epicentric, Inc.</u>

17  <u>Health and Welfare Plan</u>, 225 Fed. Appx. 484 (9th Cir. 2007) [remanded to district court for

18  reconsideration in light of <u>Abatie</u>]; <u>Baldoni v. UNUMProvident</u>, 200 Fed. Appx. 724 (9th Cir.

19  2006) [remanding district court decision granting defendant's summary judgment motion for

20  reconsideration in light <u>Abatie</u>].)

21          Plaintiff's reliance upon <u>Baker v. General Motors Corp.</u>, 522 U.S. 222, 118 S. Ct. 657

22  (1998) is misplaced because it is factually distinguishable.  In <u>Baker</u>, an action for wrongful

23  discharge, the Court analyzed whether an injunction entered in one state that precluded a witness

24  from testifying on certain matters was binding in another jurisdiction under the Constitution's full

25  faith and credit clause.  The Court noted that in general a final judgment in one State gains

26  national force for purposes of issue preclusion.  (<u>Id.</u> at 233.)  As set forth above, this action is a

27  continuation of the prior action and involves the review of an entirely new decision.  Moreover,

28  the court's order remanding the claim back to Liberty for further investigation was not a "final"

DEFENDANT'S AND REAL PARTY IN
INTEREST'S CROSS MOTION FOR JUDGMENT
CASE NO.  C 07-1302-CW (JL)

1   judgment. In the Ninth Circuit, an ERISA remand order is appealable only if: (1) the district

2   court order conclusively resolved a separable legal issue, (2) the remand order forces the agency

3   to apply a potentially erroneous rule which may result in a wasted proceeding, and (3) review

4   would, as a practical matter, be foreclosed if an immediate appeal were unavailable. (Hensley v.

5   Northwest Permanente P.C. Ret. Plan & Trust, 258 F.3d 986, 992-93 (9th Cir. 2001).) The

6   court's order remanding the claim to Liberty for further investigation does not satisfy any of these

7   requirements. Thus, the remand order was not final and *res judicata* does not apply.[5]

8   **B.    LIBERTY'S DECISION IS ENTITLED TO SUBSTANTIAL DEFERENCE**

9        In Abatie, the Ninth Circuit changed how the district court applies the abuse of discretion

10  standard of review when the claim administrator is also responsible for paying the claim. The

11  Court described the new standard as "abuse of discretion review, tempered by skepticism

12  commensurate with the plan administrator's conflict of interest." (Abatie, supra, 458 F.3d at

13  959.) "An egregious conflict may weigh more heavily (that is, may cause the court to find an

14  abuse of discretion more readily) than a minor, technical conflict might." (Id.) Further, the effect

15  of a conflict "may be low if a structural conflict of interest is unaccompanied, for example, by any

16  evidence of malice, of self-dealing, or a parsimonious claims-granting history." (Id. at 968.)

17       Applying the guidelines set forth in Abatie, Liberty's decision is entitled to significant

18  deference because there is no evidence that Liberty acted with a malicious intent, or engaged in

19  self-dealing or parsimonious claims handling practices. Liberty did not violate any ERISA

20  regulations and it did not act under a conflict of interest. Indeed, the administrative record shows

21  Liberty conducted an objective, timely, careful and detailed evaluation of plaintiff's claim.

22  Accordingly, Liberty's decision is entitled to substantial deference from the court.

23       **1.    Liberty Conducted a Complete, Thorough, and Objective Investigation**

24       Contrary to plaintiff's assertions, Liberty conducted an adequate, thorough, complete, and

25  unbiased investigation during the remand. Liberty did not rush to a decision. Liberty timely

26  requested medical records and information from the only two doctors plaintiff identified to

27  ────────────────

28  [5] Indeed, because the order on remand was not final, plaintiff erroneously filed a new action when he should have re-opened the prior case.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   Liberty as supporting his claim – Dr. Karalis and Dr. Gershengorn.  When Dr. Karalis failed to

2   respond to Liberty's requests, it repeatedly followed up with him and plaintiff's counsel in an

3   effort to obtain information.  Liberty also repeatedly advised plaintiff he could submit additional

4   information he would like to have considered in support of his appeal and repeatedly gave his

5   counsel extensions of time to submit the information.  Although plaintiff's claim was based on

6   anxiety, Liberty also sought information from plaintiff's cardiologist, Dr. Gershengorn, to

7   determine whether he was disabled as a result of his cardiac condition.  When Dr. Gershengorn

8   provided incomplete answers to its questions, Liberty actively followed up with him and

9   requested that he provide his entire medical file, which it had reviewed by an independent

10  cardiologist.  Liberty also instructed the independent cardiologist to contact Dr. Gershengorn

11  directly to discuss his medical condition, which Dr. Zwicke did.  After Dr. Zwicke noted in her

12  addendum to her report that Dr. Gershengorn agreed plaintiff was able to perform a sedentary job

13  from a cardiac standpoint, Liberty sent the report to Dr. Gershengorn (and plaintiff's counsel) for

14  confirmation.  (CF-9)  Thus, the administrative record demonstrates Liberty engaged in

15  "meaningful dialogue" with plaintiff and her treating physicians during the investigation

16  following remand.  (See, <u>Booton v. Lockheed Med. Benefit Plan</u>, 110 F.3d 1461, 1463 (9th Cir.

17  1997); <u>Saffon v. Wells Fargo Long Term Disability Plan</u>, 511 F.3d 1206,1213 (9th Cir. 2008).)

18          Plaintiff's failure to provide objective medical evidence of disability during the claim and

19  during the remand is not evidence that Liberty's investigation was inadequate.  Contrary to

20  plaintiff's assertions, it is incumbent on plaintiff to provide proof of continuing disability during

21  the claim, not the plan administrator.  (See, <u>Jordan v. Northrop Grumman Corp. Welfare Benefit</u>

22  <u>Plan</u>, 63 F.Supp.2d 1145, 1157 (C.D. Cal. 1999).)  Thus, it is not improper for a plan to place an

23  initial burden of proof on claimants to prove disability.  (<u>Id.</u>, <u>Miller v. Metropolitan Life Ins. Co.</u>,

24  925 F.2d 979, 985 (6th Cir. 1991).)  As the court held in <u>Jordan</u>:

25              MetLife's correspondence with Plaintiff sufficiently informed her
                of the medical information which it needed, and repeatedly advised
26              Plaintiff to call her MetLife claim reviewers if she had further
                questions.  At that point, Plaintiff bore some responsibility to either
27              present the information herself, encourage her doctors to do so, or
                request further information from MetLife. . . She could have
28              provided information, and MetLife repeatedly informed both

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/5108855.2/KCC                    - 18 -         DEFENDANT'S AND REAL PARTY IN
                                                    INTEREST'S CROSS MOTION FOR JUDGMENT
                                                    CASE NO.  C 07-1302-CW (JL)

Plaintiff and her doctors what sorts of information would be considered relevant and helpful. That neither Plaintiff nor her doctors actually did present this information cannot now be blamed on MetLife. (Id.)

Likewise, here, Liberty sufficiently informed plaintiff and his doctors of the medical information it needed, and repeatedly advised him to do so, even extending numerous extensions to submit additional information. Accordingly, plaintiff's failure to provide adequate proof of disability during the investigation cannot be blamed on Liberty.

### a.     Liberty Was Not Required To Consider Dr. Morse's Untimely Report

Contrary to plaintiff's assertions, Liberty was not required to consider Dr. Morse's untimely report, which was submitted to Liberty two months after it had concluded its investigation on remand and upheld its decision to discontinue benefits after September 1, 2002. (See, Alford v. DCH Foundation Group Long Term Disability, 311 F.3d 955, 958 (9th Cir. 2002).) In Alford, the Ninth Circuit held UNUM's refusal to acknowledge or consider medical evidence submitted several weeks after the 60-day deadline for furnishing additional evidence on appeal was not probative material evidence of a conflict of interest. (See also, Bendixen v. Standard Ins. Co., 185 F.3d 939, 944 (9th Cir. 1999) ["It was not error to refuse to consider Dr. High's report because the report was given to Standard after its second review had been completed and a final determination had been made. Because the report was not before the plan administrator at the time of the denial, the district court was limited to that record and could not consider the report in its review."].) Likewise, here, Liberty's refusal to consider the late submitted evidence was proper, and is not evidence that Liberty was acting under a conflict of interest or abused its discretion.

### b.     A Medical Examination Was Neither Warranted, Nor Required

Also contrary to plaintiff's assertions, Liberty did not act under a conflict of interest because it did not obtain an independent medical examination. There is nothing in the Plan,[6] the statutes, or case law that requires a medical consultant to physically examine a claimant prior to

---

[6] Contrary to plaintiff's assertions, the Plan does not limit the claim administrator's duties in any manner. Indeed, The Plan provides the Plan Administrator with authority to carry out any and all responsibilities with respect to the Plan. (PLAN-0097.) The Plan Administrator in turn delegated such duties to Liberty to administer claims, including the right to investigate claims. (LC-0003.)

DEFENDANT'S AND REAL PARTY IN INTEREST'S CROSS MOTION FOR JUDGMENT CASE NO. C 07-1302-CW (JL)

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    rendering an opinion. (Frost v. Met Life Ins. Co., et al., 470 F. Supp. 2d 1101, 1108 (C.D. Cal

2    2007); See also, Kaiser v. Standard Ins. Co. et al., 2007 U.S. Dist. LEXIS 2239 (N.D. Cal. 2007)

3    [insurer's use of physician's records review report constitutes reasonable basis for finding

4    plaintiff could perform material duties of his job with reasonable continuity].)  Moreover, an

5    independent examination was not warranted under the circumstances here, because the relevant

6    inquiry was whether plaintiff was disabled as of September 1, 2002 – when Liberty denied the

7    claim, not whether he was disabled four years later in September 2006.  Also contrary to

8    plaintiff's unsubstantiated assertions, it is not improper under ERISA or the Plan for Liberty to

9    seek the medical opinions of two independent medical specialists before making a decision.

10    Indeed, it is evidence that Liberty was not acting under a conflict of interest.

11        The doctors relied upon by Liberty (Dr. Zwicke, Dr. Mirkin, and Dr. Gershengorn,

12    plaintiff's treating cardiologist) were highly qualified and their opinions were supported by the

13    administrative record.

14        **c.    Liberty Did Not Fail to Credit Any Reliable Evidence of Disability**

15        Liberty did not fail to credit any reliable evidence of disability under the Plan, which

16    requires that a disability be determined based on objective medical evidence.  The alleged

17    evidence plaintiff alleges Liberty failed to consider -- plaintiff's 1999 Social Security Award

18    letter, his friends' letters, and his personnel work records – was not objective medical evidence.

19    Therefore, Liberty was not obligated to consider it.  Regardless, the record shows that Liberty

20    fully considered and weighed all of the relevant evidence, objective and subjective, medical and

21    otherwise, in reaching its decision.  The information simply did not support his claim.

22        Plaintiff's reliance on Saffon v. Wells Fargo, supra, 511 F.3d 1206 is misplaced.  Saffon

23    concerned a claim based on chronic pain, whereas, here, plaintiff seeks disability based on

24    anxiety and stress.  Thus, the Court's analysis in Saffon regarding how to assess subjective

25    complaints of pain is inapplicable here.  Moreover, unlike the Plan in Saffon, the Plan at issue

26    here expressly requires that the claim be based on objective medical evidence.

27        Because there is little, if any, evidence that Liberty's apparent conflict of interest caused it

28    to breach its fiduciary obligations to plaintiff, Liberty's decision to deny benefits is entitled to

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    significant deference by the Court.

2    **C.    LIBERTY DID NOT ABUSE ITS DISCRETION**

3    In an ERISA action, the claimant bears the burden of proving that the claim administrator

4    abused its discretion. (Dowden v. Blue Cross & Blue Shield of Texas, Inc., 126 F.3d 641, 644

5    (5th Cir. 1997).) Plaintiff cannot meet his burden here because Liberty's decision was reasonable

6    and supported by substantial evidence. "The touchstone of arbitrary and capricious conduct is

7    unreasonableness." (Clark v. Wash. Teamsters Welfare Trust, 8 F.3d 1429, 1431 (9th Cir.

8    1993).) A decision "grounded on any reasonable basis is not arbitrary and capricious, and that in

9    order to be subject to reversal, an administrator's factual findings that a claimant is not totally

10   disabled must be clearly erroneous." (Kaiser v. Standard Ins. Co., 2007 U.S. Dist. LEXIS 2239,

11   11 (N.D. Cal. 2007) quoting Jordan v. Northrup Grumman Corp. Welfare Benefit Plan, 370 F.3d

12   869, 875 (9th Cir. 2004); Estate of Shockley v. Alyeska Pipeline Serv. Co., 130 F.3d 403, 405

13   (9th Cir. 1997) [insurer's decision must be upheld if it was "based upon a reasonable

14   interpretation of the plan's terms and was made in good faith."].) Therefore, as long as the record

15   demonstrates there is a reasonable basis for concluding the medical condition was not disabling,

16   the Court must defer to the decision of the plan administrator. (Jordan, supra, 370 F.3d at 879.)

17   A court may not substitute its own judgment for that of the administrator unless the administrator

18   relied on clearly erroneous findings of fact, rendered its decision without any explanation, or

19   construed provisions in a way that conflicts with the plain language of the plan. (Bendixen v.

20   Standard Ins. Co., 185 F.3d 939, 944 (9th Cir. 1999).)

21   Liberty did not terminate benefits without explanation, it did not misconstrue the Plan, and

22   it did not rely on clearly erroneous findings of fact. Moreover, Liberty's decision to discontinue

23   plaintiff's long term disability benefits was consistent with the terms of the Plan and supported by

24   substantial medical evidence. Liberty made a good faith effort to evaluate plaintiff's medical

25   condition. It requested, obtained, and examined plaintiff's medical records, regularly sought

26   input from plaintiff and his health care providers, and carefully considered their opinions. It kept

27   plaintiff fully apprised of the progress of the investigation and requested plaintiff's input. Liberty

28   obtained input from highly qualified medical professionals and considered each opinion, as well

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   as the information provided by plaintiff's doctors. Liberty's investigation yielded specific,

2   credible information demonstrating his ability to perform the material and substantial duties of a

3   sedentary occupation.

4           Liberty's decision was supported by the opinion of Dr. Mirkin, who concluded based on

5   his review of the available medical records and psychiatric notes, that plaintiff's anxiety and

6   depression were mild at best and did not preclude him from performing sedentary work. (CF-49

7   to 50.) Although Dr. Karalis was given an opportunity to respond to Dr. Mirkin's report and

8   opinions, Dr. Karalis did not and, in fact, failed to provide any additional information during the

9   remand. Liberty's decision was also supported by the opinions of Dr. Zwicke and Dr.

10  Gershengorn, who opined that from a cardiac perspective plaintiff was able to perform a

11  sedentary job. Indeed, plaintiff worked full time for ten years after he had his heart attack.

12  Although plaintiff had reported to Dr. Gershengorn subjective complaints of chest pain and

13  fatigue, Dr. Gershengorn had no objective cardiac data to support an inability to perform

14  sedentary or light work. (CF-99.) Because Liberty's decision was reasonable and amply

15  supported by the evidence in the administrative record including plaintiff's treating physician, it

16  did not abuse its discretion. (See, Meyers v. Hartford Life and Accident Ins. Co., 489 F.3d 348

17  (8th Cir. 2007) [claim administrator did not abuse its discretion by relying on statements made by

18  a treating physician].)

19  **D.    PLAINTIFF HAS NOT AND CANNOT PROVE THAT HE WAS "DISABLED"
         FROM ANY OCCUPATION AS OF SEPTEMBER 1, 2002**

20          In an ERISA action, plaintiff has the burden of proving she was disabled under the plan.

21  (Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998).) Thus, even if

22  little weight is accorded to Liberty's decision, the Plan is still entitled to judgment in its favor

23  because, once again, plaintiff has not and cannot prove that he is disabled from "any occupation"

24  within the meaning of the Plan. As the Ninth Circuit has held, "The language of the 'any

25  occupation' standard is not demanding . . . it requires only that [plaintiff] be able to perform a job

26  for which he is qualified or for which he can reasonably become qualified by training, education,

27  or experience." (McKenzie v. General Tel. Co. of Cal., 41 F.3d 1310, 1317 (9th Cir. 1994).)

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

As set forth above, Dr. Zwicke, Dr. Gershengorn, and Dr. Mirkin opined that plaintiff could perform sedentary work and plaintiff failed to provide any objective medical evidence to the contrary. The only medical provider who supported plaintiff's claim for disability was Dr. Karalis. Dr. Karalis, however, provided no information during the remand, and plaintiff admits that he is no longer relying on him to support his claim because his opinions are not reliable. Because Dr. Karalis refused to provide additional information during the remand or respond to Dr. Mirkin's findings, the court must infer that his opinions do not support plaintiff's claim. (Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 877 (9th Cir. 2004).)

Contrary to plaintiff's assertions, the 1999 social security award letter, the personnel records, the letters from his friends, and Dr. Morse's September 2006 report, are insufficient evidence of disability because (1) they are not objective medical evidence or (2) they are irrelevant to plaintiff's condition on September 1, 2002 when Liberty denied the claim.

1.     **The 1999 Social Security Award is Not Medical Evidence of Disability in 2002**

The 1999 letter awarding plaintiff social security benefits is not objective medical evidence, nor is it evidence that plaintiff was unable to work in September 2002 -- three years later. Further, even if the award of Social Security benefits was contemporaneous with Liberty's denial, which it was not, numerous courts have held that an award of social security benefits is not controlling as to whether someone is "disabled" within the meaning of an ERISA plan. (See, Black & Decker Disability Plan v. Nord, 538 U.S. 822, 123 S. Ct. 1965; 155 L. Ed. 2d 1034 (2003); Madden v. ITT Long Term Disability Plan, supra, 914 F.2d at 1287; Boomis v. Metropolitan Life Ins. Co., 970 F.Supp. 584, 590 (E.D. Mich. 1997).) This is so, because the evidence submitted in support of a Social Security award is different from the information obtained by a claims administrator. Social Security also applies a treating physician rule, which is inapplicable to ERISA disability claims. (Black & Decker, supra, 538 U.S. 822.) Because there is no evidence in the administrative record regarding plaintiff's claim for social security, aside from the award letter itself, there is no evidentiary basis provided for Social Security's finding. For instance, Social Security's award may be based on Dr. Karalis' opinions, whom plaintiff now concedes is unreliable. Similarly, there is no evidence to support plaintiff's

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RCI/5108855.2/KCC                          - 23 -

DEFENDANT'S AND REAL PARTY IN
INTEREST'S CROSS MOTION FOR JUDGMENT
CASE NO. C 07-1302-CW (JL)

1    assertions that Social Security applied the same criteria as used by the Plan.  (Opening Brief, pp.

2    14-15.)  In fact, here, unlike Social Security, the Plan requires disability to be supported by

3    objective medical evidence, rather than subjective complaints.  Thus, the 1999 award letter is not

4    competent evidence of disability under the Plan.

5         **2.     The Personnel Records and Letters Are Not Evidence of Disability in 2002**

6         Plaintiff's work performance reviews did not support his claims.  Contrary to plaintiff's

7    assertions, the personnel records did not document any drop off in plaintiff's work performance

8    from when he started until his last day of work.  Plaintiff's last evaluation ("exceeds

9    expectations") was the same or better rating he received throughout his employment at

10    McKesson.  The performance reviews are also irrelevant because they have no bearing on

11    plaintiff's medical condition in 2002 -- four years after he stopped working.  Similarly, the letters

12    received from plaintiff's friends and neighbors during the remand are irrelevant, because they are

13    not objective medical evidence and they do not discuss plaintiff's medical condition in September

14    2002.  Again, they refer only to plaintiff's condition in 1998 when the claim was being paid.

15         **3.     Dr. Morse's September 6, 2006 Report is Untimely, Irrelevant and Insufficient Evidence of Disability in 2002**

16         As set forth above, Liberty properly refused to consider Dr. Morse's report.  (See,

17    Bendixen v. Standard Insurance Company, supra, 185 F.3d at 943-944.)  Accordingly, it is not

18    part of the administrative record and cannot be considered by the court.  (See, Abatie, supra, 458

19    F.3d at 970.)  Further, the purpose of the further investigation was to determine whether plaintiff

20    was disabled as of September 1, 2002 and Dr. Morse saw plaintiff for the first time in September

21    2006 – four years after the initial denial.  Thus, the untimely report, even if considered, is not

22    competent or persuasive evidence that plaintiff was disabled as of September 1, 2002.

23         Dr. Morse's report is also irrelevant because it is based entirely on plaintiff's subjective

24    reports of his medical condition and his medical history.  (CF-24 to 25.)  Indeed, Dr. Morse's

25    report does not indicate that she reviewed any medical records and instead relied solely on her

26    discussions with plaintiff, his wife, and Dr. Karalis, as well as, letters from Dr. Gershengorn and

27    Dr. Karalis to Mr. Padway (letters that were never provided to Liberty).  (CF-24.)

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RCI/5108855.2/KCC

- 24 -

DEFENDANT'S AND REAL PARTY IN
INTEREST'S CROSS MOTION FOR JUDGMENT
CASE NO.  C 07-1302-CW (JL)

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    The report is also incompetent evidence because it is based on communications with Dr.

2    Karalis (CF-24), whom plaintiff admits he is no longer relying on because is unreliable.  Dr.

3    Morse's report is also unreliable and unpersuasive because it is replete with factual inaccuracies.

4    For instance, Dr. Morse indicates in her report that Dr. Gershengorn suggested that plaintiff

5    "immediately stop working" when he began to experience chest pains, cold sweats, light

6    headedness, nausea and weakness towards the end of 1987 and that although plaintiff tried to

7    work part-time, he soon realized he was completely unable to work.  (CF-26.)  In fact, following

8    his heart attack in February 1988 plaintiff continued to full-time work for another ten years. (CF-

9    900, 898.)  Dr. Morse also indicated that plaintiff sought treatment with Dr. Karalis at the time of

10   his heart attack.  (CF-26.)  Dr. Karalis, however, began treating plaintiff in September 1998 – ten

11   years after his heart attack.  (CF-900, 905.)  Dr. Morse also stated in her report that subsequent to

12   his heart attack and part-time employment, plaintiff's work performance dropped dramatically.

13   (CF-25)  However, in his last two performance evaluations from March 1, 1996 through August

14   31, 1996 and September 1, 1996 through August 31, 1997, plaintiff received overall ratings of

15   "exceeds most objectives."  (CF-117 to 121, CF-122 to 126.)

16   Accordingly, Dr. Morse's report is insufficient evidence of disability under the Plan even

17   if it is considered by the court.

## V.  CONCLUSION

19   For the reasons set forth herein, defendant McKesson Long Term Disability Plan is

20   entitled to judgment in its favor.

21   Dated: May 12, 2008                          ROPERS, MAJESKI, KOHN & BENTLEY

23   By:   /s/  Kathryn C. Curry
24        PAMELA E. COGAN
         KATHRYN C. CURRY
25        JENNIFER A. WILLIAMS
         McKESSON CORPORATION EMPLOYEES'
         LONG TERM DISABILITY BENEFIT PLAN and
26        Real Party in Interest LIBERTY LIFE ASSURANCE
         COMPANY OF BOSTON