1   PAMELA E. COGAN (SBN 105089)
    KATHRYN C. CURRY (SBN 157099)
2   JENNIFER A. WILLIAMS (SBN 244707)
    ROPERS, MAJESKI, KOHN & BENTLEY
3   1001 Marshall Street
    Redwood City, CA  94063
4   Telephone:    (650) 364-8200
    Facsimile:     (650) 780-1701
5   Email:         pcogan@ropers.com
                   kcurry@ropers.com
6                  jwilliams@ropers.com

7   Attorneys for
    McKESSON CORPORATION
8   EMPLOYEES' LONG TERM DISABILITY
    BENEFIT PLAN and LIBERTY LIFE
9   ASSURANCE COMPANY OF BOSTON

10                      UNITED STATES DISTRICT COURT

11                     NORTHERN DISTRICT OF CALIFORNIA

12

13  MICHAEL CREMIN,                          CASE NO.  C 07-1302 CW

14              Plaintiff,                    DEFENDANT AND REAL PARTY IN
                                              INTEREST'S REQUEST FOR JUDICIAL
15  v.                                        NOTICE IN SUPPORT OF CROSS
                                              MOTION FOR JUDGMENT
16  McKESSON CORPORATION
    EMPLOYEES' LONG TERM                      Date:      June 19, 2008
17  DISABILITY BENEFIT PLAN;                  Time:      2:00 p.m.
                                              Dept.:     Courtroom 2, 4th Floor
18              Defendant.
                                              Judge:   Honorable Claudia Wilken
19

20

21  LIBERTY LIFE ASSURANCE
    COMPANY OF BOSTON
22
23  Real Party In Interest.

24

25  **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

26       Pursuant to the Rule 201 of the Federal Rules of Evidence, defendant McKesson

27  Corporation Employee's Long Term Disability Benefit Plan and Real Party in Interest Liberty

28  Life Assurance Company of Boston hereby notify all parties that they will request the Court to

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    take judicial notice of the following papers, pleadings, records and other documentation on file in

2    the Northern District of California, including, but not limited to the following:

3        1.    Plaintiff's Complaint for Declaratory Relief filed in the underlying action <u>Cremin</u>

4    <u>v. McKesson Corporation Employees' Long Term Disability Benefit Plan, et al.</u>, Case No. C04-

5    04394 EDL.  A true and correct copy is attached hereto as Exhibit 1.

6        2.    The Court's Order Denying Plaintiff's Motion for Judgment, Denying Defendant's

7    Cross-Motion, and Remanding Case to Plan Administrator entered on December 21, 2005 in

8    <u>Cremin v. McKesson Corporation Employees' Long Term Disability Benefit Plan, et al</u>, Case No.

9    C04-4394 CW.  A true and correct copy is attached hereto as Exhibit 2.

10        This request is made on the ground that the above opinions are capable of accurate and

11    ready determination by resort to sources whose accuracy cannot reasonably be questioned

12    pursuant to Federal Rules of Evidence, Rule 201.  The request is also proper under Rule 201,

13    because a court may take judicial notice of its own records and documents that are public records

14    and capable of accurate and ready confirmation by sources that cannot reasonably be questioned.

15    (<u>Wible v. Aetna Life Ins. Co.</u>, 375 F. Supp. 2d 956, 965-966 (C.D. 2005); See also, <u>MGIC Indem.</u>

16    <u>Corp. v. Weisman</u>, 803 F.3d 500, 504 (9th Cir. 1986) (courts may take judicial notice of matters

17    of public record outside the pleadings); <u>United States v. Wilson</u>, 631 F.2d 118, 119 (9th Cir.

18    1980) ("In particular, a court may take judicial notice of its own records in other cases, as well as

19    the records of an inferior court in other cases.").)

20

21

22

23

24

25

26

27

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/5117598.1/JAW

REQUEST FOR JUDICIAL NOTICE
CASE CV 07 01017 MJJ

1    Dated: May 12, 2008                          ROPERS, MAJESKI, KOHN & BENTLEY

2

3                                                 By: _Kathyn C. Curry_____
                                                      PAMELA E. COGAN
4                                                     KATHRYN C. CURRY
                                                      JENNIFER A. WILLIAMS
5                                                     Attorneys for
                                                      McKESSON CORPORATION
6                                                     EMPLOYEES' LONG TERM
                                                      DISABILITY BENEFIT PLAN and
7                                                     LIBERTY LIFE ASSURANCE
                                                      COMPANY OF BOSTON
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RC1/5117598.1/JAW                    - 3 -        REQUEST FOR JUDICIAL NOTICE
                                                  CASE CV 07 01017 MJJ

# EXHIBIT 1

1  THORNTON DAVIDSON #166487
   Thornton Davidson & Associates
2  2055 San Joaquin Street          E-filing
   Fresno, CA 93721
3  Telephone: (559)256-9800
   Telefax: (559)256-9791

ORIGINAL FILED

04 OCT 18 PM 3:12

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

4
   Attorney for Plaintiff
5

6          U.S. DISTRICT COURT OF CALIFORNIA, NORTHERN DISTRICT

7                       (SAN FRANCISCO DIVISION)

8

9  MICHAEL CREMIN,                   Case No.:  C 04  4394

10          Plaintiff,               COMPLAINT FOR DECLARATORY
                                      RELIEF
11     vs.

12 McKESSON CORPORATION
   EMPLOYEES' LONG TERM DISABILITY
13 BENEFIT PLAN,

14          Defendant

15

16     Plaintiff MICHAEL CREMIN ("PLAINTIFF") alleges as follows:

17                            JURISDICTION

18     1.     PLAINTIFF's claim for relief arises under the Employee Retirement Income

19 Security Act of 1974, as amended ("ERISA"), 29 U.S.C. section 1132(a)(1) and (3).  Pursuant to

20 29 U.S.C. section 1331, this court has jurisdiction over this action because this action arises

21 under the laws of the United States of America. 29 U.S.C. section 1132(e)(1) provides for

22 federal district court jurisdiction of this action.

23                 VENUE/INTRADISTRICT ASSIGNMENT

24     2.     Venue is proper in the Northern District of California because the acts and

25 occurrences giving rise to PLAINTIFF's claim for relief took place in San Francisco, California

26 in that PLAINTIFF is and was a resident of San Francisco County, California, when

27 DEFENDANT terminated his long-term disability benefits.  Therefore, 29 U.S.C. section

28 1132(e)(2) provides for venue in this court in the San Francisco Division.

## PARTIES

3.      PLAINTIFF is, and at all times relevant hereto was, a participant, as that term is defined by 29 U.S.C. section 1000(7), of the McKESSON CORPORATION EMPLOYEES' LONG TERM DISABILITY BENEFIT PLAN ("The Plan") and thereby entitled to receive benefits there from.  PLAINTIFF was a beneficiary because until his termination due to disability, he was an employee of McKesson Corporation, which established The Plan.

4.      DEFENDANT The Plan is an employee welfare benefit plan organized and operating under the provisions of ERISA, 29 U.S.C. section 1001 et seq.

## CLAIM FOR RELIEF

5.      The Liberty Life Assurance Company of Boston insured the Plan and acted on behalf of the Plan in all matters alleged herein.

6.      The Plan provides long-term disability benefits after an elimination period of 180 days, which, for a person under the age of 60 at the time the disability occurred, as was PLAINTIFF herein, such benefits potentially could continue until age 65.

7.      In order to be eligible for benefits under the Plan, an employee must meet The Plan's definition of total disability.  The Plan defines total disability, as follows:

"You are Totally Disabled if:

1.      you are unable to perform the important duties of your own occupation on a Full-time or part-time basis because of Injury or Sickness that started while insured under the Group Policy; and

2.      you do not work at all; and

3.      you are receiving Doctor's Care.  We will waive this requirement if We receive written proof acceptable to Us that further Doctor's Care would be of no benefit to you."

8.      PLAINTIFF was employed by McKesson Corporation as a Director of Profitability Analysis.

9.      PLAINTIFF became totally disabled and ceased to work on September 9, 1998.

COMPLAINT FOR DECLARATORY RELIEF - 2

10.    PLAINTIFF remained disabled through the elimination period of the Plan, which ended March 5, 1999.

11.    PLAINTIFF applied for and was granted Long Term Disability ("LTD") benefits from the Plan effective May 17, 1999.

12.    PLAINTIFF also applied for Social Security Disability benefits. By letter dated August 16, 1999 PLAINTIFF was awarded Social Security Disability benefits of $1,455.80 per month.

13.    By letter dated September 21, 1999 The Plan demanded repayment of $11,640 for over-payment of Social Security Disability benefit payment. PLAINTIFF repaid the full amount.

14.    The Plan acknowledged receipt of payment from PLAINTIFF of $11,640 by letter Dated December 1, 1999.

15.    DEFENDANT is judicially and collaterally estopped to deny that PLAINTIFF is totally disabled under The Plan because:

      a.    DEFENDANT required PLAINTIFF to apply for Social Security Disability benefits.

      b.    PLAINTIFF did so, and was awarded such benefits.

      c.    Pursuant to the terms of The Plan, all such benefits, except COLA's were paid or used to decrease DEFENDANT's obligation to PLAINTIFF.

16.    By letter dated August 30, 2002 The Plan terminated benefits to PLAINTIFF, giving 60 days to appeal the decision.

17. By letter dated October 30, 2002 PLAINTIFF timely appealed the Plan's termination of his LTD benefits.

18. By letter dated December 6, 2002 the Plan notified PLAINTIFF that his appeal

1 was denied, and that PLAINTIFF had exhausted his administrative rights.

2      19.    At all times mentioned herein PLAINTIFF was, and continues to be totally
3 disabled under the terms of The Plan.

4      20.    This Court is required to review the termination of PLAINTIFF's LTD
5 benefits de novo because:

      A.    The Plan does not unambiguously confer discretion on Plan fiduciaries to
            determine benefits claims and construe Plan terms; and such discretion is
            illegal.

      B.    Plan fiduciaries acted under an actual conflict of interest at the time they
            terminated PLAINTIFF's benefits:

          i.    They changed their position without receipt of new evidence.

          ii.    They determined material facts without supporting evidence.

         iii.    PLAINTIFF is informed and believes and thereon alleges that
               claims staff is given financial incentives to deny or terminate
               claims.

         iv.    The Plan has unfair claims handling procedures. When benefits
               were terminated there was no notification to PLAINTIFF that he
               could receive a copy of the Plan's documents regarding his claim
               free of charge.

         v.    When benefits were terminated the Plan used an inconsistent
               definition of disability than is in the summary plan description.

         vi.    When benefits were terminated there was no description given of
               the Plan's review procedures and applicable time limits, including
               a statement of PLAINTIFF's right to bring a civil action.

         vii.    PLAINTIFF is informed and believes and thereon alleges that Plan
               fiduciaries relied upon an internal rule, standard or criterion to
               terminate his benefits; however, when benefits were terminated he

COMPLAINT FOR DECLARATORY RELIEF - 4

was not advised that a copy of such internal rules, standards or criterion would be provided free of charge to her upon request.

    viii.    The Plan utilized unfair appeal procedures:

        a.    PLAINTIFF was not notified that he had the right, free of charge, to get copies of all documents relied upon to terminate his benefits.

        d.    The Plan failed to consider all new evidence submitted on appeal.

    C.    The Plan failed to take timely action on his appeal.

21.    PLAINTIFF has exhausted all administrative remedies required to be exhausted under the terms of The Plan.

22.    The Plan's denial of PLAINTIFF's long-term disability benefits was arbitrary and capricious, an abuse of discretion, and a violation of the terms of The Plan.

23.    An actual controversy has arisen and now exists between PLAINTIFF and The Plan with respect to whether PLAINTIFF is entitled to long-term disability benefits under the terms of The Plan.

24.    PLAINTIFF contends, and The Plan disputes, that PLAINTIFF is entitled to benefits under the terms of The Plan for long-term disability because PLAINTIFF contends, and DEFENDANT The Plan disputes, that PLAINTIFF is totally disabled.

25.    PLAINTIFF desires a judicial determination of his rights and a declaration as to which party's contention is correct, together with a declaration that The Plan is obligated to pay long-term disability benefits, under the terms of The Plan, retroactive to the first day of his

///

COMPLAINT FOR DECLARATORY RELIEF - 5

1  eligibility, until and unless such time that PLAINTIFF is no longer eligible for such benefits

2  under the terms of The Plan.

3

4      26.    A judicial determination of these issues is necessary and appropriate at this time

5  under the circumstances described herein in order that the parties may ascertain their respective

6  rights and duties, avoid a multiplicity of actions between the parties and their privities, and

7  promote judicial efficiency.

8      27.    As a proximate result of DEFENDANT's wrongful conduct as alleged herein,

9  PLAINTIFF was required to obtain the services of counsel to obtain the benefits to which he is

10

11  entitled under the terms of the Plan. Pursuant to 29 U.S.C. section 1132(g)(1), PLAINTIFF

12  requests an award of attorney's fees and expenses as compensation for costs and legal fees

13  incurred to pursue PLAINTIFF's rights under the terms of The Plan.

14     WHEREFORE, PLAINTIFF prays judgment as follows:

15

16      1.    For declaratory judgment against DEFENDANT The Plan, requiring The Plan to

17  pay long-term disability benefits under the terms of The Plan to PLAINTIFF for the period to

18  which he is entitled to such benefits, with prejudgment interest on all unpaid benefits, until

19  PLAINTIFF attains the age of 65 years or until it is determined that PLAINTIFF is no longer

20  eligible for benefits under the terms of The Plan.

21

22      2.    For attorney's fees pursuant to statute.

23      3.    For costs of suit incurred.

24      4.    For such other and further relief as the Court deems just and proper.

25

26  Dated: October 12, 2004

27                                    THORNTON DAVIDSON
                                      Attorney for Plaintiff
28                                    MICHAEL CREMIN


COMPLAINT FOR DECLARATORY RELIEF - 6

# EXHIBIT 2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL CREMIN,

        Plaintiff,

   v.

McKESSON CORPORATION EMPLOYEES' LONG
TERM DISABILITY BENEFIT PLAN and
LIBERTY LIFE ASSURANCE COMPANY OF
BOSTON,

        Defendants.

_____/

No. C 04-4394 CW

ORDER DENYING
PLAINTIFF'S
MOTION FOR
JUDGMENT, DENYING
DEFENDANT'S
CROSS-MOTION, AND
REMANDING CASE TO
PLAN
ADMINISTRATOR

    Plaintiff Michael Cremin moves the Court, pursuant to Federal
Rule of Civil Procedure 52, for review of Defendant Liberty Life
Assurance Company's[1] termination of his long-term disability
benefits.  Defendant opposes the motion, and cross-moves for
judgment in its favor.  The matter was heard on December 2, 2005.
Having considered the parties' papers, the evidence cited therein
and oral argument on the motions, the Court DENIES the parties'
motions for judgment, but GRANTS Defendant's motion in the
alternative to remand the case to the Plan Administrator for
further consideration.

BACKGROUND

    The following facts are taken from the administrative record,
McGee Decl., Ex. C, unless otherwise noted.  Plaintiff began

---

    [1] On January 5, 2005, the Court approved a stipulation
substituting Defendant Liberty Life Assurance Company for Defendant
McKesson Corporation Employees' Long Term Disability Benefit Plan
(McKesson Plan), and dismissing the claims against McKesson Plan.

United States District Court
For the Northern District of California

1    working for McKesson Corporation in 1980.  At all times relevant to

2    this action, Plaintiff was covered by the McKesson Plan, which is a

3    benefits plan organized under the Employee Retirement Income

4    Security Act (ERISA).

5         Plaintiff suffered a heart attack in 1988.  Ten years later,

6    on January 23, 1998, Plaintiff was placed on short-term disability

7    by his cardiologist, Dr. Gershengorn, due to an unspecified cardiac

8    condition.  Dr. Gershengorn initially recommended that Plaintiff

9    take a two week break, return to work part-time for two or three

10   weeks, and then be reassessed.  CF-0490.

11        Plaintiff returned to work on February 10, 1998, but worked

12   only part-time until September 21, 1998, when he filed a claim for

13   long-term disability benefits.  On the long-term disability claim

14   form, Plaintiff listed his disabling conditions as coronary artery

15   disease and anxiety; the claim form identified both Dr. Gershengorn

16   and Plaintiff's psychiatrist, Dr. Karalis.[2]  According to the

17   physician's statement completed by Dr. Karalis, Plaintiff suffered

18   from severe anxiety disorder.  Dr. Karalis defined his physical

19   impairment as Class 5: "severe limitation of functional capacity:

20   incapable of minimum (sedentary) activity."  At the time Plaintiff

21   applied for long-term disability benefits, the McKesson Plan was

22   self-funded by the McKesson Corporation and administered by

23   Preferred Works.

24   _____

25        [2]Research conducted by Defendant shows that the Medical Board
     of California put Dr. Karalis on probation, which was completed on
26   June 9, 1998.  He also resigned, with charges pending, from the
     State Bar of Californa, after serving five years' probation for
27   Medicaid fraud.

28                                    2

1    Preferred Works awarded Plaintiff long-term disability

2   benefits on April 20, 1999.  The approval letter stated that

3   Plaintiff would receive long-term benefits for twenty-four months,

4   and would thereafter continue to receive benefits if Plaintiff

5   (1) could prove by "objective medical evidence" that he was unable

6   to perform any occupation for which he was reasonably qualified,

7   and (2) was receiving Social Security disability benefits.  On

8   August 16, 1999, the Social Security Administration granted

9   Plaintiff disability benefits, effective retroactively from

10  January, 1999.

11     The McKesson Plan defines "disability" as follows:

12     "Disability" shall mean any physical or mental condition
       arising from an illness, pregnancy or injury which renders a
13     Participant incapable of performing work.  During the first
       thirty (30) months of Disability, a Participant must be unable
14     to perform the work of his or her regular occupation or any
       reasonably related occupation, and must not, except as
15     provided in Section 3.4, be performing work or services of any
       kind for remuneration.  After thirty (30) months of
16     Disability, a Participant must be unable to perform the work
       of any occupation for which he or she is or becomes reasonably
17     qualified by training, education or experience, and, in
       addition, be receiving Social Security benefits on account of
18     his or her disability.

19     Effective January 1, 2000, McKesson Corporation became wholly

20  insured by Defendant, and Defendant became responsible for both the

21  funding and administration of the McKesson Plan.

22     Dr. Gershengorn's office notes and tests results date back to

23  January, 1997.  In early 1997, Dr. Gershengorn noted that Plaintiff

24  was "feeling pretty well," with back and hip pain but no chest

25  pain.  On June 27, 1997, Dr. Gershengorn noted that Plaintiff "uses

26  Xanax for sleep."  CF-484.

27     On December 4, 2001, Dr. Gershengorn submitted to Defendant a

28                                  3

1  physical capacities form which stated that Plaintiff was physically

2  capable of sitting up to eight hours, with breaks.  CF-269.  He

3  also checked a box indicating that Plaintiff could "work 8 hours

4  per workday."  Id.  In May, 2002, in response to a request from

5  Defendant for updated medical information, Dr. Gershengorn

6  submitted office notes which indicated that, among other things,

7  Plaintiff was still taking Xanax as recently as May 8, 2001.

8  According to an August 12, 2002, update from Dr. Gershengorn,

9  Plaintiff suffered from coronary heart disease, he was permanently

10  restricted in all functional activities other than sitting, and his

11  estimated return to work date was "unknown."  CF-169.

12      According to forms regularly submitted by Dr. Karalis between

13  September, 1998 and May, 2000, Plaintiff suffered from anxiety

14  disorder and was "totally disabled."  Dr. Karalis' initial notes of

15  September 10, 1998, near the end of Plaintiff's part-time work

16  experience, indicate that Plaintiff said that he had

17  psychologically deteriorated over the year, that he couldn't "work

18  those long hours at McKesson," and that he felt he was "pushing

19  himself into another heart attack."  CF-499.  The documentation

20  indicates that Dr. Karalis provided Plaintiff with supportive

21  psychotherapy, on an as-needed basis, but that Plaintiff took

22  cardiac medications only.  CF-0301, 0303.  According to a March 20,

23  2001 form, Dr. Karalis indicated that Plaintiff's psychiatric

24  condition had "not worsened" during his treatment, but that

25  Plaintiff could do "no work at all."  CF-0281.  At that point, Dr.

26  Karalis described Plaintiff's Axis V Global Assessment of

27

28                                          4

United States District Court

For the Northern District of California

1   Functioning (GAF) as 45.[3]  Dr. Karalis revised Plaintiff's

2   estimated date to return to work to "never."  CF-0279.  On February

3   13, 2002, Dr. Karalis told Defendant that he had last seen

4   Plaintiff on February 2, 2002; that Plaintiff remained totally

5   disabled due to anxiety disorder; that Plaintiff's prognosis

6   remained poor; and that Plaintiff could not return to work.  Dr.

7   Karalis' office notes further indicate that he had contact with

8   Plaintiff on February 5, 2002, April 11, 2002, May 22, 2002, and

9   August 6, 2002.  On each occasion, Dr. Karalis noted that he

10  provided supportive therapy to Plaintiff.  In his February 5, 2002

11  note, Dr. Karalis stated "GAF remains 45."[4]

12       In a May 5, 2000 questionnaire, Plaintiff stated that he

13  could, among other activities, drive his car, occasionally go

14  grocery shopping, and visit friends' houses.  He stated that he was

15  not able to participate in an exercise program such as aerobics,

16  that he had difficulty sleeping at night, and that he sometimes

17  took a nap during the day for one to four hours.  On February 4,

18  2002, Plaintiff filled out a similar, updated activities

19  questionnaire.  At that point, he stated he could drive for short

20  _____

21       [3]Plaintiff asks the Court to take judicial notice of an
    excerpt from the American Psychiatric Association's Diagnostic and
    Statistical Manual of Mental Disorder, Fourth Edition DSM-IV-TR,
22  which describes the GAF scale between 41 and 50 as "Serious
    symptoms (e.g., suicial ideation, severe obsessional rituals,
23  frequent shoplifting) OR any serious impairment in social,
    occupational, or school functioning (e.g., no friends, unable to
24  keep a job)."  The Court grants the unopposed request for judicial
    notice.

25
         [4]Defendant attempts to dismiss the recent GAF rating as
26  "inadmissible hearsay, unsupported, speculative, and improper
    expert opinion."  Defendant fails to show that Dr. Karalis' opinion
27  as Plaintiff's treating psychiatrist is inadmissible.

28

**United States District Court**
For the Northern District of California

1  periods of time, and left his house several times per week.

2  However, he reported that he could not participate in an exercise

3  program, was able to sit only one hour per day, and that his daily

4  routine involved fourteen hours in bed or watching television, in

5  addition to a two hour nap.  According to Defendant's notes from a

6  February 7, 2002 phone call, Plaintiff reported that he had "hurt

7  his ankle and torn some ligaments due to exercise he needs to do."

8  CF-0015.

9      Defendant began a review of Plaintiff's claim file on March 9,

10  2002.  Susan Leonardos, a registered nurse, conducted the initial

11  review.  According to her notes, Dr. Karalis told her on August 7,

12  2002 that he had not seen Plaintiff since February, 2002 (contrary

13  to his records of visits in April and May), that he was "not saying

14  that [Plaintiff] cannot RTW [return to work]," and that he agreed

15  that Plaintiff "may well have a sedentary capacity."  CF-0175.

16  When Nurse Leonardos asked why Plaintiff was not prescribed anti-

17  depressant or anti-anxiety medication, Dr. Karalis reportedly told

18  her that he did not do so because of Plaintiff's cardiac condition,

19  but that Plaintiff had "improved overall," that he was seen "only"

20  "every few" months, and that he had "never been in therapy."  CF-

21  180.  After Nurse Leonardos concluded that there was no objective

22  evidence from Dr. Karalis to support a finding that Plaintiff was

23  incapable of sedentary functional activity, Defendant ordered

24  surveillance of Plaintiff.  On Thursday, March 28, Friday, March

25  29, and Saturday, March 30, Plaintiff was twice seen leaving his

26  house, once to go to the store and once to drive to an

27  acquaintance's house, and was once seen retrieving an object from

28                              6

his car.

On August 30, 2002, Defendant sent Plaintiff a letter stating that his long-term disability benefits had been terminated.  The letter indicated that Defendant had determined that Plaintiff was capable of sedentary work, relying in part upon the functional limitations form completed on August 12, 2002 by Dr. Gershengorn. Defendant also stated that its determination was based in part upon Nurse Leonardos' opinion that "there is not enough information to support lack of function from a psychiatric perspective.  The claimant sees the psychiatrist sporadically and is on no psychiatric medication."  The termination letter stated that Plaintiff could perform the following sedentary jobs:  financial analyst, budget analyst, economist, and credit analyst.

In a letter dated October 10, 2002, Plaintiff appealed the termination of his benefits.  The October 10 letter also requested, among other things, copies of the surveillance tapes that Defendant had made of Plaintiff.  Plaintiff also sent Defendant a October 18, 2002 letter from Dr. Karalis in which the psychiatrist expressed his disagreement with the termination of benefits.  Specifically, Dr. Karalis stated that it appeared that Defendant had terminated Plaintiff's disability benefits based solely upon the August 12, 2002 physician's statement from Dr. Gershengorn which indicated that Plaintiff was not restricted from sitting for eight hours, although he was restricted in all other physical activities.  Dr. Karalis reported the October 15, 2002 administration of Zung

United States District Court
For the Northern District of California

1  Depression and Anxiety Psychological Tests[5]; the results showed, in

2  part, that Plaintiff felt more nervous and anxious than usual, that

3  he felt weak or tired easily, that he got tired for no reason, that

4  he had some loss of mental clarity, and that he did not find it

5  easy to make decisions.  Dr. Karalis opined that, given the

6  exertional restrictions imposed by Dr. Gershengorn, Plaintiff could

7  not work; he elaborated,

> In my experience, patients who attempt job reentry in jobs
> allowing only "sitting" do not do well, since sitting becomes
> uncomfortable and there is often (as with you) an ongoing
> psychological impairment (concentrating, remembering,
> analyzing, etc.--commonly called cognitive functions).

11  CF-0141.  Dr. Karalis further stated that Plaintiff could not

12  perform the sedentary jobs recommended by Defendant because

13  Plaintiff did "not possess the stabilization of moods and control

14  of psychiatric symptomatology required to have predictably stable

15  cognitive functioning to perform these jobs, which assume full

16  cognitive functioning."  CF-0143.

17      Defendant conducted further daily surveillance of Plaintiff

18  from November 6 through November 10, 2002.  Over the course of

19  those five days, Plaintiff was observed leaving his residence only

20  three times: once to retrieve a newspaper on the curbside, once to

21  drive to the store, and once to drive to an unknown location.  At

22  one point, Plaintiff left his car parked partially in a lane of

---

24      [5]Dr. Mirkin, hired by Defendant to review Plaintiff's file,
25  states that the Zung test is a self-rating scale that can be used
    to assess progress over time, but which "is not a diagnostic tool
    and certainly not one that should be used to resolve a dispute as
26  to the valid presence of symptoms because there is no objective
    validity scale built into the inventory questions."  CF-0114.
27  Plaintiff does not dispute this statement.

**United States District Court**
For the Northern District of California

1  traffic.

2       Plaintiff called Defendant on November 21, 2002 and informed a

3  representative that his cardiologist, Dr. Gershengorn, also

4  disagreed with Defendant's decision to terminate his benefits and

5  would be submitting a letter to that effect.  Also in November,

6  Defendant initiated a review by psychiatrist Dr. Mirkin of the

7  information in Plaintiff's file.  On November 30, 2002, Dr. Mirkin

8  submitted a report that, under the heading "Recommendations and

9  Conclusions," criticized Dr. Karalis' treatment and opinions, on

10  the grounds that:  (1) the psychatric information supporting

11  Plaintiff's disability was subjective only, and his condition

12  should have been treated more aggressively, e.g. with medication,

13  if it was as debilitating as Dr. Karalis claimed; (2) there was no

14  indication of imminent threat from Plaintiff's cardiac disease, and

15  if Plaintiff displayed abnormally cautious behavior, Dr. Karalis

16  should have treated it more aggressively; (3) Dr. Karalis' office

17  notes are very brief, and fail to support his medical conclusion of

18  total disability for Plaintiff and his specific opinion that

19  Plaintiff lacked the cognitive functioning to work; and (4) there

20  was no indication from the record why Plaintiff suddenly became so

21  concerned about another heart attack.

22       In a December 4, 2002 letter to Defendant, Dr. Gershengorn

23  stated that, while he did report the functional limitations cited

24  in Defendant's original termination decision letter, Plaintiff also

25  had limitations on non-exertional activities such as "structured

26  schedules, deadlines, adversarial relationships, and commuting to

27  work."  CF-85.  Dr. Gershengorn further stated as follows: "He

28                                        9

1  remains on cardiac medications . . . and Xanax, and he remains in

2  therapy for his anxiety disorder.  I am unaware of any dramatic

3  improvement in Mr. Cremin's medical condition that warrants

4  reversal of the previous decision, which found him to be disabled."

5  Id.

6      On October 18, 2004, Plaintiff filed a complaint for

7  declaratory judgment that he is entitled to long-term disability

8  benefits under the McKesson Plan.

9      In its October 3, 2005 order addressing the issue of the

10 standard of review, the Court found that Plaintiff had submitted

11 material, probative evidence that Defendant had an actual conflict

12 of interest when it terminated Plaintiff's benefits.  Among other

13 factors, the Court found that Dr. Mirkin's report was "little more

14 than an incomplete critique of Dr. Karalis' treatment plan," which

15 Plaintiff did not have the opportunity to view and address.  Oct.

16 3, 2005 Order at 15.

17                      LEGAL STANDARD

18     ERISA provides Plaintiff with a federal cause of action to

19 recover the benefits he claims are due under the Plan.  29 U.S.C.

20 § 1132(a)(1)(B).  The standard of review of a plan administrator's

21 denial of ERISA benefits depends upon the terms of the benefit

22 plan.  In its October 3, 2005 order, the Court determined that

23 Defendant's termination of Plaintiff's benefits would be reviewed

24 de novo.  Therefore, as explained by the Court at the February 18,

25 2005 case management conference, the Court conducts a bench trial

26 based on the administrative record in order to evaluate Plaintiff's

27 claim.  Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094-95 (9th

28                              10

United States District Court
For the Northern District of California

1  Cir. 1999) (en banc), <u>cert. denied</u>, 528 U.S. 964 (1999).

2      In its <u>de novo</u> review of Defendant's decision to deny

3  benefits, the Court must decide whether Plaintiff is disabled under

4  the terms of the plan.  In <u>Juliano v. Health Maintenance</u>

5  <u>Organization of New Jersey, Inc.</u>, 221 F.3d 279, 287-8 (2nd Cir.

6  2000), the Second Circuit held that it was the plaintiffs' burden

7  "to establish that they were entitled to [the] benefit [sought]

8  pursuant to the terms of the Contract or applicable federal law."

9  Following <u>Juliano</u>, the Court concludes that Plaintiff must carry

10 the burden to prove that he was disabled under the meaning of the

11 plan.  <u>Sabatino v. Liberty Life Assur. Co.</u>, 286 F. Supp. 2d 1222,

12 1232 (N.D. Cal. 2003).  On <u>de novo</u> review, the Court may weigh

13 contradictory evidence.  <u>Newcomb v. Standard Ins. Co.</u>, 187 F.3d

14 1004, 1007 (9th Cir. 1999).

15     "While under an abuse of discretion standard [the Court's]

16 review is limited to the record before the plan administrator, this

17 limitation does not apply to de novo review."  <u>Jebian v. Hewlett-</u>

18 <u>Packard Co. Employee Benefits Organization Income Protection Plan</u>,

19 349 F.3d 1098, 1110 (9th Cir. 2003).  The Court has discretion "to

20 allow evidence that was not before the plan administrator 'only

21 when circumstances clearly establish that additional evidence is

22 necessary to conduct an adequate de novo review.'"  <u>Kearney</u>, 175

23 F.3d at 1090 (citations omitted); <u>see also</u> <u>Mongeluzo v. Baxter</u>

24 <u>Travenol Long Term Disability Benefit Plan</u>, 46 F.3d 938, 943 (9th

25 Cir. 1995) (On <u>de novo</u> review, "new evidence may be considered . .

26 . to enable the full exercise of informed and independent

27 judgment.").

28                              11

United States District Court

For the Northern District of California

<div style="writing-mode: vertical-rl">**United States District Court** For the Northern District of California</div>

1

DISCUSSION

2  I.  Plaintiff's Evidence of Disability

3      As evidence that he is disabled, Plaintiff points to the

4  following:  (1) the opinions of his treating physicians, including

5  Dr. Karalis' determination that Plaintiff had a GAF score of 45;

6  (2) the Social Security Administration's determination that he was

7  disabled; and (3) the results of Defendant's surveillance of

8  Plaintiff.[6]  Defendant does not dispute that Plaintiff may have

9  been disabled at some point in the past, but argues that this

10  evidence is insufficient to prove that his disability continued

11  until September 1, 2002, when Defendant discontinued benefits.

12      A.  Dr. Gershengorn

13      Dr. Gershengorn's records show that Plaintiff is physically

14  capable for sitting for eight hours, but is not capable of any

15  other regular work activity.  None of the evidence from the

16  cardiologists' records suggests that sedentary work would, in

17  itself, put Plaintiff at cardiac risk.  However, Dr. Gershengorn's

18  December 4, 2002 letter does state that Plaintiff "also has non-

19  exertional limitations due to his medical conditions."  Dr.

20  Gershengorn opined that non-exertional activities "that could be

21  harmful to him include structured schedules, deadlines, adversarial

22

23  ────────────────

24      [6]Plaintiff also points to Defendant's failure to conduct an
independent psychiatric examination of him, alleged gaps and errors
in Dr. Mirkin's review of Plaintiff's file, and Defendant's failure

25  to solicit review of Dr. Mirkin's report from Drs. Karalis or
Gershengorn.  Although these factors were relevant to the Court's

26  decision to apply a de novo standard of review, and may go to the
weight of Dr. Mirkin's evidence, these alleged errors are not, in

27  themselves, affirmative evidence that Plaintiff is disabled.

28

United States District Court

For the Northern District of California

1  relationships, and commuting to work."[7]  He also notes that "major

2  depression/anxiety has been shown to be the strongest predictor of

3  adverse outcome (MI, CABG, angioplasty) on patients with coronary

4  artery disease," although he renders no opinion on whether

5  Plaintiff in fact suffers from major depression or anxiety.

6      In the absence of any specific findings, direct observations

7  or diagnoses to the contrary, it appears that Dr. Gershengorn's

8  opinion regarding Plaintiff's non-exertional limitations is not

9  based directly on objective evidence.  He may have been relying on

10  Dr. Karalis' diagnosis, or Plaintiff's self-reporting of anxiety.

11  Notably, Dr. Gershengorn does not actually say that Plaintiff

12  cannot work; instead, the cardiologist merely states that he is

13  "unaware of any dramatic improvement in Mr. Cremin's medical

14  condition that warrants reversal of the previous decision, which

15  found him to be disabled."  Moreover, Plaintiff concedes that his

16  cardiac condition, standing alone, is not disabling.  Pl.'s Reply

17  Br. 3.  Therefore, even taking into consideration the December 4

18  letter, Dr. Gershengorn's records and opinions do not provide

19  sufficient, objective medical evidence to establish that Plaintiff

20

21      [7]Defendant objects to the Court's consideration of Dr.
    Gershengorn's letter, which was not before the plan administrator
22  when Plaintiff's benefits were terminated.  However, the Court
    finds that consideration of this opinion of Plaintiff's treating
23  physician is necessary in order to "enable the full exercise of
    informed and independent judgment." Mongeluzo, 46 F.3d at 943.
24  The Court notes that Defendant was aware at the time it denied
    Plaintiff's appeal that Dr. Gershengorn disagreed with Defendant's
25  denial of benefits.  Furthermore, as the Court noted in its October
    3, 2005 order, Plaintiff did not have the opportunity to view and
26  address Dr. Mirkin's report prior to Defendant's final decision
    regarding his benefits; under these circumstances, Defendant's
27  objection to the letter are inconsistent and unfounded.

28                                    13

1  is disabled under the plan.

2     B.   Dr. Karalis

3     The parties sharply dispute the significance of Dr. Karalis'

4  evidence.  Nurse Leonardos' notes of her August, 2002 phone

5  conversation, in which Dr. Karalis allegedly told her that

6  Plaintiff had improved and might have functional capability,

7  contrast sharply with his previous, regular descriptions of

8  Plaintiff as totally disabled, as well as his October 18, 2002

9  letter opining that Plaintiff's cognitive impairments prevented him

10 from performing even a completely sedentary job.  Defendant uses

11 this discrepancy to dismiss Dr. Karalis' February, 2002 GAF rating,

12 an objective test, as "irrelevant" because Dr. Karalis later told

13 Defendant that Plaintiff's condition had improved.  The Court

14 cannot resolve the discrepancies between Nurse Leonardos' notes and

15 Dr. Karalis' later statements.

16     Nevertheless, Dr. Karalis' documentation contains little in

17 the way of objective assessment of Plaintiff's cognitive

18 impairments.  The GAF result of 45 does provide some objective

19 evidence of Plaintiff's level of functioning, yet the rating, in

20 itself, shows that Plaintiff may not be able to work but not that

21 Plaintiff cannot work, because such an assessment may relate to

22 social rather than occupational functioning.  Plaintiff does not

23 dispute Dr. Mirkin's opinion that the Zung tests, based on self-

24 reporting of anxiety and depression, are not an acceptable means to

25 reach an objective disability determination.  Dr. Karalis did not

26 prescribe any medication for Plaintiff.  Although apparently

27 Plaintiff was taking Xanax prescribed by Dr. Gershengorn, there is

28

14

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    no evidence in the record that Dr. Karalis was aware of this.  Dr.

2    Karalis' notes and letter state that he gave Plaintiff "supportive

3    therapy," but nowhere does he describe the intensity, goals or

4    outcomes of that therapy in any detail.[8]  Dr. Karalis' credibility

5    is undermined by his suspension from the California State Bar for

6    Medicaid fraud.  For these reasons, although Dr. Karalis' opinion

7    and GAF assessment provide some evidence in support of Plaintiff's

8    disability claim, the Court finds that Dr. Karalis' opinions are

9    not sufficiently persuasive to allow Plaintiff to meet his burden

10   of proof.

11        C.  Surveillance Tapes

12        Plaintiff asserts that the surveillance tapes, which show a

13   generally low level of activity as well as poor driving skills,

14   support his claim of disability.  The Court finds that the tapes,

15   while consistent with the claimed disability, are not, in

16   themselves, probative, objective medical evidence of disability.

17        D.  Social Security Determination

18        The Social Security Administration's (SSA's) determination

19   that Plaintiff was disabled is a factor that weighs in Plaintiff's

20   favor.  However, there are no substantive findings by the SSA

21   contained within the administrative record.  And, although SSA

22   regulations generally require administrative law judges to give

23   deference to the opinions of a claimant's treating physician, such

24   special deference is not required in the ERISA context.  <u>Black &</u>

25   _____

26   [8]Plaintiff's statement that Dr. Karalis initially provided
     Plaintiff with "intensive" therapy is unsupported by the record.
     At best, the evidence shows that the two spoke or met somewhat more
27   frequently earlier in their relationship.

28                                    15

1   Decker Disability Plan v. Nord, 538 U.S. 822, 829-30 (2003).  Here,

2   much of Plaintiff's case rests on the credibility of his treating

3   physicians.  Nevertheless, the Court finds that the SSA's

4   determination, at minimum, provides objective support for the

5   opinions of Plaintiff's treating physicians as of SSA's August,

6   1999 award of benefits.  See Calvert v. Firestar Finance, Inc., 409

7   F.3d 286, 294 (6th Cir. 2005) (holding that SSA disability

8   determination supports conclusion that objective support existed

9   for treating physician's opinion).

10          Plaintiff further urges the Court to find that, having

11   required him to apply for Social Security benefits, Defendant is

12   now judicially estopped from arguing that he is not disabled under

13   the plan.  Judicial estoppel is a doctrine which "precludes a party

14   from gaining an advantage by taking one position, and then seeking

15   a second advantage by taking an incompatible position." Rissetto

16   v. Plumbers & Steam Fitters Local 343, 94 F.3d 597, 600 (9th Cir.

17   1996).  However, Defendant did not argue to the SSA that Plaintiff

18   was disabled, and Plaintiff has not shown that Defendant has taken

19   inconsistent positions.  Furthermore, as the Court ruled in its

20   previous order in response to a similar argument by Plaintiff, the

21   SSA disability determination does not create an irrebuttable

22   presumption of disability under the plan because the SSA's

23   mandatory treating physician rule does not apply in the ERISA

24   context.  October 3, 2005 Order at 14 (citing Black & Decker).

25   II.  Defendant's Evidence of No Disability

26          Although Plaintiff's evidence of continued disability is weak,

27   Defendant does not persuasively rebut it.  The purported

28                                      16

**United States District Court**
For the Northern District of California

1   inconsistencies identified by Defendant are overblown, or decrease

2   the weight of Plaintiff's evidence rather than demonstrate that

3   Plaintiff was not disabled as of September, 2002.  For instance,

4   without additional information about the exercise that Plaintiff

5   told Defendant he needed to do but that resulted in a broken ankle,

6   there is no reason to think that it is necessarily inconsistent

7   with Plaintiff's earlier May 5, 2000 statement that he could not

8   participate in an exercise program such as aerobics.  Nor is

9   Plaintiff's part-time employment status in 1998 persuasive evidence

10  that Plaintiff is not disabled.  Nothing in the record reflects

11  Plaintiff's actual work performance during that time, and Plaintiff

12  subsequently ceased work altogether, with the support of his

13  doctors.

14      Dr. Mirkin's report is more thoroughly reasoned and supported

15  than the opinions of Dr. Karalis.  As the Court found in its prior

16  order, however, Dr. Mirkin's report is at best an incomplete

17  critique of Dr. Karalis' opinions and treatment.  Dr. Mirkin did

18  not examine Plaintiff or communicate directly with Plaintiff's

19  treating physicians; instead, he reviewed the scanty records.  Dr.

20  Mirkin's opinion that Plaintiff should have been treated more

21  aggressively is persuasive, but it is equally susceptible to two

22  different interpretations:  that Dr. Karalis erred in concluding

23  that Plaintiff could not work, because his depression and anxiety

24  is not that severe; or in the alternative, that Plaintiff does

25  suffer severe depression and anxiety, but that Dr. Karalis'

26  treatment was inadequate.

27

28                                    17

United States District Court
For the Northern District of California

III.   Remedy

In light of the gaps in the record, the Court finds it cannot reach an adequately supported final adjudication of Plaintiff's disability claim.  Plaintiff has introduced some evidence of disability, but it is not sufficient to meet his burden of proof. Nevertheless, the Court has serious questions regarding Plaintiff's level of impairment that render final judgment in Defendant's favor inappropriate.  Relatively minimal additional development of the record could significantly assist a fact-finder.  For instance, if Dr. Karalis knew that Plaintiff took Xanax prescribed by Dr. Gershengorn and relied on this in devising Plaintiff's psychiatric treatment, this would alter the import of Dr. Mirkin's opinion. Therefore, the Court concludes that the most appropriate course is to remand Plaintiff's claim to the Plan Administrator for additional investigation.

Plaintiff argues that Defendant's authority supporting remand is inapposite.  Both Gallo v. Amoco Corp., 102 F.3d 918 (7th Cir. 1996) and Miller v. United Welfare Fund, 72 F.3d 1066 (2nd Cir. 1995) involved a lower court's review under an "arbitrary and capricious," standard, and thus are not directly applicable to this de novo review.  Yet even Plaintiff's authority, also involving review under the arbitrary and capricious standard, suggests that the Court has the authority to remand a case where, as here, the facts are unclear.  Cf. Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1163 (9th Cir. 2001) (holding retroactive reinstatement of benefits to be appropriate remedy where Plan Administrator's decision "was simply contrary to the facts").

18

1  Therefore, the Court grants Defendant's motion for remand.

2                        CONCLUSION

3       For the foregoing reasons, the Court DENIES Plaintiff's motion

4  for judgment (Docket No. 60) and GRANTS Defendant's cross-motion,

5  in the alternative, to remand Plaintiff's claim to the Plan

6  Administrator for further investigation (Docket No. 62).  The case

7  will be closed, and the Clerk shall enter judgment in Defendant's

8  favor.  Each party shall bear its own costs of the action.

9

10      IT IS SO ORDERED.

11

12  Dated: 12/21/05                    *Claudia Wilken*

13                                     _____
                                       CLAUDIA WILKEN
14                                     United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28                            19

United States District Court
For the Northern District of California

1   periods of time, and left his house several times per week.

2   However, he reported that he could not participate in an exercise

3   program, was able to sit only one hour per day, and that his daily

4   routine involved fourteen hours in bed or watching television, in

5   addition to a two hour nap.  According to Defendant's notes from a

6   February 7, 2002 phone call, Plaintiff reported that he had "hurt

7   his ankle and torn some ligaments due to exercise he needs to do."

8   CF-0015.

9        Defendant began a review of Plaintiff's claim file on March 9,

10  2002.  Susan Leonardos, a registered nurse, conducted the initial

11  review.  According to her notes, Dr. Karalis told her on August 7,

12  2002 that he had not seen Plaintiff since February, 2002 (contrary

13  to his records of visits in April and May), that he was "not saying

14  that [Plaintiff] cannot RTW [return to work]," and that he agreed

15  that Plaintiff "may well have a sedentary capacity."  CF-0175.

16  When Nurse Leonardos asked why Plaintiff was not prescribed anti-

17  depressant or anti-anxiety medication, Dr. Karalis reportedly told

18  her that he did not do so because of Plaintiff's cardiac condition,

19  but that Plaintiff had "improved overall," that he was seen "only"

20  "every few" months, and that he had "never been in therapy."  CF-

21  180.  After Nurse Leonardos concluded that there was no objective

22  evidence from Dr. Karalis to support a finding that Plaintiff was

23  incapable of sedentary functional activity, Defendant ordered

24  surveillance of Plaintiff.  On Thursday, March 28, Friday, March

25  29, and Saturday, March 30, Plaintiff was twice seen leaving his

26  house, once to go to the store and once to drive to an

27  acquaintance's house, and was once seen retrieving an object from

28                                      6

1 his car.

2     On August 30, 2002, Defendant sent Plaintiff a letter stating

3 that his long-term disability benefits had been terminated.  The

4 letter indicated that Defendant had determined that Plaintiff was

5 capable of sedentary work, relying in part upon the functional

6 limitations form completed on August 12, 2002 by Dr. Gershengorn.

7 Defendant also stated that its determination was based in part upon

8 Nurse Leonardos' opinion that "there is not enough information to

9 support lack of function from a psychiatric perspective.  The

10 claimant sees the psychiatrist sporadically and is on no

11 psychiatric medication."  The termination letter stated that

12 Plaintiff could perform the following sedentary jobs:  financial

13 analyst, budget analyst, economist, and credit analyst.

14     In a letter dated October 10, 2002, Plaintiff appealed the

15 termination of his benefits.  The October 10 letter also requested,

16 among other things, copies of the surveillance tapes that Defendant

17 had made of Plaintiff.  Plaintiff also sent Defendant a October 18,

18 2002 letter from Dr. Karalis in which the psychiatrist expressed

19 his disagreement with the termination of benefits.  Specifically,

20 Dr. Karalis stated that it appeared that Defendant had terminated

21 Plaintiff's disability benefits based solely upon the August 12,

22 2002 physician's statement from Dr. Gershengorn which indicated

23 that Plaintiff was not restricted from sitting for eight hours,

24 although he was restricted in all other physical activities.  Dr.

25 Karalis reported the October 15, 2002 administration of Zung

26

27

28                               7

**United States District Court**
For the Northern District of California