Laurence F. Padway, #89314
Law Offices of Laurence F. Padway
1516 Oak Street, Suite 109
Alameda, California 94501
Telephone: (510)814-6100
Facsimile : (510)814-0650

David J. Linden (SBN: 041221)
P.O. Box 5780
Napa, California 94581
Telephone: (707) 252-7007
Facsimile: (707) 252-7883

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL CREMIN,<br><br>    Plaintiff,<br><br>vs.<br><br>MCKESSON CORPORATION EMPLOYEES' LONG TERM DISABILITY PLAN,<br><br>    Defendant.<br>_____/<br>LIBERTY LIFE ASSURANCE COMPANY OF BOSTON,<br><br>    Real Party in Interest.<br>_____/ | No. C07-01302 CW |

# PLAINTIFF'S REPLY MEMORANDUM

Table of Contents

1. Liberty Changed the Approval of Benefits to a Denial of Benefits Without a Change in Medical Condition ... 1

2. This Court's Previous Decision Establishing De Novo Review is Still the Law of the Case. ... 3

3. The Report of Dr. Roxanne Morse Must be Considered (a) Because Mr. Cremin is Entitled to an Appeal of the Adverse Decision and (b) Because Liberty Failed to Provide Mr. Cremin With an Opportunity to Respond to the Report of Dr. Mirkin ... 5

4. Mr. Cremin Demonstrates Objective Evidence of Cardiac Disability ... 6

5. Mr. Cremin Proves He Suffers From Continuously Disabling Anxiety/Fatigue. ... 8

6. Dr. Mirkin's Report Does Not Sufficiently Dispute Mr. Cremin's Anxiety. ... 10

7. Conclusion. ... 11

Table of Authorities

*Abatie v. Alta Health and Life Ins. Co.*,
458 F. 3d 955 (9th Cir. 2006) ..... 1,4

*Abram v .Cargill, Inc.*,
395 F.3d 882 (8th Cir. 2005) ..... 4

*Levinson v. Reliance Standard Life Ins. Co.*,
245 F.3d 1321 (11th Cir. 2001) ..... 2

*McOsker v. Paul Revere Life Ins. Co.*,
279 F.3d 586 (8th Cir. 2001) ..... 1

*Moore v. Jas. H. Matthews & Co.*,
682 F.2d 830 (9th Cir. 1982) ..... 4

*Norris v. City Bank N.A. Disability Plan (501)*,
308 F.3d 880 (8th Cir. 2002) ..... 2

*Saffon v. Wells Fargo and Co. Long Term Disability Plan*,
522 Fed. 3d 863 (9th Cir. 2008) ..... 2 ,4, 5, 6

*Walke v. Group Long Term Disability Ins.*,
256 F.3d 835 (8th Cir. 2001) ..... 2

**1. Liberty Changed the Approval of Benefits to A Denial of Benefits Without A Change in Medical Condition.**

On December 1, 1999, Preferred Works, which then acted as an independent claims administrator for the McKesson Plan wrote to Mr. Cremin noting that he had crossed from the "own occupation" to the "any occupation" threshold, and would only continue to receive benefits if he was (1) disabled from work in any occupation, and (2) receiving Social Security benefits. The independent Claim Administrator **approved** the claim:

> "The medical information in your file indicates your condition prevents you from working in any occupation. In addition, you are receiving Social Security Disability Benefits. Since you meet the requirements of the plan for benefits beyond eighteen months [plus the six month waiting period], benefits will continue beyond January 25, 2000." CF-701.

But the same month this letter was written, Liberty Mutual, which was purchasing the claims portfolio and intent on terminating claims to earn a profit, had already begun redoing the claims review work of Preferred Works. CF-684. What changed in Mr. Cremin's medical condition between the approval of "any occupation" benefits by the independent claims administrator Preferred Works, and the denial of his claim by the structurally conflicted Liberty Mutual[1]? Why was Liberty conducting a review less than a month after the independent administrator had awarded any occupation benefits?

In *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2001), the Court held that unless information available to an insurer alters in some significant way, "the previous

---

[1] A structural conflict exist when the Claims Administrator pays the claim from its own assets, and therefore has a built in conflict of interest. This is the usual case when an insurance company acts as both the claims administrator and the payor of claims. This conflict informs the review conducted by the District Court. *Abatie v. Alta Health and Life Ins. Co.,* 458 F. 3d 955, 965 (9th Cir. 2006). Even if the Court reviews the administrator's determination for abuse of discretion, this review is "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." *Id.* at 968. This standard, the court stated, "applies to the kind of inherent conflict that exists when a plan administrator both administers the plan and funds it, as well as to other forms of conflict." *Id.*

payment of benefits is a circumstance that must weigh against the propriety" of an insurer's decision to terminate those benefits. *See also Norris v. City Bank N.A. Disability Plan (501)*, 308 F.3d 880, 885 (8th Cir. 2002); *Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 840-41 (8th Cir. 2001); *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1331 (11th Cir. 2001). Similarly, the Ninth Circuit in *Saffon v. Wells Fargo and Co. Long Term Disability Plan*, 522 Fed. 3d 863, 871 (9th Cir. 2008) chastised a plan for failing to consider its past determination of a claimant's disability in considering the effect of unchanged medical imaging:

> After all, MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she was already disabled. In order to find her no longer disabled, one would expect the MRIs to show an *improvement,* not a lack of degeneration.

Notably, Liberty Mutual nowhere claims that Mr. Cremin improved following the Preferred Works determination that he was disabled from working in any occupation under the Plan. In the absence of evidence of improvement, all that has occurred is that the independent claims administrator's decision has been replaced by a decision of a conflicted claims administrator.

**2. This Court's Previous Decision Establishing De Novo Review is Still The Law of the Case.**

In its Opposition, Liberty acknowledges that this action is a continuation of the previous action regarding the same claim for benefits. Opposition 16:23-27. In its October 3, 2005, order, this court found that a de novo standard of review applied because Liberty had a conflict of interest when it terminated Mr. Cremin's benefits. By subsequent order dated December 21, 2005, the court remanded Mr. Cremin's claim to Liberty.

Liberty's argument about the finality of the remand order misses the mark. The court's October 3, 2005, order remains the law of the case with respect to the issue of the standard of

review. "The 'law of the case' rule ordinarily precludes a court from re-examining an issue previously decided by the same court, or a higher appellate court, in the same case." *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 833 (9th Cir. 1982).

This court should not depart from its October 3, 2005, order establishing de novo review. Both parties recognize that *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006), is now the controlling legal authority. While *Abatie* clarified the standard of review analysis, the result reached by this court in its previous order would be the same. After *Abatie*, a court "must determine the extent to which the conflict [of interest] influenced the administrator's decision. . . ." *Saffon v. Wells Fargo Long Term Disability Plan,* 522 F.3d 863, 868 (9th Cir. 2008). This is precisely what the court did in its October 3, 2005, order. The court carefully reviewed the evidence of conflict, focusing particularly on Liberty's procedural irregularities. For example, the court noted that Liberty failed to disclose Dr. Peter Markin's report to Mr. Cremin before it denied his appeal. Citing *Abram v .Cargill, Inc.*, 395 F.3d 882 (8th Cir. 2005), the court found that this failure denied Mr. Cremin a full and fair review of his appeal, which is required by ERISA regulations that prescribe benefit claim procedures.

It is significant to note that Liberty made the same procedural error in its review of Mr. Cremin's claim after remand. In its December 21, 2005, order, the Court specifically requested Liberty to clarify the report of Dr .Mirkin. That was not done until October 4, 2006. Liberty affirmed its decision terminating benefits only six days later, on October 10, 2006, without giving Mr. Cremin a chance to review and comment on Dr. Mirkin's new report. CF-0046-47.

Once again, Liberty violated the procedural requirements of ERISA that ensure a full and fair claim review. As the court in *Abram* noted: "There can hardly be a meaningful dialogue between the claimant and the Plan administrator if evidence is revealed only after a final decision. A claimant is caught off guard when new information used by the appeals committee emerges only

Pltfs. Reply Memo                               Page 3 of  11

after with the final denial. The plaintiff should have been permitted to review and respond to the report by [the doctor]." *Id.* at 886.

**3. The Report of Dr. Roxanne Morse Must be Considered (a) Because Mr. Cremin is Entitled to an Appeal of the Adverse Decision and (b) Because Liberty Failed to Provide Mr. Cremin with an Opportunity to Respond to the Report of Dr. Mirkin.**

Liberty Mutual claims to have left the appeal open for an extraordinarily long period of time in an effort to provide Mr. Cremin a full and fair opportunity to provide information to Liberty. But the Court, in remanding the case, specifically requested Liberty to clarify the report of Dr. Peter Mirkin, which Liberty did not do until October 4, 2006. CF-49. Liberty affirmed its decision terminating benefits only six days later, on October 10, 2006. CF-42. Liberty neither allowed Mr. Cremin to review and comment on Dr. Mirkin's new report, nor explains why, having waited seven months for Dr. Mirkin's report, it could not wait the additional two months for Mr. Cremin's psychologist to complete her report.

Liberty correctly points out that counsel for Mr. Cremin had expected Dr. Morse's report to be received earlier than it was received. But there is nothing about that delay which was caused by Mr. Cremin. And there is nothing about the delay which prejudiced Liberty Mutual's position in any respect. What we have, rather, is an administrator who decided to keep matters open just long enough to secure the reports it needed to terminate benefits but not long enough to allow Mr. Cremin to repond to those reports. Notably, Liberty never wrote to counsel for Mr. Cremin and announced a final deadline for receipt of Dr. Morse's report. It never inquired as to the reasons for the delay in the preparation of the report. It never contacted Dr. Morse, although it contacted Dr. Gershengorn and Dr. Koralis.

Under *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 Fed. 3d 863 (2008) the beneficiary is entitled to introduce evidence regarding the new report from Dr. Mirkin:

> In *Abatie,* the beneficiary presented evidence in the district court bearing on the new issue, but the court refused to consider it. *Id.* We held that this was error, which must mean that a claimant in such circumstances is entitled to present evidence and to have the district court consider it. In addition, the fact that the claims administrator presented a new reason at the last minute bears on whether denial of the claim was the result of an impartial evaluation or was colored by MetLife's conflict of interest. After all, coming up with a new reason for rejecting the claim at the last minute suggests that the claim administrator may be casting about for an excuse to reject the claim rather than conducting an objective evaluation.
>
> *Saffon v. Wells Fargo & Co. Long Term Disability Plan* 522 F.3d 863, 872 (9th Cir., 2008)

The whole point of Dr. Mirkin's October 4, 2006 report is to cast aspersions on Dr. Koralis's opinion that Mr. Cremin is disabled due to anxiety. Dr. Morse responds to this by providing objective evidence through psychometric testing that demonstrates (1) Mr. Cremin is not malingering and (2) Mr. Cremin has very high levels of anxiety which interfere with his functioning. Liberty Mutual should have considered this evidence, as responsive to Dr. Mirkin's report. Its failure to do so means that the District Court not only should consider the evidence, but that Liberty Mutual has no response to it, so that it is undisputed.

**4. Mr. Cremin Demonstrates Objective Evidence of Cardiac Disability.**

A cardiac catheterization report from UCSF medical center dated March 14, 2002 demonstrated a "total occlusion of a probably non-dominant right coronary artery with collateral filling from left." CF-252. A drawing of this condition appears at CF-254, and it leaves no doubt that there is a significant cardiac condition. It is not a "normal" condition for a coronary artery to be completely blocked, as this one happens to be.

A myocardial perfusion study performed on February 22, 2002 demonstrated a

"perfusion defect involving the apex and distal anteroseptum. The stress supine and prone images demonstrate further decrement in activity involving this area which extends more proximally, In addition, decreased perfusion is also noted in the inferior wall and posterior septum." The radiologist concludes that "this suggests a limited area infarction involving that territory consistent with the patient's history MI. In light of a normal wall motion, this area of infarction is probably very limited in extent in the LAD territory. In addition, reversibility in perfusion is also noted in the mid-distal LAD territory suggesting ischemia in the same distribution." CF-248-249.

Dr. Gershengorn wrote to the disability carrier in December, 2002 and reported that Mr. Cremin "was deemed totally disabled by the Social Security Administration because of his cardiac condition and severe anxiety disorder." "I am unaware of any dramatic improvement in Mr. Cremin's medical condition that warrants reversal of the previous decision. CF-334.

In a second letter dated July 4, 2006, CF-205, Dr. Gershengorn explained that "Mr. Cremin develops rather severe fatigue with emotional as well as physical stress. When he is under stress, such as that experienced at work, he develops extreme fatigue. He also has this problem with physical activity. Mr. Cremin has clinical angina with at least mild myocardial ischemia, possibly related to his prior myocardial infarction and/or small vessel disease. I believe his fatigue is secondary to his underlying ischemic heart disease with his prior extensive myocardial infarction."

In other words, Mr. Cremin has heart disease which is demonstrated on cardiac catheterization. This causes him "angina" which is chest pain. He has no blood circulation through the right coronary artery, either because of his prior heart attack or "small vessel disease." Obviously, the heart does not work as well if it has a blocked artery. With Mr. Cremin, this objective factor, combined with his anxiety, is disabling.

The defense cardiac consultant, Dr. Zwicke, does not dispute Dr. Gershengorns claims– indeed he was never asked to address them. He concedes the cardiac abnormalities, although he dismisses them frequently as "very small" or "very mild" even where the treating radiologists did not use those minimizing terms. CF 61. He agrees with Dr. Gershengorn that the 2002 stress test "demonstrated a limited area of infarction with peri-infarct ischemia." CF-63. He finds that the reasonable limitations would be lifting more than 50 pounds occasionally or 25 pounds frequently, and *no change in current (2006) impairments from 2002*. Dr. Zwicke disagrees with Dr. Gershengorn not on the cardiac limitations so much as on the anxiety issue, which he does not deal with at all. From a strictly cardiac standpoint, disregarding the anxiety and fatigue issue, we do not see much difference between the two physicians. But we do not believe that one can fairly assess Mr. Cremin, as Dr. Zwicke does, by considering the cardiac condition separately from anxiety and fatigue, when the issue is ability to work.

Liberty points out, and correctly so, that the cardiac condition, taken alone, would not be expected to be disabling from sedentary work. Dr. Gershengorn has confirmed that on more than one occasion. The significance of the cardiac condition is that it provides a partial disability which, when coupled with the anxiety is disabling. Moreover, it provides an objective trigger for the severe anxiety which has taken over Mr. Cremin's life.

**5. Mr. Cremin Proves He Suffers From Continuous Disabling Anxiety/Fatigue.**

Liberty Mutual complains that Mr. Cremin has not proven his anxiety to be continuously affecting his ability to work. The record demonstrates otherwise.

1. On December 1, 1999, Preferred Works accepted Mr. Cremin's proof that he was disabled from work in any occupation under this Plan because of his combined cardiac and anxiety

disability.  As we point out in section 1, supra, Liberty has offered no evidence that Mr. Cremin's condition ever improved following this determination.

      2.  Social Security has continuously awarded disability benefits to Mr. Cremin from 1999 forward due to his combined cardiac and anxiety disability.  CF-711.  The record shows no change in his social security status.

      3.  On August 7, 2002, Sue Laliberte, the Nurse Coordinator for the TAM program, a program recommended to Mr. Cremin by Dr. Gershengorn to treat his cardiac related anxiety, wrote (CF-330):

> Mike completed the TAM program in July 2002.  Risk factors include hyperlipidemia, sedentary lifestyle, stress and anxiety. ...
>
> Psychological screening pre-TAM suggested moderate depression and severe anxiety... I have encouraged Mike to continue with mental health follow-up as stress and anxiety remain major issues for him.  In fact, obstacles to his cardiac recovery.

      4.  Dr. Gershengorn wrote to the claims administrator on December 4, 2002 that Mr. Cremin remained totally disabled due to his combined cardiac/anxiety disorder since he had been found disabled by the Social Security Administration in 1999, and noted that he was taking Xanax, a prescription medication, for his anxiety.  CF-444.

      5.  On July 4, 2006, Dr. Gershengorn summarized his 20 year physician-patient relationship with Mr. Cremin, again explaining that things such as structured schedules, deadlines, and commuting to work caused him "rather severe fatigue with emotional as well as physical stress." He again noted the longstanding prescription of "Xanax, this was prescribed for anxiety."

6. On September 6, 2006, Dr. Roxanne Morse performed psychometric testing which confirmed the extensive anxiety and provided objective measurement of it. Specifically, his very low, 1st percentile performance on the "Processing Speed Index" of the Wechsler Adult Intelligence Scale III, CF-29, a performance which falls in the "mild mental retardation" range, is obviously incompatible with his performance as a Director of Profitability of a Major Fortune 500 Corporation. Dr. Morse points out that "anxiety and depression" negatively impact this score, and she points out similar examples of aberrant test performance caused by his high level of anxiety. CF-30. As Dr. Morse points out, the anxiety pre-dates the cardiac disease, with Mr. Cremin having first sought assistance from a minister in 1983 to assist him with it. CF-27. Over time, the cardiac disease intensified the anxiety, leading to his present disability, Dr. Morse concludes that Mr. Cremin has a "Generalized Anxiety Disorder which is primarily secondary to his cardiovascular status." CF-33. Dr. Morse is well credentialed and her C.V. appears in the record at CF-33.

7. We have deliberately left out any reference to Dr. Koralis who, unknown to Mr. Cremin, had been convicted of a felony, and whose credibility therefore is suspect.

**6. Dr. Mirkin's Report Does Not Sufficiently Dispute Mr. Cremin's Anxiety**.

Dr. Mirkin attacks the treatment by Dr. Koralis as inadequate for the severe anxiety which Mr. Cremin claims to have experienced. But Dr. Mirkin did not review any of the records on which the Social Security Administration relied in approving disability for Mr. Cremin. He reviewed none of the records from the TAM program. So for him to opine that the records did not show the sort of more aggressive treatment that he would have expected for the severe anxiety which was reported does not really mean very much.

Dr. Mirkin suggests that more intense therapy would have been appropriate. But what

Pltfs. Reply Memo                                  Page 9 of 11

does he think of the TAM program? Does that fit his prescription or not?  Who can tell since he apparently did not review those records.

Furthermore, Dr. Mirkin does not cite any literature or standard references for the treatment which he says should have been prescribed for severe anxiety.  Without reference to the literature or standard references, his opinion of what is required for a patient he has never seen has little weight.  Many times, financial reasons, limitations of insurance coverage, patient preferences, and physician preferences, influence the type and extent of treatment, so that it is quite impossible to conclude, without reference to the literature or standard practices, that the failure to prescribe a particular type of treatment proves the absence of a particular level of severity of psychiatric disease.  For this reason, the Court should disregard Dr. Mirkin's opinions.

**7.  Conclusion.**

Liberty Mutual seeks the opportunity to clarify offsets and the amount of attorneys fees for which it may be liable in the event the Court rules in favor of Mr. Cremin.  We have no objection to the Court issuing a ruling in favor of Mr. Cremin and referring the matter back to the parties to see if they can agree on the amount of back benefits, prejudgment interest and attorneys' fees, and if the parties do not agree on the amounts, then those items can be subject to further briefing.

The evidence is clear, as Preferred Works found, that Mr. Cremin is disabled from any occupation under the Plan, and that Liberty Mutual's disapproval of benefits is colored by its purchase of the claim portfolio and the simple fact that the more claims it denies, the more money it makes.  It has a structural conflict of interest which caused it, less than a month after Preferred Works approved "any occupation" benefits, to engage on a determined effort to overturn that finding

1 | irrespective of the facts.

      Mr. Cremin has a significant cardiac condition, and a history of anxiety going back to the early 1980's. These two things came together and have simply overwhelmed him. He has no motive to give up his highly paid job as Director of Profitability, and would not have given up that post were he able to continue work. The evidence demonstrates. however, that his combined cardiac illness and anxiety, prevent him from working, and his disability benefits, not six years in arrears, ought to be paid up.

Dated: May 28, 2008.

/s/_____
Laurence F. Padway
Attorney for Michael Cremin