**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL CREMIN,                              No. C 07-1302 CW

          Plaintiff,                         ORDER DENYING
                                             PLAINTIFF'S
     v.                                      MOTION FOR
                                             JUDGMENT AND
McKESSON CORPORATION EMPLOYEES' LONG         GRANTING
TERM DISABILITY BENEFIT PLAN and             DEFENDANT'S
LIBERTY LIFE ASSURANCE COMPANY OF            CROSS-MOTION
BOSTON,

          Defendants.
_____/

     Plaintiff Michael Cremin moves the Court, pursuant to Federal
Rule of Civil Procedure 52, for review of Defendant Liberty Life
Assurance Company's termination of his long-term disability
benefits.  Defendant opposes the motion, and cross-moves for
judgment in its favor.  The matter was heard on June 19, 2008.  At
the hearing, Plaintiff's counsel requested leave to file a
supplemental brief regarding the Supreme Court's opinion in
Metropolitan Life Insurance Co. v. Glenn, 2008 U.S. LEXIS 5030,
entered that day.  Plaintiff has filed such a brief and Defendant
has filed a responsive brief.  Having considered all of the
parties' papers, the evidence cited therein and oral argument on

1    the motions, the Court DENIES Plaintiff's motion and GRANTS

2    Defendant's cross-motion.

3                              BACKGROUND

4         This case is again before the Court after being remanded in

5    2005 to the Plan Administrator for further consideration.  See

6    Cremin v. McKesson, C 04-4394 CW (2004 Case), Docket No. 67.  In

7    that order, the Court summarized the factual basis for Plaintiff's

8    claim as follows:

> Plaintiff began working for McKesson Corporation in
> 1980.  At all times relevant to this action, Plaintiff
> was covered by the McKesson Plan, which is a benefits
> plan organized under the Employee Retirement Income
> Security Act (ERISA).
>      Plaintiff suffered a heart attack in 1988.  Ten
> years later, on January 23, 1998, Plaintiff was placed
> on short-term disability by his cardiologist, Dr.
> Gershengorn, due to an unspecified cardiac condition.
> Dr. Gershengorn initially recommended that Plaintiff
> take a two week break, return to work part-time for two
> or three weeks, and then be reassessed.
>      Plaintiff returned to work on February 10, 1998,
> but worked only part-time until September 21, 1998,
> when he filed a claim for long-term disability
> benefits.  On the long-term disability claim form,
> Plaintiff listed his disabling conditions as coronary
> artery disease and anxiety; the claim form identified
> both Dr. Gershengorn and Plaintiff's psychiatrist, Dr.
> Karalis.[1]  According to the physician's statement
> completed by Dr. Karalis, Plaintiff suffered from
> severe anxiety disorder.  Dr. Karalis defined his
> physical impairment as Class 5: "severe limitation of
> functional capacity: incapable of minimum (sedentary)
> activity."  At the time Plaintiff applied for long-term
> disability benefits, the McKesson Plan was self-funded
> by the McKesson Corporation and administered by
> Preferred Works.
>      Preferred Works awarded Plaintiff long-term
> disability benefits on April 20, 1999.  The approval

_____

[1]Research conducted by Defendant shows that the Medical Board
of California put Dr. Karalis on probation, which was completed on
June 9, 1998.  He also resigned, with charges pending, from the
State Bar of Californa, after serving five years' probation for
Medicaid fraud.

United States District Court
For the Northern District of California

letter stated that Plaintiff would receive long-term benefits for twenty-four months, and would thereafter continue to receive benefits if Plaintiff (1) could prove by "objective medical evidence" that he was unable to perform any occupation for which he was reasonably qualified, and (2) was receiving Social Security disability benefits. On August 16, 1999, the Social Security Administration granted Plaintiff disability benefits, effective retroactively from January, 1999.

The McKesson Plan defines "disability" as follows:
"Disability" shall mean any physical or mental condition arising from an illness, pregnancy or injury which renders a Participant incapable of performing work. During the first thirty (30) months of Disability, a Participant must be unable to perform the work of his or her regular occupation or any reasonably related occupation, and must not, except as provided in Section 3.4, be performing work or services of any kind for remuneration. After thirty (30) months of Disability, a Participant must be unable to perform the work of any occupation for which he or she is or becomes reasonably qualified by training, education or experience, and, in addition, be receiving Social Security benefits on account of his or her disability.

Effective January 1, 2000, McKesson Corporation became wholly insured by Defendant, and Defendant became responsible for both the funding and administration of the McKesson Plan.

Dr. Gershengorn's office notes and tests results date back to January, 1997. In early 1997, Dr. Gershengorn noted that Plaintiff was "feeling pretty well," with back and hip pain but no chest pain. On June 27, 1997, Dr. Gershengorn noted that Plaintiff "uses Xanax for sleep."

On December 4, 2001, Dr. Gershengorn submitted to Defendant a physical capacities form which stated that Plaintiff was physically capable of sitting up to eight hours, with breaks. He also checked a box indicating that Plaintiff could "work 8 hours per workday." <u>Id.</u> In May, 2002, in response to a request from Defendant for updated medical information, Dr. Gershengorn submitted office notes which indicated that, among other things, Plaintiff was still taking Xanax as recently as May 8, 2001. According to an August 12, 2002, update from Dr. Gershengorn, Plaintiff suffered from coronary heart disease, he was permanently restricted in all functional activities other than sitting, and his estimated return to work date was

3

"unknown."

According to forms regularly submitted by Dr. Karalis between September, 1998 and May, 2000, Plaintiff suffered from anxiety disorder and was "totally disabled." Dr. Karalis' initial notes of September 10, 1998, near the end of Plaintiff's part-time work experience, indicate that Plaintiff said that he had psychologically deteriorated over the year, that he couldn't "work those long hours at McKesson," and that he felt he was "pushing himself into another heart attack." The documentation indicates that Dr. Karalis provided Plaintiff with supportive psychotherapy, on an as-needed basis, but that Plaintiff took cardiac medications only. According to a March 20, 2001 form, Dr. Karalis indicated that Plaintiff's psychiatric condition had "not worsened" during his treatment, but that Plaintiff could do "no work at all." At that point, Dr. Karalis described Plaintiff's Axis V Global Assessment of Functioning (GAF) as 45. Dr. Karalis revised Plaintiff's estimated date to return to work to "never." On February 13, 2002, Dr. Karalis told Defendant that he had last seen Plaintiff on February 2, 2002; that Plaintiff remained totally disabled due to anxiety disorder; that Plaintiff's prognosis remained poor; and that Plaintiff could not return to work. Dr. Karalis' office notes further indicate that he had contact with Plaintiff on February 5, 2002, April 11, 2002, May 22, 2002, and August 6, 2002. On each occasion, Dr. Karalis noted that he provided supportive therapy to Plaintiff. In his February 5, 2002 note, Dr. Karalis stated "GAF remains 45."

In a May 5, 2000 questionnaire, Plaintiff stated that he could, among other activities, drive his car, occasionally go grocery shopping, and visit friends' houses. He stated that he was not able to participate in an exercise program such as aerobics, that he had difficulty sleeping at night, and that he sometimes took a nap during the day for one to four hours. On February 4, 2002, Plaintiff filled out a similar, updated activities questionnaire. At that point, he stated he could drive for short periods of time, and left his house several times per week. However, he reported that he could not participate in an exercise program, was able to sit only one hour per day, and that his daily routine involved fourteen hours in bed or watching television, in addition to a two hour nap. According to Defendant's notes from a February 7, 2002 phone call, Plaintiff reported that he had "hurt his ankle and torn some ligaments due to exercise he needs to do."

Defendant began a review of Plaintiff's claim file on March 9, 2002. Susan Leonardos, a registered nurse, conducted the initial review. According to her notes,

4

**United States District Court**
For the Northern District of California

Dr. Karalis told her on August 7, 2002 that he had not seen Plaintiff since February, 2002 (contrary to his records of visits in April and May), that he was "not saying that [Plaintiff] cannot RTW [return to work]," and that he agreed that Plaintiff "may well have a sedentary capacity."  When Nurse Leonardos asked why Plaintiff was not prescribed anti-depressant or anti-anxiety medication, Dr. Karalis reportedly told her that he did not do so because of Plaintiff's cardiac condition, but that Plaintiff had "improved overall," that he was seen "only" "every few" months, and that he had "never been in therapy."  CF-180.  After Nurse Leonardos concluded that there was no objective evidence from Dr. Karalis to support a finding that Plaintiff was incapable of sedentary functional activity, Defendant ordered surveillance of Plaintiff. On Thursday, March 28, Friday, March 29, and Saturday, March 30, Plaintiff was twice seen leaving his house, once to go to the store and once to drive to an acquaintance's house, and was once seen retrieving an object from his car.

On August 30, 2002, Defendant sent Plaintiff a letter stating that his long-term disability benefits had been terminated.  The letter indicated that Defendant had determined that Plaintiff was capable of sedentary work, relying in part upon the functional limitations form completed on August 12, 2002 by Dr. Gershengorn.  Defendant also stated that its determination was based in part upon Nurse Leonardos' opinion that "there is not enough information to support lack of function from a psychiatric perspective.  The claimant sees the psychiatrist sporadically and is on no psychiatric medication."  The termination letter stated that Plaintiff could perform the following sedentary jobs:  financial analyst, budget analyst, economist, and credit analyst.

In a letter dated October 10, 2002, Plaintiff appealed the termination of his benefits.  The October 10 letter also requested, among other things, copies of the surveillance tapes that Defendant had made of Plaintiff.  Plaintiff also sent Defendant a October 18, 2002 letter from Dr. Karalis in which the psychiatrist expressed his disagreement with the termination of benefits.  Specifically, Dr. Karalis stated that it appeared that Defendant had terminated Plaintiff's disability benefits based solely upon the August 12, 2002 physician's statement from Dr. Gershengorn which indicated that Plaintiff was not restricted from sitting for eight hours, although he was restricted in all other physical activities.  Dr. Karalis reported the October 15, 2002 administration of Zung Depression

5

and Anxiety Psychological Tests[2]; the results showed, in part, that Plaintiff felt more nervous and anxious than usual, that he felt weak or tired easily, that he got tired for no reason, that he had some loss of mental clarity, and that he did not find it easy to make decisions.  Dr. Karalis opined that, given the exertional restrictions imposed by Dr. Gershengorn, Plaintiff could not work; he elaborated,

> In my experience, patients who attempt job reentry in jobs allowing only "sitting" do not do well, since sitting becomes uncomfortable and there is often (as with you) an ongoing psychological impairment (concentrating, remembering, analyzing, etc.--commonly called cognitive functions).

Dr. Karalis further stated that Plaintiff could not perform the sedentary jobs recommended by Defendant because Plaintiff did "not possess the stabilization of moods and control of psychiatric symptomatology required to have predictably stable cognitive functioning to perform these jobs, which assume full cognitive functioning."

Defendant conducted further daily surveillance of Plaintiff from November 6 through November 10, 2002. Over the course of those five days, Plaintiff was observed leaving his residence only three times: once to retrieve a newspaper on the curbside, once to drive to the store, and once to drive to an unknown location. At one point, Plaintiff left his car parked partially in a lane of traffic.

Plaintiff called Defendant on November 21, 2002 and informed a representative that his cardiologist, Dr. Gershengorn, also disagreed with Defendant's decision to terminate his benefits and would be submitting a letter to that effect.  Also in November, Defendant initiated a review by psychiatrist Dr. Mirkin of the information in Plaintiff's file.  On November 30, 2002, Dr. Mirkin submitted a report that, under the heading "Recommendations and Conclusions," criticized Dr. Karalis' treatment and opinions, on the grounds that:  (1) the psychiatric information supporting Plaintiff's disability was subjective only, and his condition should have been treated more aggressively, e.g. with medication, if it was as debilitating as Dr.

---

[2]Dr. Mirkin, hired by Defendant to review Plaintiff's file, states that the Zung test is a self-rating scale that can be used to assess progress over time, but which "is not a diagnostic tool and certainly not one that should be used to resolve a dispute as to the valid presence of symptoms because there is no objective validity scale built into the inventory questions."  Plaintiff does not dispute this statement.

United States District Court
For the Northern District of California

Karalis claimed; (2) there was no indication of imminent threat from Plaintiff's cardiac disease, and if Plaintiff displayed abnormally cautious behavior, Dr. Karalis should have treated it more aggressively; (3) Dr. Karalis' office notes are very brief, and fail to support his medical conclusion of total disability for Plaintiff and his specific opinion that Plaintiff lacked the cognitive functioning to work; and (4) there was no indication from the record why Plaintiff suddenly became so concerned about another heart attack.

In a December 4, 2002 letter to Defendant, Dr. Gershengorn stated that, while he did report the functional limitations cited in Defendant's original termination decision letter, Plaintiff also had limitations on non-exertional activities such as "structured schedules, deadlines, adversarial relationships, and commuting to work." Dr. Gershengorn further stated as follows: "He remains on cardiac medications . . . and Xanax, and he remains in therapy for his anxiety disorder. I am unaware of any dramatic improvement in Mr. Cremin's medical condition that warrants reversal of the previous decision, which found him to be disabled."

2004 Case, Docket No. 67 at 2-10 (citations and some footnotes omitted).

The Court found under then-controlling law that Plaintiff had submitted material, probative evidence that Defendant had an actual conflict of interest when it terminated Plaintiff's benefits and therefore reviewed the denial de novo. See 2004 Case, Docket No. 58. When conducting that review, the Court found that "Plaintiff has introduced some evidence of disability, but it is not sufficient to meet his burden of proof." 2004 Case, Docket No. 67 at 18. Nonetheless, "serious questions regarding Plaintiff's level of impairment" remained, making final judgment in Defendant's favor "inappropriate." Id.

In particular, the Court noted that Dr. Mirkin's report was "more thoroughly reasoned and supported than the opinions of Dr.

7

Karalis" but was "at best an incomplete critique of Dr. Karalis'

opinions and treatment." <u>Id.</u> at 17. For example, "Dr. Mirkin did

not examine Plaintiff or communicate directly with Plaintiff's

treating physicians; instead, he reviewed the scanty records." <u>Id.</u>

Further, the Court found,

> Dr. Mirkin's opinion that Plaintiff should have been
> treated more aggressively is persuasive, but it is
> equally susceptible to two different interpretations:
> that Dr. Karalis erred in concluding that Plaintiff
> could not work, because his depression anxiety was not
> that severe; or in the alternative, that Plaintiff does
> suffer severe depression and anxiety, but that Dr.
> Karalis' treatment was inadequate.

<u>Id.</u>

Moreover, the Court found, "Relatively minimal additional

development of the record could significantly assist a fact-

finder." <u>Id.</u> at 18. For example, the Court stated that "if Dr.

Karalis knew that Plaintiff took Xanax prescribed by Dr.

Gershengorn and relied on this in devising Plaintiff's psychiatric

tratment, this would alter the import of Dr. Mirkin's opinion."

<u>Id.</u> Therefore, on December 21, 2005, the Court remanded

Plaintiff's claim to the Plan Administrator for further

investigation.

On March 13, 2006, Defendant contacted Plaintiff, informing

him that it intended to contact Dr. Karalis and Dr. Gershengorn for

further information. In addition, Defendant instructed Plaintiff

to provide contact information for any health care providers from

whom he received treatment in 2002 and any pharmacy at which he had

prescriptions filled in 2002. In particular, Defendant sought

information regarding treatment related to Plaintiff's ankle injury

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

in February, 2002.  Finally, Defendant instructed Plaintiff, "At this time, you may also submit any additional objective evidence that you would like to have considered in support of your appeal." CF-372.

On March 17, 2006, Defendant received a letter from Plaintiff informing it that Plaintiff had retained new counsel to represent him on remand and a letter from new counsel informing Defendant that Plaintiff intended to submit additional materials.  Id. at 370-71.  On March 20, 2006, Defendant sent to counsel a copy of its March 13 letter to Plaintiff and asked that the requested information and any additional information in support of Plaintiff's claim be provided by April 13, 2006.  On April 14, and again on May 10, 2006, Defendant contacted Plaintiff's counsel, asking for the information previously requested as well as any supplemental materials Plaintiff wished to be considered.

On May 15, 2006, counsel responded to Defendant, indicating that Plaintiff would sign and return the list of medical providers and sign the authorization to release his medical records that week.  On June 7, 2006, after several other letters from Defendant, counsel for Plaintiff provided the requested information regarding medical providers and authorizations for release of records.  At that time counsel stated, "Mr. Cremin is currently undergoing an additional mental health evaluation.  I have asked the psychologist to prepare the report as promptly as possible, and I [] am hoping to have it by the end of the month."  Id. at 348.

On June 15, 2006, Defendant provided Plaintiff's counsel with copies of the requests for information sent to Dr. Karalis and Dr.

9

**United States District Court**
For the Northern District of California

Gershengorn on June 8, 2006.  Defendant informed Plaintiff that it requested responses from the doctors by July 7, 2006 and stated, "If nothing additional is received by this date[,] we will conduct our review based on the information contained in his file."  CF 326.

Dr. Gershengorn responded to Defendant's request by letter dated July 4, 2006.  He restated his belief that Plaintiff had "both exertional and nonexertional limitations due to his medical condition."  CF 325.  Dr. Gershengorn further stated as follows: "Mr. Cremin develops rather severe fatigue with emotional as well as physical stress. . . .  I believe his fatigue is secondary to his underlying ischemic heart disease with his prior extensive myocardial infarction."  Id.  While stating these opinions, Dr. Gershengorn acknowledged that "[i]t is somewhat difficult to objectively show medical evidence that his nonexertional limitations were precluding him from returning to any full-time work."  Id.  On July 10, 2006, Defendant again wrote to Dr. Gershengorn thanking him for his response and asking him to respond to the specific questions included in the request and reminding him to provide a copy of Plaintiff's entire medical file.  CR 305.  Dr. Gershengorn forwarded the requested medical records but did not provide further responses to Defendant's questions.

On July 7, 2006, Defendant's appeal review consultant Courtney Frasier wrote a letter to Dr. Karalis, confirming a telephone conversation she had with him that day.  Ms. Frasier had called Dr. Karalis to confirm that he had received the letter requesting information by July 7.  The letter describes the conversation as

10

1    follows:

2        You confirmed that you did receive my June 8, 2006
         letter.  I asked if you would be responding and you
3        stated as follows:
             You had a long conversation with Mr.
4            Cremin's attorney, Laurence Padway,
             yesterday and you asked Mr. Padway how he
5            wanted this paperwork filled out.  You
             stated you were waiting to hear back from
6            Mr. Padway as to what he wants you to
             complete.  You stated that you are aware
7            this file is in litigation and you are not
             sure how it is going to be handled – whether
8            it will be by deposition or some other
             manner.  You stated you would call Mr.
9            Padway today.

10   CF 321.  The letter goes on to extend the deadline for Dr. Karalis'

11   response to July 12, 2006.

12       On July 11, 2006, Defendant received a memo from Dr. Karalis,

13   stating as follows:

14           Be aware that an authorization is revocable.  I
         need to confirm that the patient is still consenting to
15       release.
             Also, said authorization affects only existing
16       documents.  It has no authority to compel any new
         writings.  Thus, it cannot compel me to write any new
17       report.
             If a new report is required, some party must pay
18       for the physician to write it.  You make no such
         provision.
19           A new report cannot be compelled.  However, new
         information is discoverable via deposition.  You would
20       be required to pay the deponent.
             If you disagree, obtain a court-order, if you can.
21
     CF 299.
22
23       Defendant also sent Plaintiff's counsel a copy of its July 7,

24   2006 letter to Dr. Karalis.  Counsel responded on July 10, 2006,

25   stating that it would not be possible to meet the July 12 deadline.

26   Counsel requested another extension of time for Dr. Karalis to

27   provide information.  Further, counsel stated that he intended,

28                                      11

1  within one week, to submit Plaintiff's work records and

2  psychological test results.  CF 295.

3       Defendant did not receive any further information from Dr.

4  Karalis.  Plaintiff's counsel did not contact Defendant at the end

5  of the one week extension he requested.

6       On August 16, 2006, Plaintiff's counsel wrote to Defendant

7  stating,

> I apologize for the delay, but we are still waiting for
> a couple of medical reports, and I have some material
> from Mr. Cremin which I believe demonstrates his ethic
> and tradition of hard work – something to which he
> aspires to return, but cannot because of his medical
> condition.  You can also see how his work performance
> deteriorated with his illness.

CF 111.  Attached to the letter were Plaintiff's performance

evaluations from work as well as various certificates and articles

demonstrating Plaintiff's contributions to the community in the

1980s and early 1990s.  Plaintiff's counsel did not contact

Defendant again until September 24, 2006, when he received the

written report of Dr. Zwicke, a cardiologist Defendant hired to

review and assess Plaintiff's medical records, and a copy of a

letter sent by Defendant to Dr. Gershengorn, asking him to state

whether he agreed with Dr. Zwicke's report.  Plaintiff's counsel

stated that he "would like to have Dr. Gershengorn review and

respond to the medical review" and therefore requested that

Defendant delay making any decision for two weeks.  CF 51.  Counsel

also stated that he was "also still waiting for the psychologist

report, which we should have shortly."  Id.

     Dr. Zwicke's report described Plaintiff's impairment as

follows:

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> Mr. Cremin suffered a very limited myocardial infarction in 1998, with excellent recovery. The medical records provided since 1998 demonstrate cardiac stability, with a subjective complaint of mild chest discomfort and dyspnea on exertion only with high level activities, despite the fact he is able to perform at far above average levels of physical activities on his stress tests. The 2002 stress test demonstrated a limited area of infarction with peri-infarct ischemia. The cardiac catheterization demonstrated acceptable coronary anatomy, with no interventional procedures or significant change in medical therapy necessary. The restrictions and limitations for a cardiac patient, such as Mr. Cremin, would include limitations of physical activities up to the medium strength category, as well as avoidance of heavy physical activities in extremes of temperature . . . . This would include lifting or carrying up to 50 pounds occasionally or 25 pounds frequently, with no specific restrictions on upper extremity activities. Current impairments are unchanged from 2002, with restrictions and limitations remaining the same. Mr. Cremin has demonstrated stability in his cardiac status for eight years, requiring no intervention or significant change in therapy. He also participates in regular aerobic exercise activities and, clearly, is capable of performing more than sitting and activities of daily living.

CF 77-78. Although Dr. Zwicke reviewed Dr. Karalis and Dr. Mirkin's psychiatric reports, see id. at 74, she did not mention Plaintiff's history of anxiety in her report.

On September 12, 2006, Dr. Zwicke sent a letter to Defendant, indicating that she had spoken to Dr. Gershengorn regarding her report. Id. at 71-72. Dr. Zwicke described the conversation as follows:

> From a cardiac point of view, Dr. Gershengorn felt that Mr. Cremin was able to walk at frequent intervals, sit for reasonable periods of time, and perform activities with hands, feet, standing, walking, pushing, pulling, reaching, and lifting within a sedentary or light physical labor job description. He reported that Mr. Cremin "subjectively" complained of chest pain and easy fatigability, but he had no objective cardiac data to support inability to perform work in the sedentary or light category. Additionally, performing work in the

13

1  
2  
3  

> light or sedentary category would pose no danger to him
> from his cardiac status.  Additionally, he stated that
> Mr. Cremin reported significant stress-related symptoms
> and he would be unable to comment on that aspect of his
> health care.

Id. at 72.  On September 26, 2006, Dr. Gershengorn signed and

returned to Defendant the letter regarding Dr. Zwicke's report,

indicating that he agreed with her findings.  CF 82.

On October 4, 2006, Dr. Mirkin submitted an additional

memorandum.  Dr. Mirkin explained that he was asked to clarify his

opinion because of the Court's finding that his earlier report was

susceptible to two interpretations and stated, "In my 11/30/02

report, I may have created the impression that I believed that Mr.

Cremin received inadequate treatment from Dr. Koralis [sic], but

this would be a misinterpretation."  Id. at 49.  Dr. Mirkin again

recognized that "Dr[.] Koralis' [sic] records are incomplete and

too brief to provide a clear record of his assessments."  Id.

Therefore, Dr. Mirkin explained that he "examined [Karalis']

clinical treatment actions to assess whether these actions either

supported his retrospectively claimed opinion that Mr. Cremin was

limited or, alternatively, supported the impression created by his

clinical notes that there was no support for such limitations."

Id. at 50.  Because "neither Dr[.] Koralis [sic] contemporaneous

office notes nor his contemporaneous clinical treatment actions

indicate that [Mr. Cremin] had symptoms of a condition at a level

of severity that would limit him occupationally," Dr. Mirkin opined

that "there was no support for such functional limitation."  Id.

On October 10, 2006, Defendant wrote to Plaintiff's counsel

indicating that it had completed its supplemental investigation and

14

United States District Court
For the Northern District of California

determined that it was "unable to alter our original decision to deny benefits beyond August 31, 2002. Id. at 42. The letter concludes, "This claim determination reflects an evaluation of all claim facts and McKesson Plan provisions. Mr. Cremin's administrative right to review has been exhausted and no further review will be conducted." Id. at 48. Plaintiff's counsel had not submitted any information since his September 24, 2006 request that Defendant postpone its decision for two weeks to allow him to supplement the record.

On October 18, 2006, Plaintiff's counsel wrote to Defendant seeking a copy of Dr. Mirkin's October 4, 2006 memorandum and stating his opinion that Defendant's decision not to change its original determination following the additional investigation constituted "a new decision of the Plan Administrator and therefore that an administrative appeal from this decision would be appropriate." Id. at 39.

Defendant responded on November 1, 2006, attaching a copy of Dr. Mirkin's memorandum and stating, "[T]his is not a new report. Rather, . . . Dr. Mirkin clarified the opinions in his prior report dated November 30, 2002 pursuant to the Court's Order. . . . We sent Dr. Mirkin's November 30, 2002 report to Dr. Karalis for review and comment. Dr. Karalis refused to respond to our repeated request for additional information." Id. at 38. In addition, Defendant reiterated its opinion that "[s]ince the case was remanded to conduct further investigation on appeal, and the appeal is now concluded, there is no further right to an appeal and the claim is now closed." Id.

15

United States District Court
For the Northern District of California

On December 10, 2006, Plaintiff's counsel again wrote to Defendant, attaching the report of psychologist Roxanne Morse and requesting an appeal from Defendant's October 10, 2006 decision not to alter its 2002 determination. In addition, counsel requested information regarding Defendant's "reviewing medical professionals." Id. at 23.

Dr. Morse's undated report indicates that it was based on (1) a letter from Dr. Gershengorn to Plaintiff's counsel, (2) a letter from Plaintiff's counsel to Dr. Karalis, (3) a July 19, 2006 telephone conversation between Dr. Morse and Dr. Karalis, and (4) a September 6, 2006 interview and assessment of Mr. Cremin. Id. at 24. The letters between Plaintiff's physicians and his attorney are not included in the record. In her report, Dr. Morse first summarizes Mr. Cremin's medical and psychiatric history based on "the information provided by Mr. Cremin and available documentation." Id. at 25. She goes on to report the results of the four tests she administered to Mr. Cremin. Although the report states that the testing "spanned about 8 hours over 2 days," it indicates that Dr. Morse interviewed Mr. Cremin only on September 6, 2006. Id. at 28.

According to Dr. Morse, Mr. Cremin "was overly concerned about his performance on the tests, repeatedly asking the examiner if he gave the right answer." Id. In addition, "[t]he palms of Mr. Cremin's hands, as well as the back of his palms, were observed to be 'sweaty' throughout the sessions"; and Mr. Cremin "demonstrated visible agitation in the form of restlessness and anxiety when he was attempting some of the timed items on the WAIS III [Wechsler

16

Adult Intelligence Scale III]." Id.

Dr. Morse administered tests to assess malingering and "to assess symptom exaggeration and symptom inconsistency in Mr. Cremin's self-report of anxiety." Id. at 29. Dr. Morse concluded that the results from one of the tests "would indicate that Mr. Cremin is not malingering." Id. (emphasis in original). Dr. Morse also found that Mr. Cremin's profile based on the other test "indicates that he has responded to the test in a frank and honest manner with no tendency to exaggerate his subjective experience of his anxiety disorder." Id. (emphasis in original).

Mr. Cremin's scores on the various sections of the WAIS III varied widely. Dr. Morse opined that the "statistically significant discrepancy between Mr. Cremin's Verbal Comprehension Index (126) and his Processing Speed Index (63) speaks to some of the challenges Mr. Cremin may experience with regard to timed tasks in his day-to-day life. Specifically, domains involving activities which have deadlines and working under time pressure seem to be a challenge for Mr. Cremin, all of which is negatively impacted by anxiety disorders." Id. at 30.

The final test administered, the Million Clinical Multiaxial Inventory III (MCMI III), is "a personality test designed to gather objective evidence of a person's symptoms in consideration of a DSM-IV-TR diagnosis." Id. Again, Dr. Morse concluded, "There was no evidence of malingering. He appears to have responded to the test in a frank and self-revealing manner. He has not tried to present himself in a 'better light'; instead he has a moderate

17

tendency to depreciate [sic] himself."[3]  Id.

Dr. Morse goes on to a general discussion of her evaluation of Mr. Cremin in which she states,

> Severe anxiety appears to be interfering with Mr. Cremin's ability to adequately process information and work; subsequently he is disabled. . . .
> Mr. Cremin uses medication and walking as ways of containing his anxiety disorder.  The containment that Mr. Cremin experiences is mild to moderate at best; his anxiety persists.  Were he to be in a work environment experiencing additional stressors and expectations his current anxiety management routine would be totally and completely unsuccessful. . . .
> In summary, Mr. Cremin has a Generalized Anxiety Disorder that preceded his heart attack and became increasingly unmanageable and more severe after his heart attack and accompanying fatigue. . . .
> I concur with the part of Dr. Gershengorn's assessment that states that "non-exertional limitations" put Mr. Cremin at risk for additional cardiovascular complications and make him disabled. These non-exertional limitations include Mr. Cremin's Generalized Anxiety Disorder which is primarily secondary to his cardiovascular.

Id. at 31-32.

On January 19, 2007, Defendant again explained its position regarding a further appeal and stated that it declined to consider Dr. Morse's report.  On March 6, 2007, Plaintiff filed the complaint in this case.  In his opening brief filed on April 21, 2008, Plaintiff states for the first time that he no longer relies on Dr. Keralis' opinions because of Dr. Keralis' fraud conviction. See Opening Brief at 10.

---

[3]This summary is somewhat contradictory.  A tendency to depreciate oneself could be interpreted as malingering in this context.

United States District Court
For the Northern District of California

DISCUSSION

I.    Standard of Review

When the Court first addressed the termination of Plaintiff's long-term disability benefits in the 2004 case, the Court found that the Plan granted discretion to Defendant but that there was an apparent conflict of interest because Defendant was both the McKesson Plan's insurer and its administrator.  Moreover, the Court found that Defendant failed to rebut material probative evidence produced by Plaintiff that an actual conflict existed when Defendant, acting as the McKesson Plan's insurer and administrator, terminated Plaintiff's benefits.  Therefore, the Court reviewed the denial de novo.  See C04-4394, October 3, 2005 order.

Plaintiff now argues that the Court's decision in the 2004 case is law of the case and precludes Defendant from arguing that review in this case should not be de novo as well.  However, as Plaintiff concedes, there has been a significant change in the law regarding the standard of review in ERISA cases.  See Metropolitan Life Insurance Co. v. Glenn, 2008 U.S. LEXIS 503; Abatie v. Alta Health & Life Insurance Co., 458 F.3d 955 (9th Cir. 2006) (en banc).  As Defendant points out, "a court will apply the law as it exists when rendering its decision. . . .  This principle applies even when a change to existing law occurs during the pendency of an appeal."  DeGurules v. INS, 833 F.2d 861, 863 (9th Cir. 1987).

Recognizing this change, Plaintiff argues in the alternative that de novo review is proper under Metropolitan Life.  In Metropolitan Life, the Supreme Court held that courts should

review denial of plan benefits under a de novo standard

19

**United States District Court**
For the Northern District of California

1
2
3
4
5
6

> unless the plan provides to the contrary.
>       Where the plan provides to the contrary by
> granting the administrator or fiduciary <u>discretionary</u>
> <u>authority</u> to determine eligibility for benefits, trust
> principles make a <u>deferential standard</u> of review
> appropriate.
>       If a benefit plan gives discretion to an
> administrator or fiduciary who <u>is operating under a</u>
> <u>conflict of interest</u>, that conflict must be <u>weighed as</u>
> <u>a factor</u> in determining whether there is an abuse of
> discretion.

7   2008 U.S. LEXIS 5030 at *11-*12 (internal quotations omitted,

8   emphasis in original); <u>see also</u>, <u>Abatie</u>, 458 F.3d at 959 ("abuse of

9   discretion review, tempered by skepticism commensurate with the

10  plan administrator's conflict of interest," rather than <u>de</u> <u>novo</u>

11  review, applies in situations where "a plan administrator denies

12  benefits and (1) the wording of the plan confers discretion on the

13  plan administrator and (2) the plan administrator has a conflict of

14  interest.")

15      Plaintiff first argues that Defendant does not have discretion

16  to deny him benefits because he had already been awarded benefits

17  when Defendant bought the plan in 2000.  However, Plaintiff

18  conceded, in the 2004 case, that the Plan grants such discretion to

19  Defendant.  <u>See</u> 2004 Case, October 3, 2005 order at 10 ("The

20  parties do not dispute that the McKesson Plan expressly grants

21  Defendant discretionary authority as plan administrator to construe

22  the plan's terms and determine benefit eligibility.").  Moreover,

23  Plaintiff cites no authority for his position; the Plan documents

24  expressly provide that the discretion afforded by the Plan can be

25  transferred to a designee; and the Reserve Buyout Agreement

26  provides that Defendant "has the authority in its sole discretion

27  to construe the terms of the Plan and to determine benefit

28                              20

United States District Court
For the Northern District of California

eligibility with respect to persons claiming benefits under the Plan and pursuant to this Agreement.  Decisions of Liberty regarding construction of the terms of the Plan and benefit eligibility are conclusive and binding."  McGee Decl., Ex. A. at 3. The Court finds that Defendant had discretion to interpret the terms of the Plan.

The Court also finds that Defendant has a structural conflict in exercising that discretion; it is both the plan administrator and the funding source.  Defendant argues that under the standard set out in Metropolitan Life, its decision is entitled to significant deference.  In Metropolitan Life, the Supreme Court held that a conflict of interest is just one "factor" and "that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one."  2008 U.S. LEXIS 5040 at *20-*21. Moreover, the Court explained that

> any one factor will act as a tiebreaker when the other
> factors are closely balanced, the degree of closeness
> necessary depending upon the tiebreaking factor's
> inherent or case-specific importance.  The conflict of
> interest at issue here, for example should prove more
> important (perhaps of great importance) where
> circumstances suggest a higher likelihood that it
> affected the benefits decision, including but not
> limited to, cases where an insurance company
> administrator has a history of biased claims
> administration.  It should prove less important
> (perhaps to the vanishing point) where the
> administrator has taken active steps to reduce
> potential bias and to promote accuracy, for example, by
> walling off claims administrators from those interested
> in firm finances, or by imposing management checks that
> penalize inaccurate decisionmaking irrespective of whom
> the inaccuracy benefits.

Id. at *21-*22 (internal citations omitted).

21

United States District Court
For the Northern District of California

In arguing that the Court should review its decision with significant deference, Defendant focuses primarily on its handling of Plaintiff's claim following remand.  However, as Plaintiff points out, the Court found in the 2004 case that Defendant's reliance on undisclosed materials in making its final 2002 decision prevented Plaintiff from meaningfully participating in the appeals process and its continued reliance on Dr. Gershengorn's August 12, 2002 report despite notice that it should not do so were indicators that there was an actual conflict of interest under the pre-Metropolitan Life standard.  These actions similarly indicate that the Court should view Defendant's decision with at least some skepticism under Metropolitan Life.

However, the Court notes that, on remand, Defendant made significant efforts to seek out information from Plaintiff and Plaintiff's treating physicians.[4]  Moreover, Defendant granted Plaintiff numerous extensions to deadlines to submit his information.  Nonetheless, Plaintiff argues that Defendant's post-remand conduct also calls for less deference.  First, Plaintiff argues that Defendant failed adequately to investigate the claim because it did not request an independent physical examination. While the Plan provides that Defendant may request a medical examination of the insured, nothing requires Defendant to do so. Moreover, as Defendant points out, the inquiry on remand was

---

[4]Indeed, Defendant expended significant effort in seeking information and opinions from Dr. Karalis.  Although Plaintiff was on notice of Dr. Karalis' fraud conviction by 2005, he did not inform Defendant that he no longer relied on Dr. Karalis' opinions until he filed his opening brief in April, 2008.

United States District Court
For the Northern District of California

whether Plaintiff was disabled in 2002 when his benefits were terminated, not whether he was disabled as of 2006, when any such examination would have taken place.

Plaintiff next argues that Defendant did not offer Plaintiff an opportunity to respond to Dr. Mirkin's October 4, 2006 memorandum and wrongly ignored evidence provided by Plaintiff that supported a finding of eligibility for benefits. Defendant asserts that it was not required to allow Plaintiff to respond to Dr. Mirkin's memorandum because it simply clarified his earlier report. Moreover, Dr. Mirkin's original report and his 2006 memorandum relate to his critique of Dr. Karalis's opinions regarding and treatment of Plaintiff's condition. As stated above, Plaintiff no longer relies upon Dr. Karalis's opinion.

Plaintiff also faults Defendant for failing to consider other evidence of disability, including Dr. Morse's report. However, that report was not submitted to Defendant until December 10, 2006, two months after Defendant concluded its additional investigation on appeal on October 10, 2006 and more than two months after the expiration of the final two-week extension Plaintiff's counsel requested on September 24, 2006.[5] The Ninth Circuit has held that materials submitted outside of a plan's deadline need not be considered by the plan. See Alford v. DCH Found. Group Long-Term Disability Plan, 311 F.3d 955, 959 (9th Cir. 2002).

Plaintiff further contends that Defendant should have set a

---

[5]Further, Plaintiff's counsel requested the two-week extension for Dr. Gershengorn to respond to Dr. Zwicke's report, which he did on September 26, 2008.

United States District Court

For the Northern District of California

final deadline for Dr. Morse's report and "inquired as to the reasons for the delay in the preparation of [Dr. Morse's] report." Reply at 4.  However, Defendant repeatedly set deadlines, which Plaintiff failed to meet.  Moreover, Plaintiff provides no basis for finding that Defendant had a duty to determine why Dr. Morse's report was delayed.  Similarly, Plaintiff faults Defendant for contacting Dr. Gershengorn and Dr. Karalis for information but not contacting Dr. Morse.  However, there is nothing in the record to suggest that Defendant was aware of Dr. Morse's identity before December, 2006.

Other evidence Plaintiff asserts that Defendant failed to consider include the Social Security Administration's (SSA's) determination that Plaintiff was disabled, Defendant's surveillance tapes, letters from Plaintiff's friends and Plaintiff's work records.  Defendant first notes that the Plan requires that determinations regarding disability are to be made "on the basis of objective medical evidence."  Plan at 72.  Moreover, the Court already found that the SSA's determination and the surveillance tapes were not sufficient evidence of disability and did not ask Defendant to consider them on remand.

As Defendant argues, the work records do not, as Plaintiff claims, demonstrate a "downward spiral" in his work performance. In the reviews for 1996-1998, Plaintiff was rated as "exceeds expectations," "meets most expectations," or "meets expectations" as he had been in the 1970s and 1980s.  See CF 112-31; 158-198.

Therefore, the Court will apply an abuse of discretion review, reducing the deference it affords Defendant's decision according to

24

United States District Court
For the Northern District of California

the factors discussed above.   Plaintiff must prove by a
preponderance of the evidence in the administrative record that
Defendant's decision to terminate his benefits, when considered
with some skepticism, constituted an abuse of discretion.   If
Defendant's decision, considered with this degree of deference, was
reasonable and supported by substantial evidence in the
administrative record as a whole, it was not an abuse of
discretion.   See McKenzie v. General Tel. Co. of Cal., 41 F.3d
1310, 1316-17 (9th Cir. 1994).

II.   Defendant's Decision to Deny Benefits

       Defendant argues that Plaintiff cannot meet his burden of
demonstrating that the decision to deny benefits was unreasonable.
Plaintiff argues to the contrary that the record establishes that
he was disabled.

       In its order denying the parties' motions for judgment in the
2004 case, the Court found that, because of "gaps in the record,"
it could not "reach an adequately supported final adjudication of
Plaintiff's disability claim."   2004 Case, Docket No. 67 at 18.   In
particular, the Court sought additional information regarding Dr.
Karalis' treatment of Plaintiff.   Now, because of Plaintiff's late
disclosure of his decision not to rely on Dr. Karalis' opinion, the
Court is faced with a record with even larger gaps.   Not only does
the repudiation of Dr. Karalis' opinions remove the primary basis
on which Plaintiff previously relied for his claim of disability,
but it calls into question the reliability of much of Plaintiff's
evidence in the record because that evidence refers to Dr. Karalis'
reports.

25

United States District Court
For the Northern District of California

In the earlier order, the Court found that "Plaintiff's evidence of continued disability was weak." Id. at 16. The finding that Plaintiff had presented even weak evidence of disability relied in significant part on Dr. Karalis' opinion and GAF assessment. In addition, the Court noted that Plaintiff conceded that "his cardiac condition, standing alone, is not disabling" and found that "Dr. Gershengorn's records and opinions do not provide sufficient, objective medical evidence to establish that Plaintiff is disabled under the plan." Id. Plaintiff still maintains that it is his cardiac condition together with anxiety that is disabling.

However, the additional evidence Plaintiff cites is not sufficient to establish that he is disabled under the plan. As the Court earlier found, the SSA's 1999 determination that Plaintiff was disabled weighs in Plaintiff's favor, but "does not create an irrebutable presumption of disability under the plan." Id. at 16. Moreover, there are no substantive findings by the SSA or indications of what evidence the SSA relied upon in making its decision; the Court cannot know if the SSA's decision relied in part on Dr. Karalis' opinions.

Similarly, the Court noted, "In the absence of any specific findings, direct observations or diagnoses to the contrary, it appears that Dr. Gershengorn's opinion regarding Plaintiff's non-exertional limitations is not based on objective evidence." Id. at 13. Indeed, as noted above, during the additional investigation Dr. Gershengorn conceded that "[i]t is somewhat difficult to objectively show medical evidence that his nonexertional

26

United States District Court
For the Northern District of California

limitations were precluding him from returning to any full-time work."  CF 325.  Moreover, Dr. Gershengorn agreed with Dr. Zwicke's position that "performing work in the light or sedentary category would pose no danger to [Mr. Cremin] from his cardiac status."  Id. at 72.  Although Dr. Gershengorn stated that "Mr. Cremin reported significant stress related symptoms," Dr. Gershengorn informed Dr. Zwicke that he "would be unable to comment on that aspect of his health care."  Id.

Finally, Plaintiff points to his July, 2002 participation in the "TAM Program."  Plaintiff does not provide any additional information about the TAM Program.  According to the program's website, TAM stands for Total Atherosclerosis Management.  See http://www.camsf.com/tam_overview.html.  The program is described as "a Lifestyle Management Program that follows a comprehensive, integrated and holistic approach to reducing risk factors contributing to coronary heart disease."  See id.

The only evidence in the record regarding the program is a report of Plaintiff's participation drafted by Sue Laliberte, the nurse coordinator for the program.  In that report, Ms. Laliberte states,

> Psychological screening pre-TAM suggested moderate depression and severe anxiety.  Post-TAM, Mike refused the screening tool as well as the hostility tool both pre- and post-TAM.  Mike currently sees a psychiatrist for talk therapy.  I have encouraged Mike to continue with mental health follow-up as stress and anxiety remain major issues for him.  In fact, obstacles to his cardiac recovery.

CD 239.  Although Plaintiff asserts that he was referred to the program "to treat his cardiac related anxiety," the report suggests

27

United States District Court
For the Northern District of California

that Plaintiff's focus while enrolled in the program was to lose weight, change his diet and quit smoking. Indeed, the report drafted by Ms. Laliberte cites numerous risk factors "including hyperlipidemia, sedentary lifestyle, stress and anxiety" and only notes that Plaintiff was already seeing a psychiatrist, presumably Dr. Karalis. CF 239. Nonetheless, the fact that Plaintiff exhibited "severe anxiety" on admission to the program provides some support for a finding of disability.

The only other evidence of anxiety Plaintiff provides is Dr. Morse's report. However, as discussed above, that report was not submitted until two months after Defendant decided to stand by its decision to deny benefits. Plaintiff asserts that Dr. Morse's report is responsive to Dr. Mirkin's October, 2006 memorandum to which Plaintiff did not have an opportunity to respond prior to Defendant's decision. Therefore, Plaintiff argues that Dr. Morse's report should be considered under Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863 (9th Cir. 2008).

In Saffon, the Ninth Circuit reiterated its holding in Abatie that a district court must consider material outside of the administrative record if it is responsive to a reason for denying benefits which the plaintiff did not have an opportunity to rebut. Id. at 872. However, as Plaintiff himself notes, Dr. Mirkin's report serves to undermine Dr. Karalis' opinion that Plaintiff is disabled due to anxiety. This is not a new opinion. Indeed, Plaintiff was well aware that one of the reasons that the case was remanded was for Dr. Mirkin to clarify his already existing opinion. Plaintiff had ample opportunity to present any evidence

regarding his anxiety between March and October, 2006, when Defendant was conducting its additional inquiry. Moreover, Dr. Mirkin's report is no longer necessary to undermine Dr. Karalis' opinion because Plaintiff himself states that he no longer relies on that opinion. Therefore, the Court will not consider Plaintiff's late evidence.

Dr. Morse's report is also not entirely reliable. She based her findings, at least in part, on Dr. Karalis' opinions, <u>see</u> CF 24 (among the materials Dr. Morse relied upon were a telephone conversation with Dr. Karalis and a letter from Plaintiff's counsel to Dr. Karalis), and the testing conducted by Dr. Morse can only demonstrate Plaintiff's condition in 2006, at the time of the tests, not in 2002 at the time Defendant made its disability determination. Although Dr. Morse discusses Plaintiff's medical history in her report, that discussion contains numerous factual errors. For example, the report suggests that Plaintiff began to see Dr. Karalis immediately after his heart attack, rather than ten years later. CF 26.

The Court finds that Plaintiff has failed to establish that, in 2002, he was disabled under the terms of the plan. Moreover, the Court finds that neither Defendant's decision to deny benefits nor its later decision to stand by that determination was an abuse of discretion, even when examined with a moderate degree of skepticism.

Plaintiff argues that Defendant's reliance on Dr. Mirkin is an abuse of discretion because Dr. Mirkin did not review any records on which the SSA relied in reaching its disability determination or

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  Plaintiff's records from the TAM program.  Therefore, Plaintiff

2  argues that Dr. Mirkin's opinion "that the records did not show the

3  sort of more aggressive treatment that he would have expected for

4  the severe anxiety which was reported does not really mean very

5  much."  Reply at 9.  However, Plaintiff did not supply any of these

6  records.  Moreover, Plaintiff's suggestion that the TAM program

7  suffices as "intense therapy" is not well-taken.  There is no

8  evidence that the TAM program was a psychiatric therapy program nor

9  of how long Plaintiff participated in the program.  In addition,

10 Plaintiff refused the psychiatric screening at the end of the

11 program and, according to the records provided by Plaintiff, did

12 not follow the program's suggestion that he "continue with mental

13 health follow-up as stress and anxiety remain major issues for

14 him."  CF 239.

15                          CONCLUSION

16     For the foregoing reasons, the Court DENIES Plaintiff's motion

17 for judgment (Docket No. 42) and GRANTS Defendant's cross-motion,

18 (Docket No. 43).  The case will be closed, and the Clerk shall

19 enter judgment in Defendant's favor.  Each party shall bear its own

20 costs of the action.

21     IT IS SO ORDERED.

22

23 Dated: 7/1/08                 _____

24                               CLAUDIA WILKEN
                                 United States District Judge

30